## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re:<br><br>**THE COLONIAL BANCGROUP, INC.,**<br><br>Debtor. | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,**<br><br>Appellant,<br><br>v.<br><br>**THE COLONIAL BANCGROUP, INC., et al.,**<br><br>Appellees. | Case No. 2:10-cv-0877 (MHT)<br><br><u>**Bankruptcy Appeal**</u> |

## BRIEF OF APPELLANT FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK

Michael A. Fritz, Sr.
michael@fritzandhughes.com
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, AL 36117
(334) 215-4422

John J. Clarke, Jr.
Thomas R. Califano
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
(212) 335-4500
(212) 335-4501

Dated:  November 30, 2010

Attorneys for the
  Federal Deposit Insurance Corporation,
  as Receiver for Colonial Bank

**Table of Contents**

Page

TABLE OF AUTHORITIES ...................................................................................... iii

BASIS OF APPELLATE JURISDICTION ................................................................ 1

QUESTIONS PRESENTED AND STANDARD OF REVIEW ................................. 2

STATEMENT OF THE CASE ................................................................................... 3

    A.    Nature of the Appeal ............................................................. 3

    B.    Statement of Facts ................................................................. 5

        1.    The Debtor and Its Bank Subsidiary, Colonial Bank ................................ 5

        2.    The Debtor's Capital Maintenance Commitments .................................. 7

            a.    The Bank MOU ...................................................................... 8

            b.    The Debtor's 4(m) Agreement ...................................................... 9

            c.    The Debtor MOU .................................................................. 10

            d.    The Bank C&D Order ............................................................. 11

            e.    The Debtor's C&D Order ......................................................... 14

        3.    The Failure of Colonial Bank ................................................. 15

    C.    The Proceedings Below ........................................................ 16

    D.    The Opinions and Orders ...................................................... 18

    E.    This Appeal ..................................................................... 20

SUMMARY OF ARGUMENT ................................................................................ 20

ARGUMENT

I.    THE LOWER COURT MISAPPLIED SECTION 365(o) IN FINDING THERE WAS NO ENFORCEABLE CAPITAL MAINTENANCE COMMITMENT .............. 21

    A.    Section 365(o) Requires a Debtor to Immediately Cure Any Deficit Under Its Capital Maintenance Commitments as a Condition to Chapter 11 Protection ..................................................................... 21

    B.    The Bankruptcy Court Erred in Concluding That the Debtor Had Made No Capital Maintenance Commitment ................................................. 23

    C.    The Bankruptcy Court Erred in Holding That Section 365(o) Ceases to Apply Upon the Regulatory Closure of an Insured Depository Institution ......... 31

    D.    The Bankruptcy Court Erroneously Construed Material Facts Against the FDIC-Receiver While Purporting to Grant Summary Judgment ...................... 34

        1.    The "Ordinary Meaning" of the Relevant Promises .............................. 35

        2.    The Debtor's Public Statements Admitting its Commitments ................. 38

i

Page

      3.    Other Disputed Evidence of the Parties' Intent Precludes an Award of Summary Judgment for the Debtor ...................................................... 40

  E.    The Bankruptcy Court Erred in Holding That the Federal Reserve Is Not a "Federal Depository Institutions Regulatory Agency" ........................................ 42

II.    THE LOWER COURT ABUSED ITS DISCRETION BY RECEIVING EVIDENCE FROM THE DEBTOR'S PUTATIVE EXPERT WITNESS ................... 46

III.   THE BANKRUPTCY COURT'S DENIAL OF THE FDIC-RECEIVER'S MOTION FOR STAY RELIEF ALSO MUST BE REVERSED ................................. 47

CONCLUSION.................................................................................................... 48

## Table of Authorities

Page

### Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...........................................................................................35, 41

*Andreni & Co. v. Pony Express Delivery Servs. (In re Pony Express Delivery Servs., Inc.),* 440 F.3d 1296 (11th Cir. 2006).............................................................35

*Barclays-Am. Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.),*
871 F.2d 1023 (11th Cir.), *cert. denied*, 493 U.S. 853 (1989)...................................2

*Catlin v. United States,*
324 U.S. 229 (1945)...........................................................................................1

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)...........................................................................................34

*Charter Co. v. Prudential Ins. Co. (In re The Charter Co.),*
778 F.2d 617 (11th Cir. 1985) ...........................................................................1

*Connecticut Nat'l Bank v. Germain,*
503 U.S. 249 (1990)...........................................................................................34

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida,*
402 F.3d 1092 (11th Cir. 2005) ...........................................................................3

*Enron Corp. v. New Power Co. (In New Power Co.),*
438 F.3d 1113 (11th Cir. 2006) .......................................................................2, 3

*Equitable Life Assurance Soc'y v. Sublett (In re Sublett),*
895 F.2d 1381 (11th Cir. 1990) ...........................................................................2

*Franklin Savs. Corp. v. O.T.S. (In re Franklin Savs. Corp.),*
303 B.R. 488 (D. Kan. 2004)..............................................................................31

*Gordon v. Terrace Mortg. Co. (In re Kim),*
571 F.3d 1342 (11th Cir. 2009) .........................................................................35

*Gray v. Manklow (In re Optical Technologies, Inc.),*
246 F.3d 1332 (11th Cir. 2001) .......................................................................3, 35

Page

*In re FirstCorp, Inc.,* 126 B.R. 688 (Bankr. E.D.N.Y. 1991),
   *rev'd*, No. 91-473-CIV-5-BR, 1991 WL 355141 (E.D.N.C. Nov. 7, 1991),
   *aff'd*, 973 F.2d 243 (4th Cir. 1992) ...................................................................26

*In re Mirant Corp.,*
   378 F.3d 511 (5th Cir. 2004) ......................................................................22

*In re Overland Park Fin. Corp.,*
   217 B.R. 879 (Bankr. D. Kan. 1998), *rev'd* 232 B.R. 215 (D. Kan. 1999),
   *aff'd*, 236 F.3d 1246 (10th Cir. 2001) .........................................................24, 25

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) ...................................................................................3

*MCorp Fin. Corp. v. Board of Governors of the Federal Reserve,*
   900 F.2d 852 (5th Cir. 1990), *rev'd*, 502 U.S. 32 (1991) ...........................37

*Mize v. Jefferson City Board of Educ.,*
   93 F.3d 739 (11th Cir. 1996) ..................................................................35, 41

*Nat'l City Bank of Ky. v. Toffel (In re Alabama Land & Mineral Corp.),*
   292 F.3d 1319 (11th Cir. 2002) ...............................................................35

*O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.),*
   232 B.R. 215 (D. Kan. 1999) ..............................................................2, 24, 25

*O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.),*
   236 F.3d 1246 (10th Cir. 2001) ...................................................... *passim*

*Resolution Trust Corp. v. FirstCorp, Inc. (In re FirstCorp, Inc.),*
   973 F.2d 243 (4th Cir. 1992) ........................................................... *passim*

*U.S. v. Spellissy,*
   374 Fed. Appx. 898 (11th Cir. 2010) ......................................................46

*Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.),*
   527 F.3d 959 (9th Cir. 2008) .................................................................22, 31, 34

Page

### Statutes, Regulations and Rules

11 U.S.C. § 101(21B) ...................................................................................43, 44

11 U.S.C. § 362(d) ...............................................................................1, 2, 20, 47

11 U.S.C. § 365(o) ........................................................................................ *passim*

11 U.S.C. § 507(a)(9) ....................................................................................4, 22

11 U.S.C. § 542(b) ..............................................................................................17

11 U.S.C. § 1107(a) ..............................................................................................7

11 U.S.C. § 1108 ...................................................................................................7

12 U.S.C. 1813(q) ......................................................................................43, 44, 45

12 U.S.C. § 1821(d)(2)(A) ....................................................................................6

12 U.S.C. § 1821(d)(11)(A) ................................................................................33

12 U.S.C. § 1821(g) ............................................................................................33

28 U.S.C. § 158(a)(1) ............................................................................................1

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 ......................................46

Crime Control Act of 1990, Pub. L. 101-647, 104 Stat. 4789  ....................................................45

12 C.F.R. § 225.83(c)(1) ......................................................................................36

12 C.F.R. § 325.2 ............................................................................................9, 13

Fed. R. Bankr. P. 7056.........................................................................................35

Fed. R. Bankr. P. 9014........................................................................................35

<u>Page</u>

Fed. R. Civ. P. 56...................................................................................34, 35

Fed. R. Evid. 103(a) ......................................................................................2

Fed. R. Evid. 602 ........................................................................................46

<u>Other Authorities</u>

Black's Law Dictionary 248 (5th ed. 1979).................................................26

Charles A. Wright, *et al*, 16 Fed. Prac. & Proc. § 3926.2.............................1

FDIC Notice of Adoption of Policy Statement, Uniform Financial Institution Rating
   System, 62 Fed. Reg. 752 (Jan. 6, 1997) ................................................8

H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990)............................21

Webster's Ninth New Collegiate Dictionary (1983) ....................................28

This appeal is taken from three orders of the United States Bankruptcy Court for the Middle District of Alabama (Williams, J.), entered on August 31, 2010 and an amendment to one of those orders that was entered on September 1, 2010.  In the contested matter below, appellant Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), filed motions seeking relief under sections 362(d) and 365(o) of the Bankruptcy Code, 11 U.S.C. §§ 362(d), 365(o).  In the rulings at issue, the bankruptcy court granted motions for summary judgment that the debtor The Colonial BancGroup, Inc. (the "Debtor") filed against the FDIC-Receiver's two motions and denied a motion to exclude the opinion and testimony of a purported expert witness offered by the Debtor in connection with the motions.

## BASIS OF APPELLATE JURISDICTION

The orders at issue are final orders that are appealable as of right pursuant to 28 U.S.C. § 158(a)(1).  Under that section, the district courts "shall have jurisdiction to hear appeals . . . from final judgments, orders and decrees" of bankruptcy courts.  *Id.*  While a final decision generally is "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *Catlin v. United States*, 324 U.S. 229, 233 (1945), in bankruptcy the concept of finality is applied more flexibly:  "it is generally the particular adversary proceeding *or controversy* that must have been finally resolved, rather than the entire bankruptcy litigation." *Charter Co. v. Prudential Ins. Co. (In re The Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (emphasis added) (collecting citations); *see* Charles A. Wright, *et al*, 16 Fed. Prac. & Proc. § 3926.2 ("Virtually all decisions agree that the concept of finality applied to appeals in bankruptcy is broader and more flexible than the concept applied in ordinary civil litigation.").

In this instance, the bankruptcy court has finally determined the FDIC-Receiver's motion for relief under section 365(o) of the Bankruptcy Code by granting the Debtor's motion for summary judgment against it.  Bankruptcy court orders denying relief under section 365(o) are

considered final for purposes of appellate jurisdiction.  *See, e.g., O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 232 B.R. 215, 216 (D. Kan. 1999), *aff'd*, 236 F.2d 1246 (10th Cir. 2001).  The bankruptcy court also granted the Debtor's motion for summary judgment against the FDIC-Receiver's motion for relief from the automatic stay under 11 U.S.C. § 362(d) (solely to the extent the FDIC-Receiver's motion was predicated on the FDIC-Receiver's capital maintenance claim).  In the Eleventh Circuit, orders granting or denying motions for relief from the automatic stay are also considered final.  *See Barclays-Am. Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.)*, 871 F.2d 1023, 1026 (11th Cir.), *cert. denied*, 493 U.S. 853 (1989).[1]

In addition, the bankruptcy court order denying the FDIC-Receiver's motion *in limine* to exclude the opinion and testimony of the Debtor's proposed expert witness in connection with the court's consideration of the FDIC-Receiver's motions is appealable in connection with this appeal from the bankruptcy court's final order granting summary judgment against the FDIC-Receiver.  *See* Fed. R. Evid. 103(a).

## QUESTIONS PRESENTED AND STANDARD OF REVIEW

1.  Did the lower court commit legal error in holding that each of three promises at issue made by the debtor holding company to federal bank regulators to maintain the capital of Colonial Bank was not a "commitment . . . to maintain the capital of an insured depository institution" within the meaning of 11 U.S.C. § 365(o)?  This question is subject to *de novo* review.[2]

---

[1] By stipulation, all of the FDIC-Receiver's rights were reserved to assert setoff based on any claim other than those arising under 11 U.S.C. §§ 365(o) or 507(a)(9).  *See* D.I. 633, ¶ 8.  Citations to "D.I. ____" refer to filings on the bankruptcy court docket in the Debtor's chapter 11 bankruptcy case, *In re The Colonial BancGroup, Inc.*, No. 09-32303 (DHW) (Bankr. M.D. Ala.).  A copy of the docket as of November 29, 2010 is included within the Appendix.

[2] On appeal from orders of the bankruptcy courts, district courts and the courts of appeal review legal conclusions *de novo* and the bankruptcy court's findings of fact for clear error.  *See Enron Corp. v. New Power Co. (In New Power Co.)*, 438 F.3d 1113, 1117 (11th Cir. 2006); *Equitable Life Assurance Soc'y v. Sublett (In re Sublett)*, 895 F.2d 1381, 1383-84 (11th Cir.

2.   Did the lower court commit legal error in holding that 11 U.S.C. § 365(o) is inapplicable because Colonial Bank was not an operating bank on the date of the Debtor's bankruptcy petition?  This question is subject to *de novo* review.

3.   Did the lower court commit legal error in holding that neither the Board of Governors of the Federal Reserve System nor the Federal Reserve Bank of Atlanta was a "Federal depository institutions regulatory agency" within the meaning of 11 U.S.C. § 365(o)?  This question is subject to *de novo* review.

4.   Did the lower court commit legal error in granting summary judgment for the Debtor and against the FDIC-Receiver while construing disputed aspects of the factual record against the FDIC-Receiver?  This question is subject to *de novo* review.[3]

5.   Did the lower court commit legal error in denying the FDIC-Receiver's motion for relief from the automatic stay arising under 11 U.S.C. § 362 based on its conclusion that the FDIC-Receiver had no claim to set off arising under 11 U.S.C. §§ 365(o) or 507(a)(9)?  This question is subject to *de novo* review.

6.   Did the lower court abuse its discretion in considering the opinion of the Debtor's proposed expert witness Herbert A. Biern after holding that Mr. Biern was not a competent expert witness and where it was undisputed that Mr. Biern had no personal knowledge of the facts at issue?  This question is subject to review for an abuse of discretion.[4]

## STATEMENT OF THE CASE

### A.   Nature of the Appeal

Section 365(o) of the Bankruptcy Code provides that a chapter 11 debtor-in-possession

"shall be deemed to have assumed . . . and shall immediately cure any deficit under, any

commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain

the capital of an insured depository institution . . ."  11 U.S.C. § 365(o).  The provision "places

---

1990).  The *de novo* standard of review applies whether this ruling reflected legal error as to the scope of 11 U.S.C. § 365(o) or a mixed question of law and fact.  *New Power*, 438 F.3d at 1117 (*de novo* standard of review applies to mixed questions of law and fact).

[3] *See Gray v. Manklow (In re Optical Technologies, Inc.)*, 246 F.3d 1332, 1334-35 (11th Cir. 2001) ("Our law is also clear that an appellate court reviews the bankruptcy court's grant of summary judgment *de novo*.") (collecting citations).

[4] *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 113-14 (11th Cir. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999)).

the financial interest of the federal deposit insurance system ahead of that of the holding company and its creditors."  *Resolution Trust Corp. v. FirstCorp, Inc. (In re FirstCorp. Inc.)*, 973 F.2d 243, 248 (4th Cir. 1992).  It does this by requiring a bankrupt holding company to "immediately cure" any deficit that exists under any prepetition capital maintenance commitment as a "prerequisite to reorganization under [c]hapter 11."  *Id.* at 247 (quoting 11 U.S.C. § 365(o)). If the holding company is unwilling or unable to effect such a cure "immediately," then reorganization under chapter 11 is not available, the holding company may not be a debtor-in-possession and the case must be converted to a chapter 7 liquidation.  In addition, any claim for such an uncured deficit is entitled to priority over general unsecured claims under section 507(a)(9) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 365(o), 507(a)(9).

    In the proceedings below, the FDIC-Receiver moved pursuant to section 365(o) to enforce several capital maintenance commitments that had been made by the Debtor to its federal regulators, the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") and its Reserve Bank, the Federal Reserve Bank of Atlanta.  A 52-65.[5]  In addition, the FDIC-Receiver sought relief from the automatic stay arising under 11 U.S.C. § 362(a), to the extent applicable, to exercise setoff rights against the balances in certain demand deposit account balances that had been maintained by the Debtor with its bank subsidiary, Colonial Bank, based on the FDIC-Receiver's claim for the substantial uncured deficit arising under the Debtor's capital maintenance obligations.  A 66-93.

_____

    [5] Citations to "A ____" refer to pages within the FDIC-Receiver's Appendix on Appeal dated November 30, 2010.  A redacted version of the Appendix is being filed with this brief that omits two documents that were filed by the FDIC-Receiver under seal in the bankruptcy court proceedings in compliance with a stipulated protective order entered in those proceedings.  The FDIC-Receiver is filing a separate motion to file the complete Appendix under seal in this Court in connection with this appeal.

The Debtor filed putative motions for summary judgment with respect to both of the FDIC-Receiver's motions.  [D.I. 697, 698].[6]  The Official Committee of Unsecured Creditors of Colonial BancGroup, Inc. (the "Committee") filed objections to the two FDIC-Receiver motions.  [D.I. 694, 701].  In addition to a pre-hearing memorandum of law, the FDIC-Receiver responded to these filings with a statement of facts that was supported by substantial evidentiary material demonstrating its entitlement to relief.  *See* A 94-135.  On May 26, 2010, the bankruptcy court held an evidentiary hearing with respect to the motions.  Although witnesses were available to testify, the bankruptcy court did not hear any testimony and instead limited the hearing to argument as to whether there were any disputed issues of material fact that prevented the court from granting summary judgment for the Debtor, a question that already had been resolved definitively in the negative by the FDIC-Receiver's extensive evidentiary submissions.

On August 31, 2010, the bankruptcy court entered an order granting the Debtor's motions for summary judgment against both of the FDIC-Receiver's motions.  A 44.  The reasons for the bankruptcy court's decision were set forth in a separate memorandum opinion issued on August 31, 2010 and amended on September 1, 2010.  A 1-43; *see also* D.I. 863.  Also on August 31, 2010, the bankruptcy court entered an order denying the FDIC-Receiver's motion *in limine* to exclude the opinion and testimony of the Debtor's proposed expert Herbert A. Biern, with the proviso that Mr. Biern's testimony would only be received by the bankruptcy court "regarding issues of fact."  A 45-46.  Mr. Biern had admitted that he had no personal knowledge of the facts at issue.  *See infra* at 46-47.

The FDIC-Receiver timely filed a notice of appeal from these rulings.  A 49-51.  This is the FDIC-Receiver's opening brief on appeal.

---

[6] The Debtor's separately filed objections to the two motions merely incorporated by reference its arguments in support of its motions for summary judgment.  [D.I. 695, 696]

**B.      Statement of Facts**

**1.      The Debtor and Its Bank Subsidiary, Colonial Bank**

The Debtor is a Delaware corporation with its principal place of business in Montgomery, Alabama.  It was organized in 1974 as a bank holding company and later elected to become a financial holding company.  As such, the Debtor was subject to regulation by the Federal Reserve Board and the Federal Reserve Bank of Atlanta.  Beginning in June 2008, when Colonial Bank converted to an Alabama state charter, the Debtor also was subject to regulation by the Alabama State Banking Department (the "ASBD").

Before its bankruptcy petition "[t]he principal activity of the Debtor [was] to supervise and coordinate the business of its subsidiaries and to provide them with capital and services." A 181.  Colonial Bank, also based in Montgomery, Alabama, was the Debtor's principal operating subsidiary and the source of substantially all of its income (in the form of dividends). *Id.*  In its Form 10-K filed in March 2009, the Debtor reported that Colonial Bank accounted for "approximately 99.3% of BancGroup's consolidated assets." *Id.*

By order of the ASBD dated August 14, 2009, Colonial Bank was closed and the FDIC-Receiver was appointed as its receiver.  A 108.  Upon its appointment, the FDIC-Receiver succeeded by operation of law to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution."  12 U.S.C. § 1821(d)(2)(A).  As of the closing date, the FDIC-Receiver, together with the FDIC in its corporate capacity, entered into a Purchase and Assumption Agreement dated August 14, 2009 (the "P&A Agreement") with Branch Banking & Trust Company ("BB&T"), under which BB&T purchased certain assets and assumed certain liabilities of Colonial Bank from the FDIC-Receiver.

In a press release announcing the closing, the FDIC estimated that the loss to its Deposit Insurance Fund arising from the resolution of Colonial Bank would be approximately $2.8 billion. *See* A 109. As of March 2010, the amount of that estimated loss had been revised upward to $3.8 billion. *Id.*

On August 25, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief in the bankruptcy court under chapter 11 of the Bankruptcy Code. The Debtor continues as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code but currently has no business operations or reasonable prospects of generating future revenue or reorganizing.

### 2.    The Debtor's Capital Maintenance Commitments

Before the failure of Colonial Bank, the Debtor made three separate written commitments to its federal regulators to maintain the capital of its bank subsidiary. These commitments were reflected in three different agreements with the Federal Reserve Board and the Federal Reserve Bank of Atlanta: (1) an Agreement Under the Bank Holding Company Act, dated January 6, 2009, between The Colonial BancGroup, Inc. and the Federal Reserve Bank of Atlanta (the "4(m) Agreement"), A 143-144; (2) a Memorandum of Understanding By and Among The Colonial BancGroup, Inc, the Federal Reserve Bank of Atlanta and the Alabama State Banking Department, dated January 21, 2009 (the "Debtor MOU"), A 145-148; and (3) a Cease and Desist Order Issued Upon Consent by the Federal Reserve Board and the Alabama State Banking Department dated July 22, 2009 (the "Debtor C&D Order"), A 170-178.

In each of these three instruments, the Debtor committed to "tak[e] steps designed to ensure," to "utilize its financial and managerial resources to assist," and to "take appropriate steps to ensure" that Colonial Bank met its own written obligations to regulators to increase the Bank's Tier 1 leverage capital ratio to no less than 8.0% and to increase its total risk-based capital ratio to no less than 12%.

Neither Colonial Bank nor the Debtor lived up to these obligations, which they knowingly agreed to in order to stave off more drastic regulatory actions and preserve the hope that Colonial Bank could avert failure. Instead, Colonial Bank's capital ratios declined precipitously throughout 2009, ultimately providing insufficient protection from failure when it was revealed that the Debtor was the target of a federal criminal investigation. By the time of Colonial Bank's failure, there was a deficit of more than $900 million under the Debtor's commitments to maintain the capital of its bank subsidiary, which under section 365(o) the Debtor was required to cure as a condition to obtaining relief under chapter 11 of the Bankruptcy Code.

### a.      The Bank MOU

On June 10, 2008, Colonial Bank converted from a national bank to an Alabama state-chartered, non-member bank while in the midst of a review by its former federal regulator, the Office of the Comptroller of the Currency. A 113-114. As a result of this charter conversion, Colonial Bank's chartering authority and its principal regulator became the ASBD and its principal federal regulator became the FDIC.

Those regulators quickly identified supervisory concerns and the need for corrective action. In a letter dated October 9, 2008, the FDIC and ASBD notified Colonial Bank's board of directors that they were downgrading the Bank's composite CAMELS rating due to declining trends in asset quality and the results of targeted reviews since the charter conversion.[7] A 114-115.

---

[7] "CAMELS" is an acronym used to refer to ratings provided under the interagency Uniform Financial Institutions Ratings System. The components of such a composite rating are capital, asset quality, management, earnings, liquidity and sensitivity to market risk. *See* FDIC Notice of Adoption of Policy Statement, Uniform Financial Institution Rating System, 62 Fed. Reg. 752 (Jan. 6, 1997). CAMELS ratings are provided on a scale from "1" to "5," under which

Following this downgrade, at a meeting of Colonial Bank's board of directors on December 15, 2008, Colonial Bank entered into a Memorandum of Understanding with its regulators – the FDIC and the ABSD (the "Bank MOU").  The Bank MOU included a number of provisions aimed at restoring Colonial Bank to a satisfactory condition and addressing conditions "which, if not corrected, could worsen into a more severe situation."  A 136.  Among other provisions, the Bank MOU expressly required Colonial Bank to restore its capital to specified levels.  Under the heading "CAPITAL," it included the following requirements:

> 14.    By February 28, 2009, the Bank shall have a Tier 1 Leverage Capital Ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent.  The Tier 1 Leverage and Total Risk-Based Capital ratios shall be calculated utilizing the definitions contained in Section 325.2 of the FDIC Rules and Regulations.  Thereafter, in the event that the Tier 1 Leverage Capital ratio falls below 8 percent or the Total Risk Based Capital ratio falls below 12 percent, the Supervisory Authorities should be notified and capital shall be increased in an amount sufficient to meet the ratios required by this provision within 30 days.

A 139 (emphasis in original).  At the time, the capital ratios for Colonial Bank were lower than these required levels: as of December 31, 2008, the Bank's Tier 1 leverage capital ratio was 6.03% and its total risk based capital ratio was 11.37%.  A. 116.

### b.    The Debtor's 4(m) Agreement

Within weeks of the FDIC's notice to Colonial Bank that it was lowering the Bank's composite rating, the Federal Reserve Board issued its own regulatory notice to the Debtor holding company.  In a letter dated November 7, 2008, the Federal Reserve Board informed the Debtor's board of directors that due to the Bank's ratings downgrade, the Debtor was not in compliance with requirements of the Bank Holding Company Act and the Federal Reserve

---

institutions rated "1" are "sound in every respect," while institutions rated "5" "pose a significant risk to the deposit insurance fund and failure is highly probable."  *Id.*, 62 Fed. Reg. at 753-54.

Board's Regulation Y, which among other things require holding companies to maintain their depository institution subsidiaries "in a well-capitalized and well-managed condition." A 117.

In response, on January 6, 2009, Robert E. Lowder, who was the Debtor's chairman and chief executive at the time, executed the 4(m) Agreement. A 142-144. The agreement recites that it was "entered into pursuant to section 4(m)(2) of the BHC Act and section 225.83 of Regulation Y, and is enforceable under the BHC Act and section 8 of the FDI Act." A 144. Among other provisions, the 4(m) Agreement included the following paragraph:

> 2.     By May 11, 2009 (or such additional time as the Board of Governors may permit), [the Debtor] shall address the factors resulting in the less than satisfactory CAMELS composite and management component ratings assigned to the Bank by the FDIC and the SBD by taking steps designed to ensure that the Bank complies with the Memorandum of Understanding between the Bank and the FDIC, dated December 15, 2008, and any other supervisory action regarding the Bank taken by the FDIC and SBD during the term of this agreement.

A 143 (emphasis added). As already discussed, an important provision of the Bank MOU was that Colonial Bank would cause its Tier 1 leverage capital ratio to be raised to 8% and its total risk-based capital ratio to be raised to 12% by no later than February 28, 2009.

The Debtor later requested the Federal Reserve Bank of Atlanta to grant it an extension of the May 11, 2009 deadline, but no such extension was ever granted. A 118. Nor was the 4(m) Agreement ever terminated. *Id.* The 4(m) Agreement, including its provision requiring the Debtor to ensure that the Bank's capital pledge was satisfied, remained in full force and effect as of the Petition Date.

### c.     The Debtor MOU

The 4(m) Agreement was not the only action that the Debtor's regulators took in response to the Colonial Bank rating downgrade. In a separate Memorandum of Understanding dated January 21, 2009, the Debtor agreed with the Federal Reserve Bank of Atlanta to a "program of

corrective action" that included the following provision, listed first among the document's six "operative" paragraphs:

> 1.   Colonial [BancGroup, Inc.] <u>will utilize its financial and managerial resources</u> to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and <u>achieving/maintaining compliance</u> with its December 15, 2008 Memorandum of Understanding with the Federal Deposit Insurance Corporation's Atlanta Regional Office (FDIC) and the State of Alabama Banking Department.

A 145-148 (emphasis added).  At a meeting of the Debtor's board to discuss the Debtor MOU, a representative of the Federal Reserve Bank of Atlanta "emphasized that the focus of the [Debtor's] Memorandum of Understanding was the health *of the Bank.*"  A 118 (emphasis added).

Consistent with the holding company's agreements with its regulators to "tak[e] steps designed to ensure that the Bank complies with" its MOU,  *see* 4(m) Agreement, ¶ 2, and to "utilize its financial [] resources to assist [Colonial Bank] in . . . achieving/maintaining compliance" with the Bank MOU, *see* Debtor MOU, ¶ 1, the Debtor contributed a total of $142 million of capital to Colonial Bank during the first half of 2009.  A 123.

### d.    The Bank C&D Order

In late February 2009, Colonial Bank's regulators agreed to a one-month extension of the February 28, 2009 deadline for the Bank to reach compliance with its capital commitments.  As the deadline neared to meet the capital ratios required under the various regulatory agreements, the Debtor, its management and its board of directors engaged in strenuous efforts to reach an agreement with a third party for an equity investment to satisfy regulatory requirements.

Ultimately, on March 31, 2009, the Debtor announced that it had signed a definitive agreement for a transaction under which a large customer of Colonial Bank, Taylor, Bean & Whitaker Mortgage Corporation ("<u>TBW</u>"), would lead a $300 million private equity investment

in the Debtor that was intended to satisfy a condition established by the United States Department of the Treasury to provide additional funding to the Bank under the Troubled Assets Relief Program ("TARP").  *See* A. 125.  Entering into a definitive agreement that would result in the infusion of outside capital if due diligence was successfully completed was not the same as raising the capital of Colonial Bank to the required ratios, and the Debtor acknowledged to regulators after March 31, 2009 that Colonial Bank was not in compliance with the capital requirements of the Bank MOU.  *See* A 126.

Nevertheless, the regulators permitted the Debtor and Colonial Bank some latitude under the capital provision while due diligence was proceeding.  When the due diligence deadline arrived on April 30, 2009, however, the Debtor and TBW amended their definitive agreement to provide for an even longer due diligence period.  Soon after this development, on May 13, 2009, the FDIC and the ASBD notified Colonial Bank that formal enforcement action would now be required given the Bank's failure to meet its obligations.  A 126.

On May 27, 2009, the boards of the Debtor and Colonial Bank held a special joint meeting that also was attended by representatives from the FDIC, the ASBD and the Federal Reserve Bank of Atlanta.  During that meeting, Timothy D. Rich, the FDIC's examiner in charge, reviewed the principal issues identified in a recently completed examination of Colonial Bank, noting among other things that "two key targets of the MOU remained unresolved:  an increase in capital and a reduction in classified assets."  A 127.

Other representatives from the FDIC's Atlanta regional office then reviewed with the directors the provisions of a cease and desist order that the FDIC and the ASBD intended to issue in response to the recent developments.  A 127.  The minutes reflect that particular attention was paid to the capital requirements that would be included in that order, which carried forward the

capital ratios that Colonial Bank had agreed, but failed, to achieve in the Bank MOU.  The regulators explained that the need to meet these requirements would be "absolute," and that "the bank cannot remain independent if it cannot achieve the capital ratios set forth in the proposed Order," A 127.  The minutes also reflect that Mr. Casebolt from the Federal Reserve Bank of Atlanta informed the Debtor's directors that the Federal Reserve would be initiating its own formal enforcement action as to the holding company.  A 127-128.

On June 3, 2009, the members of Colonial Bank's board of directors each signed a stipulation and consent to the issuance of a cease and desist order by the FDIC and the ASBD.  A 128.  Soon thereafter, in a letter dated June 5, 2009, the FDIC and the ASBD informed Colonial Bank's board of directors that the Bank MOU was "being discontinued and replaced by a new action in the form of a Cease and Desist Order."  *Id.*

The Bank's regulators issued their stipulated cease and desist order on June 15, 2009 (the "Bank C&D Order").  A 149-169.  Consistent with the Bank MOU, the Bank C&D Order included the following requirements with respect to the capital ratios of Colonial Bank:

### 3.     CAPITAL

(a)     By September 30, 2009, the Bank shall have a Tier 1 Leverage Capital Ratio of not less than 8 percent and a Total Risk Based Capital Ratio of not less than 12 percent.  The Tier 1 Leverage and Total Risk Based Capital ratios shall be calculated using the definitions contained in Section 325.2 of the FDIC's Rules and Regulations, 12 C.F.R. § 325.2.  Thereafter, in the event the Tier 1 Leverage Capital Ratio falls below 8 percent or the Total Risk-Based Capital Ratio falls below 12 percent, the Supervisory Authorities should be notified in writing and capital shall be increased in an amount sufficient to meet the ratios required by this provision within 30 days.

Bank C&D Order, § 3(a) (emphasis added).

e.        **The Debtor's C&D Order**

On July 15, 2009, another special joint meeting of the boards of the Debtor and its subsidiary Colonial Bank was convened to discuss the cease and desist order that would be entered by the Federal Reserve Board against the Debtor.  At the meeting, Federal Reserve official Kurt Casebolt explained that "upon its effective date, the Order takes the place of the Memorandum of Understanding previously served on the holding company . . ."  A 129.

On July 15, 2009, Simuel Sippial, Jr., the recently named chairman of the Debtor's board of directors, signed a consent cease and desist order on behalf of the Debtor with the Federal Reserve Board and the ASBD (the "Debtor C&D Order").  *See* A 170-178.  The Debtor C&D Order recited that Mr. Sippial was entering into the consent order "on behalf of BancGroup, and consenting to compliance with each and every provision of this Order by BancGroup and its institution-affiliated parties . . ."  *Id.* at 170.

Among other provisions, the Debtor C&D Order included the following paragraph:

> **Source of Strength**
>
> 1.        The board of directors of BancGroup shall take appropriate steps <u>to ensure that the Bank complies</u> with the Order to Cease and Desist entered into with the Federal Deposit Insurance Corporation (the "FDIC") and the Superintendent effective as of June 15, 2009, and any other supervisory action taken by the Bank's federal or state regulators.

A 171 (emphasis added).  This provision interacted with the provisions of the Bank C&D Order in the same way that the equivalent provisions of the Debtor MOU and the 4(m) Agreement had interacted with the provisions of the Bank MOU, including in particular the provisions requiring Colonial Bank's capital ratios to be raised to required levels

In a press release announcing the order on July 27, 2009, the Debtor told investors that in the Debtor C&D Order, "[s]imilar to the regulatory order issued to Colonial Bank by the FDIC and the State, BancGroup agreed to take certain actions intended to address various issues that

have impacted the Company's financial condition and performance," including "issues of capital, liquidity and allowance for loan losses." A 197.

Four days later, in a press release announcing its financial results for the second quarter of 2009, the Debtor provided the following "Regulatory Update":

> Colonial is operating under C&D orders with the Federal Reserve, FDIC and State of Alabama <u>which require that Colonial Bank maintain certain capital levels.</u> As of June 30, 2009, Colonial Bank was not in compliance with the capital requirements for the Tier 1 Leverage Ratio and Total Risk-Based Capital Ratio. . . .

A 204 (emphasis added). Internally, the Debtor informed employees that the Debtor C&D Order was a "formalization of the earlier requirements of the Memorandum of Understanding," and that among the unfinished requirements of the Debtor C&D Order was the need to "[i]ncrease capital." A 130.

### 3.    The Failure of Colonial Bank

On July 31, 2009, the Debtor announced that its agreement with TBW and other investors for a $300 million private equity investment in the holding company had been terminated by mutual agreement. A 130-131. Three days later, on August 3, 2009, federal agents working with the Treasury Department's special inspector general for TARP executed a search warrant at Colonial Bank's mortgage warehouse lending division in Orlando, Florida. A 131. On August 7, 2009, the Debtor filed a Form 8-K that disclosed that it was the target of a federal criminal investigation. A 220.

On August 11, 2009, the Debtor filed a notice with the SEC that it would be late in filing its Form 10-Q for the second quarter, reporting that "as a result of uncertainties associated with BancGroup's ability *to increase its capital levels to meet regulatory requirements*, management has concluded that there is substantial doubt about its ability to continue as a going concern."

A 223-224 (emphasis added).   On August 14, 2009, the ASBD closed Colonial Bank and appointed the FDIC-Receiver as its receiver.

Based on the June 30, 2009 Call Report data filed by Colonial Bank, the shortfall from the required levels of capital under the Debtor's capital maintenance commitment as of June 30, 2009 was $1,003,972,000.[8]   Colonial Bank never filed a Call Report for the next quarter end, on September 30, 2009.   However, based on statistics set forth in a daily report provided to the FDIC by Colonial Bank for August 11, 2009, three days before the Bank was closed, the amount of the shortfall from the required Tier 1 Leverage Capital level, and therefore the amount of the Debtor's deficit under its capital maintenance commitment, was $904,954,360.   A 133-134.   This was also the amount of the deficit under that commitment as of the Debtor's petition date on August 25, 2009.

### C.      The Proceedings Below

On September 18, 2009, the Debtor filed an emergency motion to use cash collateral in which, on essentially three days' notice, it sought an order directing the immediate turnover of the balances held in certain deposit accounts which the Debtor alleged to be approximately $38 million.  [D.I. 87].  The FDIC-Receiver objected to the Debtor's "emergency" cash collateral motion on numerous grounds, including that the FDIC-Receiver had interests in the alleged balances that prevented turnover under section 542(b) of the Bankruptcy Code.

On October 5, 2009, the FDIC-Receiver filed its original motion for relief from the automatic stay, in which the FDIC-Receiver requested relief, to the extent the automatic stay applied, to take the steps necessary to exercise its setoff rights with respect to the alleged account

---

[8] The shortfall is readily calculable from statistics provided in Colonial Bank's Uniform Bank Performance Report, which is a publicly available financial report of statistics and data included in Colonial Bank's quarterly Call Reports.  A 133.

balances as to which the Debtor had sought a "cash collateral order." [D.I. 156] Among other claims giving rise to setoff, the FDIC-Receiver identified an uncured capital maintenance commitment owed by the Debtor under section 365(o) of the Bankruptcy Code. Thereafter, on November 5, 2009, the FDIC-Receiver filed its motion to enforce the Debtor's capital maintenance commitment under section 365(o) of the Bankruptcy Code or convert the Debtor's bankruptcy case to a chapter 7 liquidation. [D.I. 257].[9]

On April 26, 2010, the Debtor filed motions for summary judgment with respect to both of the FDIC-Receiver's motions. [D.I. 697, 698] The Debtor also filed objections to those motions that merely incorporated by reference its summary judgment arguments. [D.I. 695, 696] The Committee also objected to both motions. [D.I. 694, 701]

On May 17, 2010, the FDIC-Receiver filed its consolidated pre-hearing memorandum in response to the objections and the Debtor's motions for summary judgment. In addition, the FDIC-Receiver filed a statement of facts supported by a 1064-page appendix of evidentiary materials. [D.I. 715] In addition, on May 24, 2010, the FDIC-Receiver filed a motion *in limine* to exclude the testimony and opinion of Herbert A. Biern, a putative expert witness who had been proposed by the Debtor. [D.I. 733]

The bankruptcy court held a hearing on the FDIC-Receiver's motions on May 26, 2010. The FDIC-Receiver informed the court that it was prepared to put on testimony in support of its

---

[9] On January 22, 2010, the FDIC-Receiver filed an amended motion for an order modifying the automatic stay. [D.I. 499] In the amended stay relief motion, the FDIC-Receiver identified a number of claims other than its claim for the substantial deficiency arising under the Debtor's capital maintenance commitment which also could be setoff against the account balances. In a subsequent stipulation, the Debtor, the Committee and the FDIC-Receiver agreed that setoff arguments relating to claims other than those arising from the Debtor's capital maintenance commitments would not be addressed in connection with the two pending motions and that all rights would be reserved with respect to such claims and arguments. [D.I. 633]

motions, but the bankruptcy court limited the hearing to argument as to whether it should grant summary judgment as to the motions.

### D.    The Opinions and Orders

On August 31, 2010, the bankruptcy court issued an order granting the Debtor's motions for summary judgment with respect to both the FDIC-Receiver's motion for relief under section 365(o) of the Bankruptcy Code and its motion for relief from the automatic stay to permit setoff based on deficiency claims arising thereunder.   A 44.   The court also issued a memorandum opinion setting forth the reasons for that order, an order denying the FDIC-Receiver's motion *in limine* to exclude the testimony and opinion of Mr. Biern, A 45-46, and an order overruling the hearsay objection raised by the Debtor and the Committee regarding statements made by assistant vice president Maria Smith of the Federal Reserve Bank of Atlanta, A 47-48.   On September 1, 2010, the bankruptcy court issued an amended memorandum opinion that corrected certain typographical errors that had been made in its original memorandum opinion.   A 1-43.

In its memorandum opinion, after reciting the standards for summary judgment, the bankruptcy court purported to "ascertain the true intent of the parties" to the instruments at issue by examining their plain language, which the bankruptcy court found to be unambiguous.   A 31-32.   According to the bankruptcy court's analysis, "[t]he documents do not require the Debtor to comply on behalf of the Bank or impose liability on the Debtor in the event the Bank fails to reach the required capital ratios.   In other words, the language in the documents does not make the Debtor either primarily or secondarily liable for the Bank's obligations."   A 28.   In addition, according to the bankruptcy court, "the documents contained no language of guarantee."   A 32. Instead, the bankruptcy court found, the Debtor's three pledges merely "required the Debtor to 'assist' the Bank in reaching the target capital ratios," A 31, an obligation that the court concluded could not be enforced under section 365(o), A 32.

The bankruptcy court also concluded that there was no need to consider extrinsic evidence to reach its conclusion but that if it were to do so it would find that "the parties did not intend to create a commitment in the Debtor to maintain the capital of the Bank within the meaning of 11 U.S.C. § 365(o)."  A 32.  Even while it purported to grant summary judgment for the Debtor, the bankruptcy court made numerous factual findings against the FDIC-Receiver in reaching this conclusion.

In addition, the bankruptcy court held that section 365(o) "embraces only enforceable commitments," A 37-38, and in the court's view of the evidence, none of the three instruments at issue was enforceable, A 38-41.  In reaching this conclusion, the bankruptcy court held that section 365(o) ceased to apply once an insured depository institution had been closed by its regulators.  A 40-41.  The court made no effort to reconcile this conclusion with several decisions that had enforced commitments under section 365(o) even after a debtor's bank subsidiary had been closed.  Finally, the bankruptcy court concluded that in the circumstances presented neither the Federal Reserve Board nor the Federal Reserve Bank of Atlanta was a "Federal depository institutions regulatory agency" within the meaning of section 365(o).  A 35-37.

Because the bankruptcy court concluded that the FDIC-Receiver had no claim arising under section 365(o), the bankruptcy court also denied the FDIC-Receiver's motion under section 362(d) of the Bankruptcy Code for relief from the automatic stay in order to exercise setoff rights with respect to such a claim.  A 42-43.  The bankruptcy court did not reach the other arguments that had been advanced by the Debtor and the Committee in opposition to that separate motion.

**E.     This Appeal**

On September 13, 2010, the FDIC-Receiver filed a timely notice of appeal from the memorandum opinion, the amended memorandum opinion, the order granting summary judgment for the Debtor and the order denying the FDIC-Receiver's motion *in limine*.  A 49-51.  No party filed a cross-appeal.  The appeal was docketed in this Court on October 21, 2010.

## <u>SUMMARY OF ARGUMENT</u>

The bankruptcy court's grant of summary judgment against the FDIC-Receiver's motion for relief under sections 365(o) and 362(d) of the Bankruptcy Court was erroneous and should be reversed.  The lower court misapplied section 365(o) in several respects, overlooked substantial appellate authority regarding the scope of that provision and erroneously resolved numerous disputed issues of fact against the FDIC-Receiver even while purporting to grant summary judgment in favor of the Debtor, all of which constitute reversible error.  Because the bankruptcy court erred in denying the FDIC-Receiver any claim based on the Debtor's capital maintenance commitments, the court also committed error in denying the FDIC-Receiver's motion for relief from the automatic stay to exercise setoff rights based on that claim.  The rulings of the bankruptcy court should be reversed and this matter should be remanded for further proceedings.

## ARGUMENT

I.   **THE LOWER COURT MISAPPLIED SECTION 365(o) IN FINDING THERE WAS NO ENFORCEABLE CAPITAL MAINTENANCE COMMITMENT**

   A.   **Section 365(o) Requires a Debtor to Immediately Cure Any Deficit Under Its Capital Maintenance Commitments as a Condition to Chapter 11 Protection**

Section 365(o) of the Bankruptcy Code provides that "[i]n a case under chapter 11 of this title, the trustee shall be deemed to have assumed . . . and shall immediately cure any deficit under any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution."  11 U.S.C. § 365(o).[10]  The section was enacted "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990).

"[T]he meaning and function of § 365(o) is plain from its language:  in every Chapter 11 case, the trustee – or, as here, the debtor-in-possession – 'shall be deemed to have assumed' any capital maintenance commitment made by the debtor, and if a deficit under such a commitment arises, he 'shall immediately cure [it]'."  *R.T.C. v. FirstCorp, Inc. (In re FirstCorp., Inc.)*, 973 F.2d 243, 247 (4th Cir. 1992).  As Judge Wilkinson, writing for the Fourth Circuit, explained:

> If the holding company is not financially able to satisfy its capital maintenance obligations, then § 365(o) denies it the opportunity to reorganize, leaving liquidation under Chapter 7 as its only option.

---

[10] In its entirety, section 365(o) provides:

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507.  This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365(o).

> Through this mechanism, § 365(o) places the financial interest of the federal deposit insurance system ahead of that of the holding company and its creditors.

*Id.* at 248 (emphasis added); *see also Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 973 (9th Cir. 2008) ("assumption and cure" mechanism of section 365(o) "has been interpreted to require a trustee to immediately pay any deficit to a federal depository institution as a condition of remaining in Chapter 11"); *O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1253 (10th Cir. 2001) (same).

The "assumption and immediate cure" obligations arising under section 365(o) "occur by operation of law, without review by or approval of the bankruptcy court." *FirstCorp.*, 973 F.2d at 247; *see also In re Mirant Corp.*, 378 F.3d 511, 521 (5th Cir. 2004) (noting that section 365(o) requires a debtor "to assume 'any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution'."). If the holding company is unwilling or unable to effect such a cure "immediately," then reorganization under chapter 11 is not available, the holding company may not be a debtor-in-possession and the case must be converted to a chapter 7 liquidation. In addition, any claim for such an uncured deficit is entitled to priority over general unsecured claims under section 507(a)(9) of the Bankruptcy Code. *See* 11 U.S.C. §§ 365(o), 507(a)(9).

The Debtor's bondholders and other creditors knew that the Debtor was a bank holding company, and they understood that the risks they were assuming in purchasing the Debtor's bonds or otherwise extending it credit included the risk that in the event of a bank failure or holding company bankruptcy, their claims against the Debtor might be subordinated to claims arising under a capital maintenance commitment. Indeed, the Debtor expressly warned these creditors, in repeated disclosures in its Form 10-K annual reports, that:

> In the event of a bank holding company's bankruptcy, <u>any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment</u>.

A 182 (emphasis added).

### B.    The Bankruptcy Court Erred in Concluding That the Debtor Had Made No Capital Maintenance Commitment

Prior to its failure, Colonial Bank was a federally insured depository institution.  Twice, it promised its regulators that it would raise its Tier 1 leverage capital ratio to 8% and its total risk-based capital ratio to 12%.  The Debtor was the holding company for Colonial Bank.  <u>Three separate times</u>, the Debtor promised its own regulators that it would "tak[e] steps designed to ensure," that it would "utilize its financial and managerial resources to assist," and that it would "take steps designed to ensure" that Colonial Bank complied with the Bank's promises to its regulators, including by meeting those capital requirements.

There is no dispute that Colonial Bank failed to raise its capital to the required ratios.  To the contrary, its Tier 1 leverage capital ratio steadily declined from the date of the Bank's memorandum of understanding in December 2008 until the Bank's closing on August 14, 2008.  The Debtor's failure to raise Colonial Bank's capital to appropriate levels when it promised regulators it would do so made it impossible to save the Bank.  The result was the closing of Colonial Bank and an estimated loss to the FDIC's Deposit Insurance Fund of $3.8 billion, one of the costliest bank failures in United States history.

In granting summary judgment for the Debtor, the bankruptcy court erroneously concluded that the unambiguous language of the 4(m) Agreement, the Debtor MOU and the Debtor C&D did not include commitments to maintain the capital of Colonial Bank within the meaning of section 365(o).  A 31-32.  Instead, the lower court held, the relevant provisions of

those instruments merely required "that the Debtor 'assist the Bank in reaching target capital levels.'"  A 28.

The bankruptcy court's analysis ignores persuasive, and unanimous, appellate authority holding that section 365(o) must be construed broadly, rather than technically, in order to serve the statute's purpose to protect the FDIC's Deposit Insurance Fund.  Contrary to the bankruptcy court's conclusion, section 365(o) itself, and the case law applying it, compel the conclusion that the Debtor's pledges to regulators here are "capital maintenance commitments" within the meaning of that section.

The history of similar litigation relating to a commitment made by another bankrupt holding company is especially instructive.  In 1998, a bankruptcy court in Kansas rejected a capital maintenance claim under section 365(o) for many of the same reasons cited by the bankruptcy court here.  *See In re Overland Park Fin. Corp.*, 217 B.R. 879 (Bankr. D. Kan. 1998), *rev'd sub nom. O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)* 232 B.R. 215 (D. Kan. 1999), *aff'd*, 236 F.3d 1246 (10th Cir. 2001).  The bankruptcy judge in *Overland* concluded that the "informal net worth stipulation" at issue did not constitute a "capital maintenance commitment" because it was "open-ended," *id.* at 885, because it did not recite that it was an "agreement" and was not "enforceable administratively by a cease-and-desist order," and because, in other contexts, informal stipulations such as the one before the court were "not enforceable contracts; they [were] merely part of the process" inherent in being a regulated holding company, *id.* at 886.  Accordingly, the bankruptcy court in *Overland Park* denied the section 365(o) motion.

On appeal, the district court reversed the bankruptcy court, and that decision later was affirmed by the Tenth Circuit.  *See O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin.*

*Corp.*), 232 B.R. 215 (D. Kan. 1999), *aff'd*, 236 F.3d 1246 (10th Cir. 2001).  The appellate courts in *Overland* did not just reverse the bankruptcy court, however, they also resoundingly rejected the reasons advanced by the bankruptcy court for its decision, which bear striking similarities to the reasoning of the bankruptcy court in its opinion below in this case.

First, the district court found on appeal, there is no requirement that a "capital maintenance commitment" under section 365(o) take the form of an "executory contract" or, for that matter, even an "enforceable" one, expressly rejecting the conclusion that also was reached by the bankruptcy court here.  *Id.*. at 221-22.  To the contrary, "[s]ubsection (o) does not use the word 'executory,' nor does it even refer to a 'contract.  Had Congress intended subsection (o) to apply only in the case of executory contracts, surely it would have said so."  *Id.* at 222.  The bankruptcy court in this case made no effort to square its conclusion with this contrary authority.[11]

Second, subsection (o) also did not "use the word 'consideration' or refer to an 'enforceable' commitment.'"  *Id.* at 222.  As the district court in *Overland* explained, the term "commitment" was "commonly defined simply as an agreement or pledge to do something," *id.*, a conclusion that also had been reached by the Fourth Circuit in its earlier decision in *FirstCorp*, *see FirstCorp*, 973 F.2d at 249 n.5 ("the common definition of commitment is "[a]greement or pledge to do something, . . . which condition 5 . . . clearly is.") (citing Black's Law Dictionary 248 (5th ed. 1979)).  The *Overland* court therefore rejected the idea that section 365(o) required an enforceable contract, finding the lower court's reasoning to be unsupported by the authorities it had cited.

---

[11] Indeed, in granting summary judgment against the FDIC-Receiver here, the bankruptcy court erroneously applied legal principles that are applicable to contract disputes but have no application to a motion for enforcement of a capital maintenance commitment under section 365(o).  *See, e.g.,* A 26, 32.

Finally, the *Overland* district court reviewed the "detailed analysis" of section 365(o) that was provided by the Fourth Circuit in the *FirstCorp* decision and found it to be persuasive.[12]  *Id.* at 226-27.  The district court reversed the bankruptcy court's decision and ordered that the holding company's bankruptcy case be converted to a liquidation under chapter 7 unless the debtor "fulfilled its obligation under its stipulation."  *Id.* at 228.  The Tenth Circuit affirmed, substantially adopting the reasoning of the district court's decision.  *See O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d  1246, 1251-53 (10th Cir. 2001).  The court of appeals considered and rejected the debtor holding company's argument that a capital maintenance commitment must take the form of an executory contract and disagreed with the debtor's "strained reading of the statute and its attempt to re-characterize the stipulation as a 'mere acknowledgement.'"  *Id.* at 1252.

For the same reason that the "informal stipulation" in *Overland* was not a "mere acknowledgement," each of the Debtor's three pledges to its federal regulators here is not a meaningless recitation of the "source of strength doctrine," as the bankruptcy court erroneously concluded.  To the contrary, each of the Debtor's promises plainly constitutes a "commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution" within the meaning of section 365(o).  In the Bank MOU signed on December 15, 2008 and the subsequent Bank C&D Order agreed to on June 15, 2009, Colonial Bank pledged to raise its capital to specified ratios.  In its 4(m) Agreement, the Debtor MOU and the Debtor C&D Order, the Debtor holding company promised to "ensure" or

---

[12] As in *Overland*, the court of appeals in *FirstCorp* was considering appeals that began when a bankruptcy court had denied a motion to enforce a capital maintenance commitment that had been made by a debtor holding company.  *See In re FirstCorp, Inc.*, 126 B.R. 688 (Bankr. E.D.N.Y. 1991), *rev'd*, No. 91-473-CIV-5-BR, 1991 WL 355141 (E.D.N.C. Nov. 7, 1991), *aff'd*, 973 F.2d 243 (4th Cir. 1992).

"achieve/maintain" compliance with the required capital ratios, not just to "assist" the Bank in

meeting them, as the bankruptcy court also erroneously found.

In the 4(m) Agreement, the Debtor promised its federal regulators that:

> "[b]y May 11, 2009 (or such additional time as the Board of Governors may permit), [the Debtor] <u>shall address</u> the factors resulting in the less than satisfactory CAMELS composite and management component ratings assigned to the Bank . . . by <u>taking steps designed to ensure that the Bank complies with the Memorandum of Understanding</u> between the Bank and the FDIC, dated December 15, 2008, <u>and any other supervisory action regarding the Bank taken by the FDIC and SBD during the term of this agreement</u>."

A 143 (emphasis added).

There is nothing at all tentative in this promise by the Debtor to its federal regulators, nor

can the language be construed as being limited to merely "assisting" the Bank, as the bankruptcy

court held.  A 31.  Instead, the language includes the mandatory requirement that the Debtor

"shall address" the problems that led to the rating downgrade for Colonial Bank, including the

Bank's inadequate capital levels.[13]  Similarly, the Debtor agreed that it would "tak[e] steps

designed <u>to ensure</u>" that the Bank complied with its commitments to regulators, including the

promise to raise its capital ratios to required levels by specified dates.  "Ensure" means "to make

sure, certain, or safe: guarantee."  Webster's Ninth New Collegiate Dictionary (1983).

The bankruptcy court committed clear error when it held, purportedly based on the

"ordinary meaning" of the words of the 4(m) Agreement alone, that "the Debtor and the Federal

Reserve did not intend to create a commitment in the Debtor to maintain the capital of Colonial

Bank within the meaning of 11 U.S.C. § 365(o)."  A 31-32.  Further, the 4(m) Agreement

expressly recited that it was an "enforceable" written agreement within the meaning of federal

---

[13] As previously noted, "CAMELS" is an acronym for the six factors that comprise a bank's federal rating and "C" stands for "capital," the first of those six factors.  *See supra*, note 7.

banking law, A 144, and there is no dispute that the 4(m) Agreement never was terminated, *see* A 38.  The promises made by the Debtor in the 4(m) Agreement applied not only to the underlying commitments in the Bank MOU but also those set forth in the later Bank C&D Order, which was also a "supervisory action regarding the Bank taken by the FDIC and SBD during the term of this agreement."  For all of these reasons, the bankruptcy court's conclusion that the 4(m) Agreement was not enforceable as of the Petition Date was further error.

While neither instrument ever supplanted the 4(m) Agreement, the Debtor's commitments in the Debtor MOU and Debtor C&D Order were similar.  The Debtor MOU recited that it set forth "an agreement" for a "program of corrective action" that included the following provision, which was listed first among its six "operative" paragraphs:

> 1.   Colonial [BancGroup, Inc.] will <u>utilize its financial and managerial resources</u> to assist its subsidiary bank in addressing weaknesses identified by its primary banking supervisors and <u>achieving/maintaining compliance</u> with its December 15, 2008 Memorandum of Understanding with the Federal Deposit Insurance Corporation's Atlanta Regional Office (FDIC) and the State of Alabama Banking Department.

A 145 (emphasis added).  In contrast with the 4(m) Agreement, which expressly stated that it was "enforceable" under the Bank Holding Company Act and section 8 of the FDI Act, the Debtor MOU provided that it was "not a 'written agreement' for purposes of Section 8 of the Federal Deposit Insurance Act, as amended."  *Id.* at 2.  Nevertheless, *Overland* makes clear that a capital maintenance commitment may be informal and need not be "enforceable" in other contexts to be subject to enforcement under section 365(o).  *See Overland Park*, 236 F.3d at 1252 ("nowhere in 11 U.S.C. § 365(o) does Congress mention the commitment must be contractual, executory, formal, or post-1984.  Congress undisputedly knew how to include 'executory' or other limiting language, but Congress did not do so in § 365(o).").  Therefore, the holding company's commitment "to utilize its financial . . . resources" so that Colonial Bank

would "achieve" and "maintain" compliance with the capital requirements of the Bank MOU was a capital maintenance commitment within the meaning of section 365(o).

Similarly, the Debtor C&D Order – which was put into place as a formal enforcement action after the Debtor failed to live up to its commitments in the Debtor MOU – contained the following paragraph:

### Source of Strength

1.      The board of directors of BancGroup <u>shall take appropriate steps to ensure that the Bank complies</u> with the Order to Cease and Desist entered into with the Federal Deposit Insurance Corporation (the "FDIC") and the Superintendent effective as of June 15, 2009, and any other supervisory action taken by the Bank's federal or state regulators.

A 171 (emphasis added).   As was the case with paragraph 2 of the 4(m) Agreement, this provision of the Debtor C&D Order contains mandatory language requiring the Debtor to "ensure" that Colonial Bank met its capital requirements, and the provision plainly constitutes a "capital maintenance commitment" by the Debtor within the meaning of section 365(o).

The bankruptcy court purported to rely solely upon the "ordinary meaning" of the words of these documents in finding that the instruments merely "require the Debtor to assist the Bank in complying with the Bank MOU or the Bank C&D," A 28, 31-32, but the words themselves do not support this reading.  *Only* the Bank MOU contains the word "assist."  As with the 4(m) Agreement, the relevant provision of the Debtor C&D Order includes a mandatory provision – that the Debtor "*shall take appropriate steps to ensure* that the Bank complies" with its capital obligations.[14]  A 171 (emphasis added).

---

[14] The bankruptcy court suggested in a footnote that the debtor and Colonial Bank could meet the capital ratios at issue in the Bank C&D Order by "selling assets as well as by infusing capital," A 31, n.18, but the Order itself prohibits such a strategy unless approved in advance in writing by the FDIC and the ASBD.  *See* A 156 (Bank C&D Order, § 3(d)).

As in *Overland* Park, the language "is mandatory and evinces [the debtor holding company's] obligation to maintain and if necessary infuse, capital in order to ensure [its] compliance . . . ."  236 F.3d at 1252-53.  Nothing about the "ordinary meaning" of this language indicates a hollow promise that could not be enforced if the Debtor failed to live up to it.  Nothing in the language supports the bankruptcy court's conclusion that the Debtor's promise was only aspirational.  Nor does anything in the language itself support the conclusion that the provision merely recited a meaningless "source of strength" doctrine, as the bankruptcy court also held.  A 32-33.[15]

Finally, there is nothing in the language of section 365(o) that limits its application to "net worth maintenance stipulations" that have been provided in connection with a regulatory application or parent guarantees of capital restoration plans that have been submitted under the "prompt corrective action" regime of federal banking law.  *See* 11 U.S.C. § 365(o) (requiring assumption and immediate cure of any deficit under "any commitment by the debtor to a Federal depository institution regulatory agency").  Yet the bankruptcy court granted summary judgment for the Debtor and against the FDIC-Receiver because the commitments at issue in this case did not resemble those types of commitments, which had been enforced in other cases arising under section 365(o).  *See* A 28-31 (discussing *Imperial Credit*, 527 F.3d at 964; *Overland Park*, 236 F.3d at 1249; *FirstCorp*, 973 F.2d at 244; *Franklin Savs. Corp. v. O.T.S. (In re Franklin Savs. Corp.)*, 303 B.R. 488 (D. Kan. 2004)).

---

[15] To the contrary, the bankruptcy court appears to have reached its erroneous views about the meaning and efficacy of these provisions not based on the "ordinary meaning" of their language but instead by reference to disputed evidence, including the incompetent testimony of a witness with no personal knowledge of the facts at issue, a further reason for reversal that is discussed below.  *See* A 28 n.16 & 32-33.

30

The statute requires the assumption and immediate cure of the deficit arising "*any commitment*" to maintain capital, 11 U.S.C. § 365(o) (emphasis added), and both the Fourth and Tenth Circuits have rejected similar attempts to narrow the plain meaning of this language.  *See Overland Park*, 236 F.3d at 1252 (finding that "informal" net worth stipulation was a capital maintenance commitment); *FirstCorp*, 973 F.2d at 249-50 (rejecting holding company argument that FHLBB resolution did not include capital maintenance commitment within the meaning of section 365(o)).  The bankruptcy court's holding that the Debtor's commitments here were not "capital maintenance commitments" under section 365(o) erroneously disregards the plain language of both the statute and the promises themselves.

### C.   The Bankruptcy Court Erred in Holding That Section 365(o) Ceases to Apply Upon the Regulatory Closure of an Insured Depository Institution

The bankruptcy court committed additional legal error when it held that the FDIC-Receiver could not enforce the Debtor's commitments here because Colonial Bank was no longer an operating institution.  A 40-41.  In the lower court's view, "[w]ith the closing and sale of the Bank, the purpose for the commitment could no longer be fulfilled, and performance under the commitment was impossible. . . .  It would also deprive a debtor of the opportunity to proceed under chapter 11 at a time when such payment could no longer serve its purpose of aiding an operating insured depository institution."  *Id.*

This precise reasoning was considered and rejected by the Fourth Circuit in *FirstCorp*. The bankruptcy court's holding also ignores several cases in which capital maintenance commitments were enforced against a debtor holding company even though its bank subsidiary was closed.  Section 365(o) was enforced in those cases because its purpose is to protect the FDIC's Deposit Insurance Fund from losses sustained when undercapitalized banks are closed,

not to "[aid] an operating insured depository institution," as the bankruptcy court mistakenly assumed in its opinion.

In *FirstCorp*, the debtor holding company argued that it should not be held liable under a pre-petition capital maintenance commitment because its bank subsidiary was in receivership. The Fourth Circuit observed that, as is also the case here, the bank was placed in receivership "precisely *because* [the holding company] failed to live up to its capital maintenance obligation. Thus, absolving FirstCorp of its liability under that obligation because [the bank] is now in receivership would reward the very conduct that made the receivership necessary and leave the federal deposit insurance system – and ultimately the federal taxpayers – to pick up the tab." *FirstCorp*, 973 F.2d at 248-49.  The appellate court explained further that the holding company's argument also misconstrued the function of capital:

> . . . capital does not serve to protect depositors; protection of depositors is the role of federal deposit insurance. . . .  Rather, capital functions <u>to maintain the viability of the federal deposit insurance system</u> by reducing the potential cost to that system of resolving failed depository institutions. It does this both by diminishing the risk that a depository institution will become insolvent and thus require a federal bailout <u>and by decreasing the cost to the insurance system if such a bailout becomes necessary</u>.  . . . Capital's role in reducing the cost to the federal deposit insurance system continues even after an institution has been placed in receivership:  capital represents a pool of resources used to pay off depositors if, because of loan defaults, deposits exceed an institution's assets.  In such circumstances, capital minimizes the cost of any federal bailout of the institution.

*Id.* at 249 (emphasis added, citations omitted).

This case involves precisely the type of deficit that was alluded to in *FirstCorp*, and that deficit is substantial.  The FDIC has estimated that the Colonial Bank receivership will cost the Deposit Insurance Fund approximately $3.8 billion, making the failure of Colonial Bank one of

the costliest bank failures in United States history.[16]   As the Debtor repeatedly warned its investors in its annual reports on Form 10-K, section 365(o) allocates the risk of such a loss to the holding company's investors, rather than to the deposit insurance system, by granting the FDIC-Receiver and other federal regulators the right to enforce a bankrupt holding company's capital maintenance commitments even after a failed bank has been closed.   *See* A 182 (disclosing that in the event of the Debtor's bankruptcy "any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment").

Enforcing the Debtor's capital maintenance commitments even after Colonial Bank was closed therefore will protect the FDIC's Deposit Insurance Fund in the manner that Congress intended.   Indeed, most of the cases addressing section 365(o) have involved commitments to maintain the capital of banks or thrifts that already were closed.   *See Imperial Credit*, 527 F.3d at 964 (bank closed on February 7, 2003, holding company filed chapter 11 petition on July 17, 2003); *Overland Park*, 236 F.3d 1249-50 (thrift placed in receivership in November 1992, holding company filed chapter 11 petition in July 1994); *see also FirstCorp*, 973 F.2d at 245-46 (holding company filed chapter 11 petition on December 5, 1990, thrift subsidiary closed on December 7, 1990, capital maintenance commitment enforced in appellate decision entered on August 10, 1992).

The bankruptcy court made no effort to explain the discrepancy between its reading of section 365(o) and these appellate decisions.   Nor is the bankruptcy court's reading of the statute

---

[16] Under applicable law, the FDIC is subrogated to claims of depositors for purposes of recovery in a failed bank receivership.  12 U.S.C. §§ 1821(g)(1), (2).  Depositor claims are granted a preference with respect to distributions from a failed bank receivership.  12 U.S.C. § 1821(d)(11)(A).  Thus, the FDIC's Deposit Insurance Fund holds a significant priority claim against any recovery obtained by the FDIC-Receiver in the Debtor's chapter 11 case.

required by the statutory language, as the lower court's opinion implies.  *See* A 40.  While section 365(o) provides for the possibility of a priority claim arising from a debtor's post-petition breach of a capital maintenance commitment that has been assumed, the plain language of the section does not preclude a claim to enforce section 365(o) when a debtor's bank subsidiary has been closed before the petition date.  The bankruptcy court's implicit amendment to the statute constitutes further reversible error.  *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1990) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'").

### D.     The Bankruptcy Court Erroneously Construed Material Facts Against the FDIC-Receiver While Purporting to Grant Summary Judgment

The standards governing motions for summary judgment in proceedings before the bankruptcy court are familiar.  Summary judgment is appropriate only when "there is no genuine issue as to any material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(c)(2).[17]  In deciding such a motion, the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "[A]ll inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party."  *Mize v. Jefferson City Board of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

While the bankruptcy court's opinion accurately recited these familiar standards, the court disregarded those standards in granting summary judgment in favor of the Debtor and against the FDIC-Receiver.  In numerous instances, the bankruptcy court resolved disputed

---

[17]  Federal Rule of Civil Procedure 56 is incorporated into the Bankruptcy Rules for adversary proceedings by Bankruptcy Rule 7056.  However, the motions at issue below were not adversary proceedings but rather "contested matters" governed by Bankruptcy Rule 9014, which in turn incorporates a number of procedural rules for such proceedings, including Bankruptcy Rule 7056.  *See* Fed. R. Bankr. P. 9014.

issues of material fact against the FDIC-Receiver and failed to view the evidence in the "light most favorable to the non-moving party."[18]   This was further error.   *See Gordon v. Terrace Mortg. Co. (In re Kim)*, 571 F.3d 1342, 1344 (11th Cir. 2009) (reversing bankruptcy court grant of summary judgment); *Nat'l City Bank of Ky. v. Toffel (In re Alabama Land & Mineral Corp.)*, 292 F.3d 1319, 1323 (11th Cir. 2002) (same).

### 1.   The "Ordinary Meaning" of the Relevant Promises

For the reasons discussed above, the bankruptcy court erred in construing the "ordinary meaning" of the Debtor's three capital maintenance commitments against the FDIC-Receiver in granting summary judgment for the Debtor.   The language of the promises themselves plainly reflects a commitment by the Debtor to maintain the capital of Colonial Bank within the meaning of section 365(o).   In ruling to the contrary, the bankruptcy court also improperly resolved disputed issues of fact against the FDIC-Receiver and, it appears, looked to disputed extrinsic evidence to reach its conclusions.

First, the bankruptcy court apparently held that the 4(m) Agreement was not enforceable as of the Debtor's petition date even while recognizing that (1) the agreement itself recites that it "is enforceable" and (2) there was "no evidence that the 4(m) Agreement was expressly terminated."   A 38.   These facts should have ended the inquiry, especially in considering a motion for summary judgment in which the FDIC-Receiver was entitled to every reasonable inference.   Instead, the bankruptcy court found that there was

> no evidence that the [Federal Reserve Bank of Atlanta] sought to enforce the agreement after the May 11, 2009 deadline, and the [Federal Reserve Bank of Atlanta] did not respond to the Debtor's request to extend that

---

[18] Similarly, on this appeal from an order granting summary judgment the appellate court must view all facts and evidence, and draw all reasonable inferences, in favor of the FDIC-Receiver.   *Andreni & Co. v. Pony Express Delivery Servs. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006); *In re Optical Techs*, 246 F.3d at 1334.

deadline.  Sarah Moore testified that the 4(m) Agreement is likely no
longer in effect because the Debtor ceased being a bank holding company
on August 14, 2009.

*Id.*  None of these purported facts alters the plain language of the agreement itself, which the

bankruptcy court purportedly relied upon in granting summary judgment for the Debtor.  Further,

Ms. Moore is not a lawyer, does not have the expertise to testify as to the legal effect of the

closing of Colonial Bank upon the continuing vitality of the 4(m) Agreement as a capital

maintenance commitment under section 365(o), and no party offered her opinion testimony on

this subject as either a lay witness or an expert.  Finally, to the extent the bankruptcy court

adopted the Committee's argument that the Debtor C&D Order "superseded" the 4(m)

Agreement, A 38, such a conclusion was without evidentiary support.

Second, the bankruptcy court recited an offer of proof made by the Debtor at the May 26,

2010 hearing to the effect that the 4(m) Agreement was not "duly authorized."  A 10.  It is

unclear whether the bankruptcy court credited this proffer in reaching its conclusions, but to the

extent it did so this was also erroneous.  There is no dispute that the 4(m) Agreement was

executed by the Debtor's chairman and chief executive officer as required by the regulations of

the Federal Reserve Board,[19] A 142-144, or that the Debtor disclosed the existence of the

agreement and its terms in its next Form 10-K filed in March 2009,[20] A 183.  In addition, the

record reflected evidence of the Debtor's substantial interactions with the Federal Reserve Bank

of Atlanta in its effort to comply with the 4(m) Agreement.  [D.I. 770, Moore Dep. at 50, 94.].

---

[19] Under Federal Reserve Board regulations, the Debtor was required to execute the 4(m)
Agreement no later than 45 days after it was notified that its subsidiary Colonial Bank was no
longer well-managed or well-capitalized.  *See* 12 C.F.R. § 225.83(c)(1).

[20] The Form 10-K erroneously described the 4(m) Agreement as an "informal
memorandum of understanding," but listed the correct date of the agreement, January 6, 2009.
A 183, A 185.

Thus, the substantial weight of the evidence establishes that the Debtor not only knew about the 4(m) Agreement but also considered itself bound by that agreement at all relevant times.

Third, even while purporting to construe the Debtor's promises in accordance with the "ordinary meaning" of the words themselves, the bankruptcy court adopted the Debtor's disputed assertion that the provisions at issue merely recited the Federal Reserve Board's "source of strength" doctrine for bank holding companies and "had very little effect."  A 27-28 & n.15-16.[21] To reach this conclusion, the court relied on testimony from the Debtor's proposed expert, Herbert A. Biern, who was a former employee of the Federal Reserve Board.  A 28, n.16, 32-33. However, the court expressly refused to accept Mr. Biern's opinions as an expert witness, A 45, and the court apparently failed to recognize Mr. Biern's admissions, during his deposition, that he had left his position with the Federal Reserve Board more than two years before the relevant events, had no personal knowledge of the regulatory instruments at issue, had no familiarity with any previous "4(m) agreement," and had no idea what was in the minds of the persons who prepared the documents at issue here.  *See infra* at 46-47.

Finally, nothing in the language of the documents at issue supports the bankruptcy court's conclusion that the Debtor's promises to its federal regulators "to ensure" that Colonial Bank satisfied its own regulatory commitments were legal nullities.   Drawing this unsupported conclusion against the FDIC-Receiver to grant summary judgment against it amounts to reversible error.

---

[21] The bankruptcy court cited for this proposition the decision in *MCorp Fin. Corp. v. Board of Governors of the Federal Reserve*, 900 F.2d 852, 863 (5th Cir. 1990), *rev'd*, 502 U.S. 32 (1991), *see* A 27 n.15, but in that case, unlike here, the debtor holding company had not made any promise in writing to maintain the capital of its bank subsidiaries and the only issue was whether the "source of strength" doctrine alone could be the basis for an enforcement action based on the holding company's refusal to capitalize its subsidiaries.  The decision sheds no light on the enforceability of the three promises at issue here as capital maintenance commitments within the meaning of section 365(o) of the Bankruptcy Code.

## 2.   The Debtor's Public Statements Admitting its Commitments

The bankruptcy court also erroneously found that "the Debtor did not state in any of its financial reports that it had made a commitment to maintain the capital of Colonial Bank."  A 35. The record established the opposite.

On March 2, 2009, the Debtor filed its annual report on Form 10-K for the year ended December 31, 2008.  In that filing, the Debtor disclosed in two separate places that "BancGroup entered into an informal Memorandum of Understanding with the Federal Reserve Bank of Atlanta on January 6, 2009, addressing among other items, management of asset quality and *increased capital for Colonial Bank*."  A 183, A 185 (emphasis added).[22]  The Form 10-K also explained that in its commitments to regulators, the Debtor "ha[d] agreed to use its resources to support Colonial Bank."   A 183; *see also id.* at A 184 (requirements placed on BancGroup included that "BancGroup's resources will be used to support the Bank"), A 185 ("BancGroup has agreed to use its resources to support Colonial Bank.").

In its Form 10-Q for the first quarter, filed on May 8, 2009, the Debtor similarly disclosed that "BancGroup entered into an informal Memorandum of Understanding with the Federal Reserve Bank of Atlanta on January 21, 2009, addressing, among other items, management of asset quality *and increased capital for Colonial Bank*."  A 190 (emphasis added). As it had in the Form 10-K, the Debtor explained that under its promises to federal regulators, "BancGroup's resources will be used to support the Bank," A 189 and that "BancGroup has agreed to use its resources to support Colonial Bank," A 190.

---

[22]  The disclosure was erroneous in stating that the Debtor MOU was dated January 6, 2009.  In fact, the 4(m) Agreement was dated January 6, 2009 and the Debtor MOU was dated January 21, 2009.  However, both instruments included commitments by the Debtor to increase the capital of Colonial Bank, as the Debtor acknowledged in the Form 10-K.

After the C&D Order had been issued, in a Form 8-K filed on July 27, 2009, the Debtor reported that it had consented to entry of the Debtor C&D Order and generally described the terms of that order.  The Debtor explained that:

> The [Debtor C&D] Order generally provides for the development and implementation of actions to ensure BancGroup's wholly owned subsidiary, Colonial Bank, complies with its Order to Cease and Desist entered into with the Federal Deposit Insurance Corporation (the "FDIC") and the Department effective June 15, 2009, and any other supervisory action taken by Colonial Bank's federal or state regulators.

A 192 (emphasis added).

A Form 10-Q was never filed for the second quarter due to the Debtor's worsening financial condition.  On August 11, 2009, the Debtor filed a Form 12b-25 disclosing that its Form 10-Q would not be filed by the regulatory deadline.  In that filing, the Debtor explained that "as a result of uncertainties associated with *BancGroup's ability to increase its capital levels to meet regulatory requirements*, management has concluded that there is substantial doubt about its ability to continue as a going concern."  A 224 (emphasis added).

All of these statements in the Debtor's public filings reflect a public recognition that the Debtor had made commitments to its federal regulators to maintain or increase the capital of its bank subsidiary, Colonial Bank.  *None* of these disclosures state that the Debtor had merely agreed "to assist" the Bank or had only agreed to "source of strength" provisions with no regulatory effect.  The bankruptcy court made no attempt to reconcile the Debtor's disclosures with the bankruptcy court's finding that the Debtor had never disclosed the existence of a capital maintenance commitment.  Nor can the content of the Debtor's disclosures be squared with the bankruptcy court's conclusion that the Debtor's filings were "consistent with the obligation that the Debtor undertook – to assist the Bank."  A 35.

### 3.   Other Disputed Evidence of the Parties' Intent Precludes an Award of Summary Judgment for the Debtor

The evidentiary record similarly contradicted the conclusions of the bankruptcy court that "the parties did not intend to create a commitment in the Debtor to maintain the capital of the Bank within the meaning of 11 U.S.C. § 365(o).  Nor did they understand that they had done so." A 32.

The first evidence cited by the bankruptcy court for this conclusion was testimony by the Debtor's proposed expert, Herbert A. Biern.  *See* A 32.  As discussed below, however, Mr. Biern had no basis to testify as to any party's intent in this matter; he had no personal knowledge of the agreements in question, [D.I. 770, Biern Dep. at 110:21-111:5], he admitted he did not know what was in the minds of the Federal Reserve in preparing the relevant documents, [D.I. 770, Biern Dep. at 129:5-7], and the bankruptcy court excluded his putative expert opinion as inadmissible, A 45.

The bankruptcy court next referred to testimony from Kurt Casebolt, a representative of the Federal Reserve Bank of Atlanta, who according to the court did not inform the Debtor's directors, and did not "understand," that the 4(m) Agreement, the Debtor MOU or the Debtor C&D Order obligated the Debtor "to pay the Bank's capital deficiency" or to guarantee its payment.  A 33.  In referring to this testimony, however, the bankruptcy court failed to mention Mr. Casebolt's testimony that his supervisor at the Federal Reserve, Maria Smith, had concluded during April 2009 that the Debtor was "not in compliance" with paragraph 1 of the Debtor MOU because the holding company had failed by that time to raise Colonial Bank's capital levels to the levels required under the Bank MOU.  [D.I. 770, Casebolt Dep. at 101:5-9, 214:16-215:7.] In a separate order entered on August 31, 2010, the bankruptcy court overruled the Debtor's hearsay objection to this testimony and, in doing so, discounted its importance.  A 47-48.  In

granting summary judgment, however, it is not a court's function to "weigh evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249. Rather, a court evaluating whether to grant summary judgment must limit itself to determining whether there exists a genuine issue of material fact that requires trial. In reaching that conclusion, the court is required to afford every reasonable inference to the non-moving party. *Mize,* 93 F.3d at 742. The difference of views within the Federal Reserve Bank of Atlanta concerning the meaning of the Debtor's capital maintenance commitments plainly represents the type of issue that a court cannot ignore in granting summary judgment.

Third, in granting summary judgment against the FDIC-Receiver, the bankruptcy court refused to credit the testimony of the FDIC's examiner in charge, Timothy D. Rich, regarding the meaning of the relevant agreements, finding that the testimony was "weak in several respects." A 33. Here again, the bankruptcy court improperly weighed evidence rather than assessing whether there was a triable issue of fact. As the FDIC's examiner in charge for Colonial Bank, Mr. Rich understood that the Debtor's promises amounted to commitments to ensure that the Bank's capital ratios would be raised to the required levels. A. 19-20, 33. Moreover, as a bank examiner with decades of experience, Mr. Rich's testimony was entitled to be viewed in the light most favorable to the FDIC-Receiver and with further deference than the bankruptcy court accorded it.

Finally, the bankruptcy court erroneously interpreted selective portions of Sarah Moore's deposition testimony, who the court believed had asserted that the Debtor's actions were motivated by its "obligation to its shareholders to protect the largest asset of the corporation." A 34. Not only does this represent another example of improper fact finding, but in addition, the court failed to address Ms. Moore's acknowledgement that she helped prepare an internal

memorandum to the Debtor's employees in which the Debtor explained that the Debtor C&D Order "imposes similar requirements and conditions set forth by bank's C&D [order] to include the holding company" and that among the unfinished requirements of the Debtor C&D Order was the need to "[i]ncrease capital."  A 130.  In her deposition, Ms. Moore confirmed her belief that these descriptions of the Debtor C&D Order were accurate.  [D.I. 770, Moore Dep. at 119.]

> ### E.   The Bankruptcy Court Erred in Holding That the Federal Reserve Is Not a "Federal Depository Institutions Regulatory Agency"

The bankruptcy court committed additional legal error by holding that neither the Federal Reserve Board nor the Federal Reserve Bank of Atlanta was a "Federal depository institutions regulatory agency" within the meaning of section 365(o).  *See* A 35-37; 11 U.S.C. § 365(o) (applying to commitments "by the debtor to a Federal depository institutions regulatory agency").  Based on its mistaken statutory construction, the bankruptcy court incorrectly held that section 365(o) could not be invoked to enforce commitments that are made to a federal regulator for a bank holding company but only to federal regulators for banks themselves.  Neither the language of the statute nor its legislative history supports such a conclusion.

Section 365(o) requires the assumption and immediate cure of any "commitment by the debtor *to a Federal depository institutions regulatory agency* (or predecessor to such agency) to maintain the capital of an insured depository institution . . . ."  11 U.S.C. § 365(o) (emphasis added).  As already mentioned, section 365(o) was enacted by Congress "to prevent institution-affiliated parties from using the bankruptcy code to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990).

There is nothing in the language of section 365(o) that limits the federal agency to which a capital maintenance commitment can be made only to the agency that directly regulates a bank

or thrift.  There is nothing in the language of that section that excludes from its scope pledges made to the federal regulator that is responsible for regulating a bank or thrift's holding company, which is the quintessential "institution-affiliated party" within the contemplation of Congress in enacting section 365(o).  Any such Bankruptcy Code limitation would conflict with federal banking law, under which both the Federal Reserve Board and its Reserve Banks are deemed to be the "appropriate Federal banking agency" for regulating bank holding companies such as the Debtor here.  *See* 12 U.S.C. § 1813(q)(2)(f).  It is therefore unsurprising that the Debtor's regulatory commitments in this case to maintain the capital of its subsidiary, Colonial Bank, were made to the Federal Reserve Board and the Federal Reserve Bank of Atlanta, rather than to the FDIC, which regulated the Bank but not its holding company.

The Bankruptcy Code expressly incorporates the definition of "appropriate Federal banking agency" from Federal banking law into its definition of "Federal depository institutions regulatory agency" in the case of "open" banks or thrifts and their institution-affiliated parties. *See* 11 U.S.C. § 101(21B).[23]  Under the Bankruptcy Code definitions, in instances in which the

---

[23] Section 101(21B) of the Bankruptcy Code provides:

(21B)   The term "Federal depository institutions regulatory agency" means –

(A)     with respect to an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act) for which no conservator or receiver has been appointed, the appropriate Federal banking agency (as defined in section 3(q) of such Act);

(B)     with respect to an insured credit union (including an insured credit union for which the National Credit Union Administration has been appointed conservator or liquidating agent), the National Credit Union Administration;

(C)     with respect to an insured depository institution for which the Resolution Trust Corporation has been appointed conservator or receiver, the Resolution Trust Corporation; and

(D)     with respect to any insured depository institution for which the Federal Deposit Insurance Corporation has been appointed conservator or receiver, the Federal Deposit Insurance Corporation.

FDIC has not been appointed the receiver or conservator of an insured bank or thrift, the definitions of Federal banking law apply not only to specify the regulator for the bank or thrift itself but also the regulator for its holding company.   *See* 11 U.S.C. § 101(21B)(A) (incorporating by reference definitions in 12 U.S.C. § 1813(q)).

The error in the bankruptcy court's analysis arises from its reliance on the phrase "with respect to an insured depository institution" contained in section 101(21B)(A) of the Bankruptcy Code and its conclusion, based on that phrase, that "the appropriate Federal banking agency" could only be an agency that directly regulates an insured depository institution.  From this error in reasoning, the bankruptcy court concluded that only commitments made to the FDIC, as a regulator for Colonial Bank, and not those made to the Federal Reserve as a regulator for the Debtor, could be enforced under section 365(o).

When the Bankruptcy Code definition is considered in its entirety, it is apparent that the phrase "with respect to an insured depository institution" that led to the lower court's error was included to modify the next phrase in the definition – "for which no conservator or receiver has been appointed."   Instead, the bankruptcy court erroneously read the introductory phrase to modify a term used later in the definition – "the appropriate Federal banking agency."  That term is elsewhere defined by federal statute without any such limitation, and it is clear from the statute that in the Bankruptcy Code definition of "Federal depository institutions regulatory agency" Congress sought to incorporate that statutory definition by reference.  *See* 11 U.S.C. § 101(21B); 12 U.S.C. § 1813(q).[24]  This is consistent with congressional intent in the enactment of section

---

11 U.S.C. § 101(21B) (emphasis added).

[24] Further, under the bankruptcy court's erroneous interpretation section 365(o) would primarily be available when a holding company and its depository institution had the same federal regulator, a status that is true for federally regulated *thrift* holding companies (which are regulated by the Office of Thrift Supervision) but not federally regulated *bank* holding

365(o) to prevent "institution-affiliated parties" from using chapter 11 to evade their capital maintenance commitments at the expense of the FDIC's Deposit Insurance Fund.  *See supra* at 21-23.

In this instance, the Debtor made its capital maintenance commitments *before* the Colonial Bank receivership.  As a result, the definitions set forth in section 3(q) of the Federal Deposit Insurance Act apply, meaning that the relevant "Federal depository institutions regulatory agency" for the purposes of section 365(o) of the Bankruptcy Code is the same as the "appropriate Federal banking agency" under federal banking law.  In the case of the Debtor holding company, that agency was the Federal Reserve Board (or its Reserve Banks exercising delegated authority).  *See* 12 U.S.C. § 1813(q)(2)(F).

The bankruptcy court's error is further illustrated by the wording of section 365(o) as it was originally enacted (before amendments in 1994).  It provided:

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System, or its predecessors or successors, to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

Crime Control Act of 1990, §2522(c), Pub. L. 101-647, 104 Stat. 4789 (Nov. 29, 1990) (emphasis added).  Under this original statutory language, there would be no doubt that the

---

companies.  There is nothing in the statute itself or its legislative history to suggest that Congress intended such disparate treatment for thrifts and banks.

Debtor's commitments in this case to the Federal Reserve Board and the Federal Reserve Bank of Atlanta constituted capital maintenance commitments that were subject to section 365(o).

In 1994, the language of section 365(o) was amended to replace the phrase "the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System" with the defined term "Federal depository institutions regulatory agency." *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 §§ 2123, (technical amendments). We have found no evidence in the legislative history of the 1994 amendments to suggest that Congress intended to alter the meaning of section 365(o) in any respect in making this technical amendment. The bankruptcy court made no attempt to reconcile its erroneous construction of the statute with this clear and compelling legislative history.

## II.   THE LOWER COURT ABUSED ITS DISCRETION BY RECEIVING EVIDENCE FROM THE DEBTOR'S PUTATIVE EXPERT WITNESS

The lower court properly excluded the opinion and testimony of the Debtor's proposed expert, Herbert A. Biern, as an expert in the contested matters below. A 45 ("any opinion by [Mr. Biern] on the legal issue of whether the debtor made a 'commitment' within the meaning of 11 U.S.C. § 365(o) shall not be considered by the court"). In the same order, however, the bankruptcy court erroneously denied the FDIC-Receiver's motion to exclude any testimony from Mr. Biern as a purported fact witness. *Id.*

Under Federal Rule of Evidence 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602; *see also U.S. v. Spellissy*, 374 Fed. App'x. 898, 900 (11th Cir. 2010). In his deposition in this case, however, Mr. Biern made admissions showing that he was not competent to provide any testimony as to factual matters. He admitted during that testimony

46

that: (1) he had no personal involvement in the supervision of the Debtor or Colonial Bank when he worked at the Federal Reserve Board, [D.I. 770, Biern Dep. at 110:21-111:5]; (2) he left the Federal Reserve Board more than two years before the Debtor entered into the 4(m) Agreement, the Debtor MOU, or the Debtor C&D Order, [D.I. 770, Biern Dep. at 232:22-23]; (3) he had no involvement in any of those agreements, [D.I. 770, Biern Dep. at 126:8-10]; (4) he never discussed the supervision of the Debtor or Colonial Bank with anyone at the Federal Reserve Board, the Federal Reserve Bank of Atlanta or the ASBD, [D.I. 770, Biern Dep. 111:6-112:6); and (5) he does not know what was in the minds of the Federal Reserve employees when they drafted the agreements at issue, [D.I. 770, Biern Dep. at 129:5-7].

Given Mr. Biern's lack of personal knowledge, and the bankruptcy court's ruling excluding his testimony as an expert, there was no legally permissible basis for the bankruptcy court to consider any evidence offered through Mr. Biern, yet the court relied on such evidence in rendering its opinion.  This abuse of the lower court's discretion also constitutes a basis for reversal.

## III.   THE BANKRUPTCY COURT'S DENIAL OF THE FDIC-RECEIVER'S MOTION FOR STAY RELIEF ALSO MUST BE REVERSED

The sole basis for the bankruptcy court's order granting summary judgment for the Debtor as to the FDIC-Receiver's motion under 11 U.S.C. § 362(d) for relief from the automatic stay to exercise setoff rights was its conclusion that the FDIC-Receiver did not have a claim arising under section 365(o) of the Bankruptcy Code that could be setoff against the Debtor's alleged deposit balances.  A 44.  Because that conclusion was erroneous for the reasons already discussed, the bankruptcy court's order on the stay relief motion also must be reversed.

## CONCLUSION

For all of the foregoing reasons, the rulings of the bankruptcy court should be reversed and these matters should be remanded to the bankruptcy court for further proceedings with respect to the FDIC-Receiver's motions.

Dated:  Montgomery, Alabama
        November 30, 2010

Respectfully submitted,

 /s/ Michael A. Fritz, Sr.
Michael A. Fritz, Sr.
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, Alabama  36117
(334) 215-4422

- and -

John J. Clarke, Jr.
Thomas R. Califano
Michael D. Hynes
Spencer Stiefel
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
212-335-4500
212-335-4501

Attorneys for the
Federal Deposit Insurance Corporation
as Receiver for Colonial Bank