UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| In re:<br><br><br>THE COLONIAL BANCGROUP, INC.,<br><br>       Debtor. | |
| FEDERAL DEPOSIT INSURANCE<br>CORPORATION, as Receiver for Colonial Bank,<br><br>       Appellant<br><br>       v.<br><br>THE COLONIAL BANCGROUP, INC.,<br>et al.,<br><br>       Appellees. | Case No.  2:10-CV-0877 (MHT)<br><br>**Bankruptcy Appeal** |

**BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
IN OPPOSITION TO THE APPEAL OF THE FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR COLONIAL BANK**

Robert B. Rubin
Marc P. Solomon
**BURR FORMAN LLP**
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone:  205-251-3000
Facsimile:  205-244-5733

*Attorneys for the Official Committee
of Unsecured Creditors*

Alan R. Glickman
Brian D. Pfeiffer
**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York  10022
Telephone:  212-756-2000
Facsimile:  212-593-5955

Dated:  January 5, 2011

## <u>TABLE OF CONTENTS</u>

<u>TABLE OF AUTHORITIES</u> ...........................................................................III

STATEMENT OF THE CASE...........................................................................1

   A.   Nature Of The Case ......................................................... 1

   B.   Statement Of Facts ........................................................ 4

   C.   The Proceedings Below ................................................. 7

   D.   The Disposition Of The FDIC's Motions ........................ 7

      1.   The Opinion On The Section 365(o) and Stay Relief Motions ...........8

         (a)   The Plain Language of the Supervisory Documents.....................8

         (b)   Extrinsic Evidence Regarding the Supervisory Documents ........ 10

         (c)   Additional Alternative Holdings .................................. 11

         (d)   Denial of the Stay Relief Motion ................................ 11

      2.   Denial of the FDIC's Motion *in Limine* ...........................11

ARGUMENT ....................................................................................12

I.   THE BANKRUPTCY COURT CORRECTLY HELD THAT THERE WAS NO CAPITAL MAINTENANCE COMMITMENT BASED ON THE PLAIN MEANING OF THE SUPERVISORY DOCUMENTS. ..................................................12

   A.   The Bankruptcy Court's Interpretation Of The Supervisory Documents ..................... 12

   B.   The Bankruptcy Court's Holding Is Consistent With Relevant Case Law. ................... 18

II.   EVEN IF THE DOCUMENTS ARE AMBIGUOUS, SUMMARY JUDGMENT WAS APPROPRIATE BASED ON THE UNDISPUTED EXTRINSIC EVIDENCE. ...........20

   A.   The Debtor's Central Point Of Contact At The Federal Reserve Did Not Believe The Regulatory Documents Were Capital Maintenance Commitments. ............................. 22

   B.   The Debtor Complied Fully With The Terms Of Its Supervisory Documents. ............. 24

   C.   None of the Debtor's Public Statements Reflects A Commitment To Maintain The Bank's Capital Levels. ............................................... 28

   D.   The Testimony of the Debtor's Expert Corroborates the Lack of a Capital Maintenance Commitment ...................................................... 29

      1.   Mr. Biern Testified that the Supervisory Documents Did Not Require the Debtor to Guarantee the Bank's Capital Levels. .................................30

      2.   The Bankruptcy Court Properly Considered Mr. Biern's Testimony. ................31

III.   THE BANKRUPTCY COURT CORRECTLY HELD THAT SECTION 365(O) DOES NOT APPLY BECAUSE THE SUPERVISORY DOCUMENTS WERE UNENFORCEABLE, TERMINATED OR OF NO EFFECT. ........................................34

   A.   The Debtor MOU Was Unenforceable And, In Any Event, Was Terminated.............. 34

i

        1.     The Debtor MOU Was Unenforceable and Therefore Cannot Be The Basis Of A Capital Maintenance Commitment Under Section 365(o). ..............................34

        2.     The Debtor MOU Was Terminated Before The Debtor Filed Its Bankruptcy Petition..............................................................................................39

    B.    The Debtor C&D And 4(m) Agreement Were Of No Effect At The Time The Debtor Filed Its Bankruptcy Petition. ........................................................... 40

IV.    THE BANKRUPTCY COURT PROPERLY CONCLUDED THAT SECTION 365(O) DOES NOT APPLY BECAUSE THE FEDERAL RESERVE WAS NOT THE "FEDERAL DEPOSITORY INSTITUTIONS REGULATORY AGENCY" IN THIS CASE. ..............................................................................................................44

V.    THE FDIC WOULD NOT HAVE STANDING TO ENFORCE ANY CAPITAL MAINTENANCE COMMITMENT OF THE DEBTOR...................................46

VI.    THE BANKRUPTCY COURT PROPERLY DENIED THE FDIC'S MOTION FOR STAY RELIEF UNDER SECTION 362(D). ..................................................48

CONCLUSION.......................................................................................................49

# TABLE OF AUTHORITIES

## CASES

*Am. Bankers Ins. Group v. United States*,
    408 F.3d 1328 (11th Cir. 2005)..................................................................46

*Bonner v. City of Pritchard*,
    661 F.2d 1206 (11th Cir. 1981)................................................................21

*Church of Scientology of Calif. v. Cazares*,
    638 F.2d 1272 (5th Cir. 1981)..................................................................27

*Cohen v. De La Cruz*,
    523 U.S. 213 (1998)................................................................................36

*Concrete Co. v. Lambert*,
    510 F. Supp. 2d 570 (M.D. Ala. 2007) ..................................................27

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*,
    402 F.3d 1092 (11th Cir. 2005)................................................................32

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)................................................................................33

*FDIC v. Butler (In re Connor Corp.)*,
    127 B.R. 775 (E.D.N.C. 1991)................................................................36

*Franklin Savings Corp. v. Office of Thrift Supervision*,
    303 B.R. 488 (D. Kan. 2004) ..............................................18, 37, 41, 42

*Gwaltney v. Russell*,
    984 So. 2d 1125 (Ala. 2007) ..................................................................12

*Harris v. Garner*,
    216 F.3d 970 (11th Cir. 2000)................................................................46

*Harrison v. Benchmark Elecs. Huntsville, Inc.*,
    593 F.3d 1206 (11th Cir. 2010)................................................................38

*Hicks v. Quaker Oats Co.*,
    662 F.2d 1158 (5th Cir. 1981)................................................................21

*Kaneb Servs., Inc. v. Fed. Sav. & Loan Ins. Corp.*,
    650 F.2d 78 (5th Cir. 1981)....................................................................37

*Lanting v. Lanting*,
  198 B.R. 817 (Bankr. N.D. Ala. 1996) .............................................................27

*MCorp Fin., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*,
  900 F.2d 852 (5th Cir. 1990), *rev'd on other grounds,* 502 U.S. 32 (1991) .......................16, 37

*Meyer v. Meyer*,
  952 So. 2d 384 (Ala. Civ. App. 2006) .............................................................12

*Mize v. Jefferson City Bd. Of Educ.*,
  93 F.3d 739 (11th Cir. 1996)..........................................................................27

*Neumont v. Florida*,
  610 F.3d 1249 (11th Cir. 2010)......................................................................47

*Nunez v. Superior Oil Co.*,
  572 F.2d 1119 (5th Cir. 1978).......................................................................27

*Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park)*,
  236 F.3d 1246 (10th Cir. 2001)..........................................................18, 37, 42, 43

*Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*,
  232 B.R. 215 (D. Kan. 1999) .....................................................................38, 48

*Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp, Inc.)*,
  973 F.2d 243 (4th Cir. 1992)....................................................................... *passim*

*Resolution Trust Corp. v. Tetco, Inc.*,
  758 F. Supp. 1159 (W.D. Tex. 1990), *vacated as moot* No. 91-5612, 1992 WL 437650
  (5th Cir. Apr. 22, 1992)................................................................................47

*Robbins v. Gould*,
  278 F.2d 116 (5th Cir. 1960).........................................................................27

*Smith v. Citicorp Person-to-Person Financial Centers, Inc.*,
  477 So. 2d 308 (Ala. 1985) ...........................................................................12

*State Nat'l Ins. Co. v. Lamberti*,
  No. 08-CV-60760, 2009 WL 764501 (S.D. Fla. Mar. 20, 2009)............................21

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004)......................................................................32

*United States v. Long*,
  300 F. App'x 804 (11th Cir.  2008) ................................................................33

*United States v. Silva*,
    443 F.3d 795 (11th Cir. 2006)..................................................................38

*Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*,
    527 F.3d 959 (9th Cir. 2008)............................................... *passim*

## STATUTES AND REGULATIONS

11 U.S.C. § 101 (2010) ............................................................ 37, 44-45

11 U.S.C. § 365(o) (2010) ..............................................................12

11 U.S.C. § 502(b)(1) (2010) ..........................................................36

11 U.S.C. § 507(a)(9) (2010) ...................................................... 35-36

12 U.S.C. § 1818 (2010) ............................................................16, 37

12 U.S.C. § 1831o (2010) ...........................................................20, 37

12 C.F.R. § 225.4(a)(1) (2010) ................................................... 15-16

## MISCELLANEOUS

H.R. Rep. No. 101-681(I) (1990) *as reprinted in* 1990 U.S.C.C.A.N. 6472, 6585 .....................35

The Official Committee of Unsecured Creditors (the "Committee") respectfully submits this memorandum in opposition to the appeal of the Federal Deposit Insurance Corporation (the "FDIC") from (i) an order of the United States Bankruptcy Court for the Middle District of Alabama entered on August 31, 2010, granting summary judgment in favor of The Colonial BancGroup, Inc. (the "Debtor") and dismissing motions of the FDIC under Sections 365(o) and 362(d) of the Bankruptcy Code [Doc. No. 864][1]; (ii) a Memorandum Opinion of the Bankruptcy Court entered on August 31, 2010, as amended on September 1, 2010, with respect to the foregoing [Doc. No. 869]; and (iii) an order of the Bankruptcy Court entered on August 31, 2010 denying a motion of the FDIC to exclude the testimony of the Debtor's expert witness [Doc. No. 866].

## STATEMENT OF THE CASE

### A.    Nature Of The Case

This appeal arises from the FDIC's attempt to hold the Debtor's estate responsible for an alleged almost $1 billion deficiency in the capital of Colonial Bank (the "Bank").  The Bank was a depository institution wholly owned by the Debtor until August 2009, when the State of Alabama Banking Department ("SABD") closed the Bank and appointed the FDIC as receiver.  According to the FDIC, the Debtor made a "commitment … to maintain the capital" of Colonial Bank within the meaning of Section 365(o) of the Bankruptcy Code.

On September 28, 2009, the Bankruptcy Court appointed the Committee to serve as fiduciary to the many unsecured creditors in this case, who collectively hold claims against the Debtor in excess of $400 million.  If the FDIC were to prevail on its almost $1 billion capital

---

[1] Citations to "Doc. No. __" refer to filings on the Bankruptcy Court docket in the Debtor's Chapter 11 bankruptcy case, *In re The Colonial BancGroup, Inc.*, No. 09-32303 (DHW) (Bankr. M.D. Ala.).

maintenance commitment claim, the claims of the Committee's constituents effectively would be wiped out.

The FDIC points to three documents as the basis for the Debtor's purported capital maintenance commitment.  None of them were entered into with the FDIC, but rather were with the SABD and the Federal Reserve.  The Bankruptcy Court held that Section 365(o) does not apply to any of these documents for several reasons, any one of which is a sufficient ground for affirming the court's decision.

First, the court held, based on their plain and unambiguous language, that the documents did not commit the Debtor to maintain the Bank's capital as required under Section 365(o).  Rather, the documents called for the Debtor to assist the Bank in complying with the requirements imposed on it by its own regulators, and take steps to achieve that compliance. There is no claim that the Debtor failed to provide such assistance and take such steps.  In construing the documents, the Bankruptcy Court, *inter alia*, contrasted their terms with the unequivocal language of guarantee used in actual commitments to maintain a bank's capital. The Bankruptcy Court's determination based on the plain meaning of the documents at issue disposes of the FDIC's Section 365(o) claim.

The Bankruptcy Court also based its decision under Section 365(o) on a series of alternative holdings, any of which independently is conclusive as to the FDIC's claim.  First, the Bankruptcy Court found that even if the documents at issue are ambiguous and the court were to consider the extrinsic evidence submitted by the parties regarding the intent of the documents, neither the Debtor nor its regulators intended to create a capital maintenance commitment. Among the evidence making that clear was the testimony of Debtor's point of contact at the Federal Reserve, and the testimony of the Debtor's expert, the former head of enforcement of the

Federal Reserve.  The lower court's holding with respect to the extrinsic evidence likewise would dispose of the FDIC's claim.

As a further basis for denying the FDIC's Section 365(o) motion, the court below held that the documents on which the FDIC bases its claim were either unenforceable from inception, terminated or of no force and effect by the time of the Debtor's bankruptcy.  These conclusions were based on clear regulatory language, the FDIC's own admissions, and the undisputed sequence of events in this case.

Additionally, the Bankruptcy Court held that Section 365(o) only applies to capital maintenance commitments made to a "Federal depository institutions regulatory agency," which the Bankruptcy Court properly concluded, pursuant to federal statute, is the FDIC.  The Debtor had no agreements with the FDIC, and Section 365(o) is therefore inapplicable for this reason as well.

The FDIC also filed a separate motion under Section 362(d) of the Bankruptcy Code in which it sought to set off alleged pre-petition claims by it, including its Section 365(o) claim, against certain of the Debtor's bank accounts held at Branch Banking & Trust Co. ("BB&T").  The parties stipulated in advance of the hearing on the FDIC's motions that, although the FDIC was asserting a right to set off a number of claims, the only basis for set-off in the instant Section 362(d) motion would be the Debtor's purported Section 365(o) claim. Because the court below rejected that claim, it also rejected the FDIC's request for set-off based on it.

The Committee respectfully submits that the Bankruptcy Court's decisions should be affirmed for any and all of the foregoing reasons, as further described below.

### B.    Statement Of Facts

The Debtor, a Delaware corporation with its principal place of business in Alabama, is a bank holding company organized under the Bank Holding Company Act of 1956, as amended.  Prior to August 14, 2009, when the SABD closed Colonial Bank and appointed the FDIC as its receiver, the Bank was a wholly-owned subsidiary of the Debtor.  The Debtor also owned certain non-banking, non-debtor subsidiaries.

On December 15, 2008, the directors of Colonial Bank signed a memorandum of understanding (the "Bank MOU") with the FDIC's Atlanta Regional Office and the Superintendent of the SABD.  (J.A. at 220-25.)[2]  Pursuant to the Bank MOU, the Bank agreed to "move in good faith to comply with" the Bank MOU's requirements, which included that, by February 28, 2009, "the Bank shall have a Tier 1 Leverage Capital ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent" (the "Capital Ratios").  (J.A. at 220, 223.)

On January 6, 2009, the Debtor entered into a so-called "4(m) Agreement" with the Federal Reserve Bank of Atlanta (the "4(m) Agreement").  (J.A. at 226-28.)  This is the first of the three documents on which the FDIC bases its claim that the Debtor committed to infuse capital into the Bank.  The paragraph of the 4(m) Agreement on which the FDIC relies provides that the Debtor shall address the factors resulting in the Bank's less than satisfactory regulatory ratings "by taking steps" designed to ensure the Bank's compliance with the Bank MOU.  (J.A. at 227.)  Neither that paragraph nor any other provision of the 4(m) Agreement states that the

---

[2] Citations to "J.A. at __" refer to pages within the Joint Appendix of Appellees The Colonial BancGroup, Inc. and the Official Committee of Unsecured Creditors, dated January 5, 2011.  A redacted version of the Joint Appendix omitting certain documents containing "Highly Confidential" materials, as that term is defined in the Confidentiality Stipulation and Protective Order that was entered in the underlying proceedings on April 7, 2010 by the United States Bankruptcy Court for the Middle District of Alabama [Doc. No. 654], was filed along with this Brief. Concurrently, the Debtor and Committee filed a motion in this Court seeking leave to file the unredacted Joint Appendix under seal.

Debtor shall contribute capital or guarantees that the Bank will be in compliance with the Bank MOU.

On January 21, 2009, the Debtor's directors signed a Memorandum of Understanding with the SABD and the Federal Reserve Bank of Atlanta, outlining a program of corrective action with which the Debtor agreed to "move in good faith to comply." (J.A. at 230-33.)  The program provided that the Debtor would "utilize its financial and managerial resources to assist [the Bank] in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance" with the Bank MOU.  (J.A. at 230.)  The Debtor MOU, which is the second document on which the FDIC relies, did not prescribe any specific steps the Debtor was to take to assist the Bank in achieving compliance.  It included no requirement that the Debtor infuse capital into the Bank or serve as a guarantor of any obligation the Bank may have had to satisfy the Capital Ratios.  In addition, the Debtor MOU stated that it "is not a 'written agreement' for the purposes of Section 8 of the Federal Deposit Insurance Act, as amended."  (J.A. at 231.)

The Bank did not achieve the Capital Ratios by February 28, 2009, the date provided in the Bank MOU.  Subsequently, the Bank consented to the entry of a cease and desist order by the FDIC and the SABD, which was issued on June 15, 2009 (the "Bank C&D").  (J.A. at 234-54.)  The Bank's regulators informed the Bank that the Bank MOU was "discontinued and replaced" by the Bank C&D.  (J.A. at 264.)  The Bank C&D called for the Bank to attain the Capital Ratios by September 30, 2009.  (J.A. at 239-40.)

The Debtor likewise consented to the entry of a cease and desist order, which was issued by the Federal Reserve Board and the SABD on July 22, 2009 (the "Debtor C&D").  (J.A. at 255-63.)  The Debtor C&D is the third document on which the FDIC bases its claim under

5

Section 365(o).[3]  It called for the Debtor's directors to "take appropriate steps to ensure that the Bank complies with [the Debtor C&D] and any other supervisory action taken by the Bank's federal or state regulators."  (J.A. at 256.)  The Debtor C&D contained no provision ordering the Debtor to contribute capital to the Bank to meet the Capital Ratios, or otherwise guaranteeing that those ratios would be met.

Consistent with the terms of these three documents, the Debtor made significant efforts to assist the Bank in attaining the Capital Ratios specified in the Bank MOU and Bank C&D.  For example, the Debtor contributed $142 million of capital to the Bank during the first half of 2009.  (FDIC Br. at 11 [Dist. Ct. Doc. No. 21].)  Additionally, the Debtor made numerous efforts to obtain capital from outside sources, including a potential $300 million private equity investment and funds from the U.S. Department of the Treasury under the Troubled Assets Relief Program ("TARP").  (Id. at 11-12.)

Despite the Debtor's efforts, the Bank did not reach the required Capital Ratios, and on August 14, 2009, prior to the September 30, 2009 deadline for achieving those Capital Ratios, the SABD closed the Bank and appointed the FDIC as receiver.[4]  (J.A. at 267-68; 269-70.)  That same day, the FDIC entered into a purchase and assumption agreement with Branch Banking and Trust, Winston-Salem, North Carolina ("BB&T"), pursuant to which BB&T assumed the Bank's deposits.  (J.A. at 267-68; 269-70.)  On September 29, 2009, one day before the Bank's deadline to attain the Capital Ratios, the FDIC terminated the Bank C&D that provided for those ratios.  (J.A. 265-66.)

---

[3] The 4(m) Agreement, the Debtor MOU, and the Debtor C&D are sometimes referred to collectively as the "Supervisory Documents."

[4] The FDIC points out that the Bank was the target of a criminal investigation at the time (FDIC Br. at 15) and that the Bank's failure was one of the costliest in United States history (id. at 23).  However, none of this has any bearing on whether the Debtor made a capital maintenance commitment.

### C.    The Proceedings Below

On August 25, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  On October 5, 2009, the FDIC, as receiver for the Bank, filed its motion under Section 362(d).  [Doc. No. 156.]  In that motion, the FDIC sought relief from the automatic stay to exercise purported setoff rights against the Debtor's deposits at BB&T, based, in part, on the alleged capital maintenance commitment that would become the subject of the FDIC's motion under Section 365(o).  The FDIC filed an amended version of that motion on January 22, 2010 (the "Stay Relief Motion").  [Doc. No. 499.]

On November 5, 2009, the FDIC, as receiver for the Bank, filed its motion under Section 365(o) (the "Section 365(o) Motion"), seeking in excess of $1 billion, the amount the FDIC claimed was the shortfall in the Bank's capital levels.  [Doc. No. 257.]  The FDIC later reduced the amount of the purported capital deficiency to $904,954,360.  (FDIC Br. at 16.)

On April 26, 2010, the Debtor filed summary judgment motions with respect to both of the FDIC motions [Doc. Nos. 697-700], and the Committee filed objections to the motions [Doc. Nos. 694, 701].  On May 26, 2010, the Bankruptcy Court held a hearing on the motions.  Prior to the hearing, the FDIC filed a motion *in limine* seeking to exclude the testimony of Debtor's expert witness.  [Doc. No. 733.]  The court accepted a proffer of testimony from the parties, and, as agreed to at the hearing, the parties later submitted designations from the depositions of seven witnesses.

### D.    The Disposition Of The FDIC's Motions

On August 31, 2010, the Bankruptcy Court issued an order granting summary judgment in the Debtor's favor on both the FDIC's Section 365(o) Motion and its Stay Relief Motion.  (J.A. at 44.)  The court issued a 43-page memorandum opinion that day explaining its grant of summary judgment, and an amended opinion (the "Opinion") correcting some

7

typographical errors on September 1, 2010.  (J.A. at 1-43.)  The Bankruptcy Court also issued an

order denying the FDIC's motion to exclude the testimony of the Debtor's expert (J.A. at 45-46)

and an order overruling an evidentiary objection raised by the Debtor and the Committee (J.A. at

47-48) on August 31, 2010.

### 1.      The Opinion On The Section 365(o) and Stay Relief Motions

The Opinion described the Bankruptcy Court's disposition of the Section 365(o)

Motion and Stay Relief Motion as follows:  "Upon consideration of the briefs and oral arguments

of counsel, the verified materials of record, and the deposition testimony, the court concludes

that there is no genuine issue of material fact and that the Debtor is entitled to summary

judgment on both motions as a matter of law."  (J.A. at 1-2.)  The court then went on to recite the

facts based on the briefs of the parties (J.A. at 2-9), and based on the testimony proffered at the

hearing and included in the deposition designations submitted thereafter (J.A. at 9-22).  After

setting forth the standard for summary judgment (J.A. at 22-24) and an overview of the relevant

statutory law (J.A. at 24-26), the Bankruptcy Court explained the basis for its Opinion.

### (a)      The Plain Language of the Supervisory Documents

In considering the FDIC's contention that "the Debtor made a commitment to

maintain the capital of the Bank," the court explained that "[a]n agreement that by its terms is

plain and free from ambiguity must be enforced as written." (J.A. at 26 (internal citations and

quotations omitted).)  The Bankruptcy Court then reviewed the relevant language of the

Supervisory Documents, and concluded:

> Each of the documents requires the Debtor to assist the Bank in
> complying with the Bank MOU or the Bank C & D, whether by
> "taking steps designed to ensure that the Bank complies," or by
> utilizing "its financial and managerial resources to assist" the
> Bank, or by taking "appropriate steps to ensure that the Bank
> complies." The documents do not require the Debtor to comply on
> behalf of the Bank or impose liability on the Debtor in the event

8

> the Bank fails to reach the required capital ratios. In other words, the language in the documents does not make the Debtor either primarily or secondarily liable for the Bank's obligations.
>
> The language is broad and general and requires only that the Debtor "assist" the Bank.  The language does not specify any particular method of assistance or prescribe specific steps that the Debtor must take.  The language does not dictate what financial and managerial resources the Debtor must utilize.  Nor does it require the Debtor to serve as a guarantor of the capital ratios or to pledge any assets to secure any capital deficiency.  Most importantly, the language does not require the Debtor to make a capital infusion, in any amount, in the Bank.

(J.A. at 28.)

The Bankruptcy Court then considered the four cases in which capital maintenance commitments were found, and determined that they did not support the FDIC's position that the language in the Supervisory Documents created a capital maintenance commitment.  The court explained that the language in each of those cases expressly "required the debtors to maintain the net worth of its subsidiary and to infuse additional capital as necessary in order to maintain the specified capital ratios" or contained specific "language of guarantee."  (J.A. at 28-31.)  By contrast, the Bankruptcy Court found "[n]o such language" in the Supervisory Documents.  (J.A. at 30.)  As the Bankruptcy Court held:

> The language [of the Supervisory Documents] is not ambiguous, and giving the words their ordinary meaning, the court concludes that the Debtor and the Federal Reserve did not intend to create a commitment in the Debtor to maintain the capital of Colonial Bank within the meaning of 11 U.S.C. § 365(o).

(J.A. at 31-32.)  The court also noted that the circumstances in this case were different from those in the other cases.  In three of those cases, the commitment was made by a debtor as an express condition of its acquisition of its bank subsidiary.  In the fourth case, the commitment was a statutorily mandated guarantee of a capital restoration plan submitted in response to a

prompt corrective action notification.  (J.A. at 31.)  Neither of those circumstances was present here.

> (b)    Extrinsic Evidence Regarding the Supervisory Documents

Having held that the unambiguous language of the Supervisory Documents did not create a capital maintenance commitment within the meaning of Section 365(o), the Bankruptcy Court explained that it was unnecessary to consider extrinsic evidence regarding the documents' meaning.  (J.A. at 32.)  Nevertheless, in an alternative holding, the Bankruptcy Court stated that if it were to consider such evidence, it "would conclude that the parties did not intend to create a commitment in the Debtor to maintain the capital of the Bank."  (J.A. at 32.)

The court described the testimony supporting its conclusion.  The Debtor's expert, Herbert A. Biern, who was head of the Federal Reserve's enforcement division for 20 years and developed the language templates for the Supervisory Documents, testified that "nothing in the documents required the Debtor to ensure or guarantee the Bank's capital at a certain level."  (J.A. at 32.)  Kurt Casebolt, who drafted the Debtor MOU and was the central point of contact between the Federal Reserve and the Debtor, presented the Debtor MOU and Debtor C&D to the Debtor's Board of Directors and never said that the directors "were obligating the Debtor to pay the Bank's capital deficiency or guaranteeing payment or making a commitment to maintain the Bank's capital."  (J.A. at 33.)  Two members of the Debtor's board and its chief financial officer testified, consistent with Mr. Casebolt's testimony, that no regulator had said that the regulatory documents constituted a guaranty or a commitment to maintain the Bank's capital.  (J.A. at 33.)

Finally, the court reviewed the testimony of Timothy Rich, a senior FDIC examiner, that the FDIC offered to oppose Mr. Casebolt's view of the Supervisory Documents. Mr. Rich stated that the Debtor MOU obligated the Debtor to pay the amount of the Bank's capital deficiency or infuse the capital necessary to bring the Bank's capital levels to the required

levels.  (J.A. at 33.)  The Bankruptcy Court observed, however, that the FDIC was not a party to any of the Supervisory Documents.  (J.A. at 33-34.)

(c) <u>Additional Alternative Holdings</u>

The Opinion also included additional alternative holdings, each of which is a sufficient independent ground for denying the FDIC's motion under Section 365(o).

First, the court observed that Section 365(o) only embraces commitments to a "Federal depository institutions regulatory agency."  (J.A. at 35.)  Following the statutory definition of that term, the court held that it required a commitment to be made to the regulatory agency for the Bank, which was the FDIC.  (J.A. at 36.)  Because the Supervisory Documents that are the basis for the FDIC's claim were all entered into with the Federal Reserve, rather than the FDIC, they do not fall within Section 365(o).  (J.A. at 36.)

Second, the court held that Section 365(o) "embraces only enforceable commitments," and that the Supervisory Documents were either unenforceable or, in the case of any obligations under the Debtor C&D and 4(m) Agreement, performance was rendered impossible by the closing and sale of the Bank.  (J.A. at 37-41.)

(d) <u>Denial of the Stay Relief Motion</u>

After disposing of the Section 365(o) Motion, the court found that denial of the FDIC's claim under Section 365(o) likewise required denial of the FDIC's set off claim under Section 362(d).  (J.A. at 42-43.)  The FDIC does not dispute that if the Section 365(o) Motion was properly denied, then the FDIC's Section 362(d) claim was properly denied as well.

**2.** **Denial of the FDIC's Motion *in Limine***

In a separate order on the FDIC's motion *in limine* to exclude Mr. Biern's testimony, the Bankruptcy Court held that Mr. Biern was qualified as an expert witness.  (J.A. at

11

45-46.)  The court held that Mr. Biern's expert testimony regarding issues of fact would be allowed, with the proviso that the court would not consider any legal conclusions.  (J.A. at 45.)

## ARGUMENT

**I.    THE BANKRUPTCY COURT CORRECTLY HELD THAT THERE WAS NO CAPITAL MAINTENANCE COMMITMENT BASED ON THE PLAIN MEANING OF THE SUPERVISORY DOCUMENTS.**

> Section 365(o) of the Bankruptcy Code provides:
>
> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under Section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution….

11 U.S.C. § 365(o) (2010).  There is no dispute as to the import of this provision for a debtor in Chapter 11 who has made a commitment to a Federal depository institutions regulatory agency. The commitment is deemed assumed by the debtor, and any deficit must be immediately cured. The consequence of the debtor's failure to cure is conversion to Chapter 7.  *See, e.g., Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 975 (9th Cir. 2008) ("*Wolkowitz*"). The question here is whether, in fact, the Debtor agreed to a capital maintenance commitment in any of the three documents on which the FDIC relies:  the 4(m) Agreement, the Debtor MOU, or the Debtor C&D.

### A.    The Bankruptcy Court's Interpretation Of The Supervisory Documents

As the FDIC recognizes, the language of the Supervisory Documents is unambiguous (FDIC Br. at 23.)  Accordingly, the Bankruptcy Court correctly held that the intention of the parties must be derived from the plain meaning of the words.  (J.A. at 26, *citing Gwaltney v. Russell*, 984 So.2d 1125, 1131 (Ala. 2007); *Smith v. Citicorp Person-to-Person Financial Centers, Inc.,* 477 So.2d 308, 310 (Ala. 1985); *Meyer v. Meyer*, 952 So.2d 384, 391

(Ala. Civ. App. 2006).)  Applying this fundamental principle of interpretation,[5] the Bankruptcy Court concluded that the Debtor and the Federal Reserve did not intend to create a capital maintenance commitment within the meaning of Section 365(o).  (J.A. at 32.)

The FDIC asserts that the Bankruptcy Court erred in holding that the language of the Supervisory Documents did not create a capital maintenance commitment, and argues that "[t]he bankruptcy court's analysis ignores persuasive, and unanimous, appellate authority holding that section 365(o) must be construed broadly, rather than technically, in order to serve the statute's purpose to protect the FDIC's Deposit Insurance Fund."  (FDIC Br. at 24.)  The FDIC does not cite a single case in support of this claim, and the Committee is not aware of any. Moreover, the Bankruptcy Court's interpretation of the Supervisory Documents does not depend on whether one construes the statute broadly or narrowly, but rather on the clear language of the documents themselves.

The Bankruptcy Court's holding that the Supervisory Documents were not capital maintenance commitments also did not depend on whether those documents were enforceable, or on whether Section 365(o) only applies to capital maintenance commitments that are enforceable.  Notwithstanding the FDIC's attempt to conflate the issue of enforceability with the issue of what the language of the documents says (*see* FDIC Br. at 24-30), the issues are completely distinct.  The Bankruptcy Court's holding that the Debtor and the Federal Reserve did not intend to create a capital maintenance commitment was based on the unambiguous language of the documents (J.A. at 31-32), without regard to whether they are enforceable.  As discussed below, the unenforceability of those documents is a separate and independent ground for denying the FDIC relief under Section 365(o).

_____

[5] Contrary to the FDIC's claim (FDIC Br. at 25 n.11) , the principle that plain language governs is a fundamental one that applies to interpretation not only of contracts, but also of statutes and indeed any legal document.

The relevant language of the Supervisory Documents makes clear that they did not obligate the Debtor to maintain the Bank's capital.  As the Bankruptcy Court observed, "[t]he documents do not require the Debtor to comply on behalf of the Bank or impose liability on the Debtor in the event the Bank fails to reach the required capital rations."  (J.A. at 28.) Significantly, none of the Supervisory Documents requires the Debtor to serve as a guarantor of the Bank's obligations or to infuse any capital into the Bank.  (J.A. at 28.)   They call for the Debtor to act "in good faith" to "assist" the Bank in complying with agreements between the Bank and its own regulators (which specified capital ratios that the Bank was to achieve), or to "take steps" in that regard.  (J.A. at 27-28.)

The FDIC has never disputed that the Debtor assisted the Bank in good faith in complying with the Bank's requirements under its own agreements with its regulators, and took steps toward enabling the Bank to comply with those requirements.  In fact, in its opening brief, the FDIC describes several actions taken by the Debtor "[c]onsistent with the holding company's agreements with its regulators," including (i) contributing $142 million of capital to the Bank during the first half of 2009 (FDIC Br. at 11); (ii) attempting to reach an agreement with a third party for a $300 million private equity investment (*Id.* at 11-12); and (iii) seeking TARP funding from the Department of the Treasury (*Id.* at 12).  Providing assistance and taking steps toward enabling the Bank to comply with its obligations is what the Debtor agreed to in the Supervisory Documents.[6]  The Debtor gave no assurance that its efforts would be successful.

**The 4(m) Agreement.**  The language of the 4(m) Agreement on which the FDIC relies is contained in paragraph 2, which provides:

---

[6] The FDIC argues that the Debtor's efforts evidence its acknowledgement that it had made a capital maintenance commitment, but the court below correctly found that such efforts were simply "consistent with the obligations [the Debtor] made under the three agreements and its obligations as a parent/holding company."  (J.A. at 34.)  The fact that the Debtor believed it was supposed to take steps to assist the Bank in the raising of its capital levels, and did so, does not mean it believed that it had guaranteed that the capital levels would be reached.

14

> By May 11, 2009 …, [the Debtor] shall address the factors
> resulting in the less than satisfactory … ratings assigned to the
> Bank … by *taking steps designed* to ensure that the Bank complies
> with the [Bank MOU] and any other supervisory action regarding
> the Bank taken by the FDIC and the [SABD] during the term of
> this agreement.

(J.A. at 227 (emphasis added).)  The FDIC tries to create the impression that this is a capital

maintenance commitment by focusing on the dictionary definition of the single word "ensure"

and on the irrelevant issue of the enforceability of the 4(m) Agreement, which the Debtor does

not even contest.  (FDIC Br. at 27-28.)  However, the 4(m) Agreement does not provide that the

Debtor would "ensure" the Bank's compliance with the Bank MOU or any other supervisory

action, but rather that, the Debtor would "*tak[e] steps designed* to ensure" such compliance.

**The Debtor MOU.**  The FDIC's interpretation of the relevant provision of the

Debtor MOU also relies on a highly selective reading of the relevant provision.  Paragraph 1 of

the Debtor MOU provides that the Debtor was to "move *in good faith*" to:

> utilize its financial and managerial resources *to assist* its subsidiary
> bank in addressing weaknesses identified by its primary banking
> supervisors and achieving/maintaining compliance with [the Bank
> MOU].

(J.A. at 230 (emphasis added).)  The FDIC asserts that this paragraph was a commitment by the

Debtor to "utilize its financial . . . resources" so that the Bank "would 'achieve' and 'maintain'

compliance" with capital requirements in the Bank MOU.  (FDIC Br. at 28-29.)  But the Debtor

did not agree to use its resources for that purpose, but rather "to *assist* [the Bank] in . . .

achieving/maintaining compliance," which is entirely inconsistent with the notion of a guarantee.

Indeed, as the Bankruptcy Court concluded, this paragraph contains the source-

of-strength doctrine, with which all holding companies are required to comply.  (J.A. at 27.)  The

source-of-strength doctrine, which has been adopted by the Federal Reserve as a regulation,

provides that a bank holding company shall "serve as a source of financial and managerial

15

strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1) (2010). That does not mean that a holding company is a guarantor of its capital requirements. As the Fifth Circuit has recognized, the source-of-strength doctrine does not require a bank holding company to make capital contributions to its subsidiaries. *MCorp Fin., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 900 F.2d 852, 863 (5th Cir. 1990), *rev'd on other grounds*, 502 U.S. 32 (1991).

**The Debtor C&D.** The relevant paragraph of the Debtor C&D states:

> The board of directors of BancGroup shall *take appropriate steps* to ensure that the Bank complies with the [Bank C&D], and any other supervisory actions taken by the Bank's federal and state regulators.

(J.A. at 256 (emphasis added).) This paragraph appears under the heading "Source of Strength," which, as discussed above, is a doctrine with which all bank holding companies are required to comply and which, *MCorp* held, does not obligate a holding company to contribute capital to its subsidiary.[7] As with the 4(m) Agreement, the FDIC asserts that this provision contains "mandatory language requiring the Debtor to 'ensure' that Colonial Bank met its capital requirements, and the provision plainly constitutes a 'capital maintenance agreement.'" (FDIC Br. at 29.) But the FDIC's argument completely ignores the introductory phrase "take appropriate steps." As the court below concluded, an agreement to "take appropriate steps to ensure" the Bank's compliance with its own cease and desist order is not an agreement to "ensure" such compliance. (J.A. at 27-28.)

---

[7] The FDIC argues that the Bankruptcy Court's reliance on *MCorp* is misplaced because "in that case, unlike here, the debtor holding company had not made any promise in writing to maintain the capital of its bank subsidiaries." (FDIC Brief at 37 n.21.) However, that argument assumes the conclusion that the Debtor in fact agreed to maintain the Bank's capital. The FDIC also claims (FDIC Br. at 26, 30, 37) that the Supervisory Documents would be "meaningless" or a "legal nullity" if they are simply a restatement of the source-of-strength doctrine. That is not so. By incorporating the source-of-strength doctrine into the Debtor C&D, the remedies that are available for breach of a cease and desist order were made available to the Debtor's regulators. *See, e.g.,* 12 U.S.C. § 1818(e) (2010).

As the Bank's holding company, the Debtor controlled the Bank. That does not mean that the Debtor became the Bank's guarantor, or that their separate corporate structures were eviscerated. This is confirmed by the fact that the paragraph is directed at the Debtor's board of directors, not the Debtor itself. If the paragraph were intended as a financial obligation, it would have been directed at the holding company, not its directors. In fact, there is nothing in this paragraph or anywhere else in the Debtor C&D that requires the Debtor to contribute any capital to the Bank to ensure its compliance with the stated capital ratios under the Bank C&D.[8]

In sum, none of the Supervisory Documents obligated the Debtor to contribute capital to Colonial Bank to ensure the Bank's achievement of the Capital Ratios.[9] As the Bankruptcy Court observed:

> Each of the documents requires the Debtor to assist the Bank in complying with the Bank MOU or the Bank C&D, whether by "taking steps designed to ensure that the Bank complies," or by utilizing "its financial and managerial resources to assist" the Bank, or by taking "appropriate steps to ensure that the Bank complies." The documents do not require the Debtor to comply on behalf of the Bank or impose liability on the Debtor in the event the Bank fails to reach the required capital ratios. In other words, the language in the documents does not make the Debtor either primarily or secondarily liable for the Bank's obligations.

(J.A. at 28.)

The FDIC asserts in response to this that "[o]nly the Bank MOU contains the word 'assist.'" (FDIC Br. at 29 (emphasis in original).) That is not true. The Debtor MOU,

---

[8] The Committee does not dispute that the Bank MOU and Bank C&D recited specific capital ratios that *the Bank* agreed to achieve. (FDIC Brief at 12-13, 15, 26.) That does not mean that the Debtor guaranteed that the Bank would achieve those ratios. Rather, it agreed to "take steps" to accomplish that end and move "in good faith" to "assist" the Bank in doing so. (J.A. at 227; J.A. at 256; *see also* J.A. at 230.) Nor is the fact that the Bank failed to achieve the agreed-on capital ratios, as the FDIC points out (FDIC Br. at 23), relevant to whether the Debtor made the efforts it said it would make. Indeed, the FDIC concedes that the Debtor did make efforts to obtain capital for the Bank.

[9] Moreover, as the Bankruptcy Court noted, the Bank's targets were ratios and thus could have been achieved by selling assets, as well as by infusing capital. (J.A. at 31 n.18.) This further confirms that there was no obligation to infuse capital. The FDIC suggests that selling assets was somehow "prohibited" because, under the Bank C&D, it required prior written approval of the Bank's regulators. (FDIC Br. at 29 n.14.) However, the fact that prior written approval could be requested (J.A. at 241, at § 3(d)(iv)) makes clear that this approach in fact was *not* prohibited.

quoted above, uses the word "assist."  What is more, the FDIC acknowledges that the

undertakings in the three Supervisory Documents were "similar."  (*Id.* at 28, 29.)  The

Committee agrees, and the documents therefore cannot be read in isolation from one another.

Whether framed in terms of "steps designed to ensure," "appropriate steps to ensure," or utilizing

resources "to assist," they were all in the nature of assistance to the Bank, not a capital

maintenance commitment.  (J.A. at 28.)

### B.    The Bankruptcy Court's Holding Is Consistent With Relevant Case Law.

The Bankruptcy Court also reviewed the case law analyzing Section 365(o).  (J.A.

at 28.)  There are four cases in which capital maintenance commitments have been found.  (J.A.

at 28-31.)  Those cases demonstrate that when regulators intend to obligate a holding company to

guarantee its bank's capital, the language used is unmistakable:

- In *Resolution Trust Corp. v. Firstcorp, Inc.* (*In re Firstcorp, Inc.*), 973 F.2d 243, 244 (4th Cir. 1992) ("*Firstcorp*"), the holding company agreed that "the regulatory net worth of [the bank] *shall be maintained* at the greater of (1) three percent of total liabilities …, or (2) a level consistent with that required by [specific regulation] … and where necessary, *to infuse sufficient additional equity capital* … to effect compliance with such requirement."  (emphasis added.)

- In *Office of Thrift Supervision v. Overland Park Fin. Corp.* (*In re Overland Park*), 236 F.3d 1246, 1249 (10th Cir. 2001) ("*Overland*"), the holding company stipulated that "it *will cause the net worth of [the bank] to be maintained* at a level consistent with [specific regulation], and where necessary, that *it will infuse sufficient additional equity capital* to effect compliance with such requirement." (emphasis added.)

- In *Franklin Savings Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 491 (D. Kan. 2004) ("*Franklin*"), the holding company agreement stated that the holding company "*will cause the net worth of [the bank] to be maintained* at a level consistent with that required of institutions insured twenty years or longer by [specific regulation] …, *infusing sufficient additional equity capital* to affect [sic] compliance with such requirement whenever necessary."  (emphasis added.)

- In *Wolkowitz*, the holding company committed itself to "*absolutely, unconditionally and irrevocably guarantee[] the performance* of [subsidiary] under the terms of the Capital Plan and … pay the sum demanded to [subsidiary]

or as directed by the [FDIC] in immediately available funds."  *Wolkowitz*, 527 F.3d at 964 (emphasis added).

The Bankruptcy Court appropriately found that the foregoing language was "vastly different" from the language in this case.  (J.A. at 31.)  The undertakings in *Firstcorp*, *Overland* and *Franklin* all specifically "required the debtors to maintain the net worth of its subsidiary and to infuse additional capital as necessary in order to maintain the specified capital ratios." (J.A. at 30.)  By contrast, the Bankruptcy Court correctly found that "[n]o such language can be found in the 4(m) Agreement, the Debtor MOU, or the Debtor C&D."  (J.A. at 30.)  Nor do the Supervisory Documents contain the "language of guarantee" that was present in *Wolkowitz*.  (J.A. at 31.)  As the court concluded with respect to the Supervisory Documents in this case:

> The language is not ambiguous, and giving the words their ordinary meaning, the court concludes that the Debtor and the Federal Reserve did not intend to create a commitment in the Debtor to maintain the capital of Colonial Bank within the meaning of 11 U.S.C. § 365(o).

(J.A. at 31-32.)  Requiring clear and unambiguous language of commitment makes perfect sense. Any commercial guarantee would contain such language, particularly one where potentially vast sums would be owing.  A party that unconditionally guarantees another's obligation does not do so with words like "good faith," "assist" or "take steps."

It also is noteworthy that the circumstances under which the Supervisory Documents were entered into were different from those in the other cases.  As the Bankruptcy Court noted (J.A. at 31), in the first three cases the capital maintenance commitments were entered into as a condition of acquiring a bank subsidiary, which was not the situation in this instance.  In the fourth case, *Wolkowitz*, the undertaking was provided with respect to an existing bank subsidiary—as was the case here—but the nature of that undertaking and the means used to obtain it were entirely different from what occurred here.

19

The guarantee in *Wolkowitz* was provided pursuant to an express statutory directive, namely a section of the prompt corrective action ("PCA") provisions of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831o(e)(2).  527 F.3d at 966.  Under that provision, a bank that has become undercapitalized is required to submit an acceptable "capital restoration plan" to its federal regulators (12 U.S.C. § 1831o(e)(2)(A)), and the bank's holding company must "guarantee[] that the [bank] will comply with the plan until the [bank] has been adequately capitalized on average during each of 4 consecutive quarters; and provide[] appropriate assurances of performance."  12 U.S.C. § 1831o(e)(2)(C)(ii).  Any such guarantee is expressly limited to five percent of the bank's assets.  12 U.S.C. § 1831o(e)(2)(E)(i).  The FDIC does not dispute there was no prompt corrective action taken with respect to the Bank pursuant to Section 1831o(e)(2), and that is telling.  Congress expressly provided for a mechanism to obtain holding company guarantees in the face of a bank's deterioration, but that mechanism was not used here.[10]

## II.   EVEN IF THE DOCUMENTS ARE AMBIGUOUS, SUMMARY JUDGMENT WAS APPROPRIATE BASED ON THE UNDISPUTED EXTRINSIC EVIDENCE.

After holding that the Debtor's regulatory documents were unambiguous, and concluding based on their plain language that neither the Debtor nor the Federal Reserve intended to create a commitment of the Debtor to maintain the Bank's capital within the meaning of Section 365(o), the Bankruptcy Court turned to the extensive testimony submitted by the parties.  The court characterized this testimony as extrinsic evidence regarding the intent and understanding of the parties to the Debtor's Supervisory Documents, and held that it was

---

[10] The FDIC's only response is to argue that Section 365(o) is not limited to the circumstances that were present in the cases described above.  (FDIC Br. at 30.) However, the FDIC's conjecture that a guarantee theoretically could be provided in some other circumstance does nothing to advance its position.  In determining whether a capital maintenance commitment was provided, the Bankruptcy Court was entitled to consider the circumstances in which such commitments are typically provided, and to note that they are not present here.

inadmissible given the unambiguous nature of those documents.  (J.A. at 32.)  Nevertheless, the court alternatively held that, if it were to consider the evidence, it "would conclude that the parties did not intend to create a commitment" of the Debtor to maintain the Bank's capital. (J.A. at 32.)

The FDIC mischaracterizes the Bankruptcy Court's Opinion, claiming that the court committed reversible error when it "erroneously resolved numerous disputed issues of fact against the FDIC-Receiver even while purporting to grant summary judgment in favor of the Debtor."  (*See, e.g.*, FDIC Br. at 20.)  In fact, the court only considered the extrinsic evidence in the alternative, after it reached its initial holding based on the plain language of the Supervisory Documents.  (J.A. at 32.)  The Opinion below plainly delineates the two holdings and makes clear that the court did not consider any extrinsic evidence in reaching its primary holding.

Nor was there error in the court's alternative holding that, even if the Supervisory Documents were ambiguous, summary judgment was appropriate.  It is well-settled that summary judgment may be granted based on evidence extrinsic to an ambiguous contract if there is no material issue of fact as to that evidence.  *See, e.g., Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1176 (5th Cir. 1981);[11] *State Nat'l Ins. Co. v. Lamberti*, No. 08-CV-60760, 2009 WL 764501, at *6 (S.D. Fla. Mar. 20, 2009).  Here, the court below correctly found that the extrinsic evidence only could lead to one conclusion—that neither the Debtor nor the Federal Reserve intended the Supervisory Documents to create a commitment by the Debtor to maintain the Bank's capital.  (J.A. at 32.)

---

[11] The Eleventh Circuit has adopted as binding all decisions of the Fifth Circuit handed down prior to October 1, 1981, as *Hicks* was.  *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

A.     **The Debtor's Central Point Of Contact At The Federal Reserve Did Not Believe The Regulatory Documents Were Capital Maintenance Commitments.**

All three Supervisory Documents were entered into by the Debtor with the Federal Reserve and the SABD.  Significantly, as the Bankruptcy Court noted, neither the Federal Reserve's "Central Point of Contact" with the Debtor, Kurt Casebolt, nor any of the Debtor witnesses, ever viewed the documents as capital maintenance commitments.  (J.A. at 33.) Mr. Casebolt testified that although he discussed the 4(m) Agreement with officials of the Debtor, he never described it as a guaranty or a commitment to maintain the Bank's capital. (Casebolt tr. 150:10-151:8 (J.A. at 440).)  In fact, Mr. Casebolt never understood the 4(m) Agreement to require the Debtor to guaranty the Bank's capital levels:

> Q.     Did you have a personal understanding that this 4-M agreement represented a guarantee?
>
> A.     No, I did not.
>
> Q.     Did you have a personal view that this 4-M agreement represented a commitment to maintain capital?
>
> A.     No.

(*Id.* at 152:15-22 (J.A. at 440).)  Debtor witnesses such as Sarah Moore, Debtor's Chief Financial Officer, and Simuel Sippial, Jr., who was a director of both the Bank and the Debtor and remains the Debtor's chairman, likewise testified that they never understood the 4(m) Agreement to create a commitment to maintain the Bank's capital levels.  (Moore tr. 157:15-158:9 (J.A. at 509-10); Sippial tr. 43:4-44:4 (J.A. at 612).)

With respect to the Debtor MOU, Mr. Casebolt, who had primary responsibility for drafting the document (Casebolt tr. 51:19-23 (J.A. at 415)) and presented it to the Debtor's board of directors (*id.* at 91:23-92:10 (J.A. at 425)), testified at his deposition that he never said to anyone at the Debtor that the Debtor MOU contained either a guaranty or a commitment to

maintain the Bank's capital.  (*Id.* at 95:8-95:21, 96:5-96:11 (J.A. at 426).)  That is because Mr.

Casebolt, like other witnesses deposed in this case, did not think the document reflected any such

thing:

> Q.      [D]id you understand [the Debtor MOU] to be a guaranty
> by Colonial BancGroup?
>
> A.      A guaranty of what?
>
> Q.      Of anything.
>
> A.      No.
>
> Q.      Did you understand that to be a commitment or obligation
> to pay the amount of the capital deficiency on any given day?
>
> A.      No.

(*Id.* at 136:4-13 (J.A. at 436).)  This testimony was corroborated by the Debtor's witnesses, Ms.

Moore and Mr. Sippial, who confirmed that no regulator ever said to them that the Debtor MOU

constituted a guaranty or a commitment to maintain the Bank's capital.  (Moore tr. 160:4-161:1

(J.A. at 510); Sippial tr. 155:10-156:15 (J.A. at 640).)

The testimony as to the Debtor C&D is the same.  Mr. Casebolt attended a Debtor

board of directors meeting "[t]o present the [Debtor C&D] to the full board, to answer any

questions and to have them execute the agreement." (Casebolt tr. 129:19-130:16 (J.A. at 434-

35).)  He testified that it was important to him that the board members understood the exact

terms of the Debtor C&D.  (*Id.* at 130:17-20 (J.A. at 435).)  During his presentation, he never

said that the Debtor C&D contained a commitment to maintain capital or an obligation of any

type requiring the Debtor to pay the amount of any deficiency in the Bank's capital levels.  (*Id.* at

132:7-24 (J.A. at 435).)  Mr. Casebolt simply did not view the Debtor C&D that way:

> Q.      Did you understand that any of those things were
> implicated by the cease and desist order?

A.      No.

(*Id.* at 133:6-9 (J.A. at 435).)

As the court noted (J.A. at 33), the Debtor's witnesses confirmed that—as was the case with the Debtor MOU—no regulator ever told them that the Debtor C&D constituted a guaranty or a commitment to maintain the Bank's capital (Moore tr. 161:4-21 (J.A. at 510); Sippial tr. 157:10-158:6 (J.A. at 640-41)).  Their testimony, and Mr. Casebolt's, was corroborated by the testimony of the FDIC's Mr. Rich, who, as the court below noted, attended the meeting of the Debtor's board at which the Debtor C&D was presented.  (J.A. at 34; Rich tr. at 102:5-15 (J.A. 564); 132:22-133:3 (J.A. at 571)).

**B.      The Debtor Complied Fully With The Terms Of Its Supervisory Documents.**

As discussed in Section I above, the FDIC acknowledges in its opening brief that the Debtor did indeed take steps to assist the Bank in reaching the Capital Ratios that the Bank was required to achieve pursuant to its own regulatory documents.  That also is reflected in the testimony of Mr. Casebolt of the Federal Reserve, who testified that the Debtor was "proactive in trying to raise additional capital."  (Casebolt tr. 88:8-11 (J.A. at 424).)  Additionally, Mr. Casebolt said that he believed the Debtor had made "good efforts" to do "things necessary to improve the financial condition of the bank."  (*Id.* at 187:7-20 (J.A. at 449).)  At no time did he ever tell representatives of the Debtor that they "should be doing something other than what they were doing to raise capital."  (*Id.* at 188:1-5 (J.A. at 449).)  Moreover, as noted by the Bankruptcy Court (J.A. at 14), the Federal Reserve never made a demand on the Debtor in connection with any of the Supervisory Documents (Casebolt tr. 160:13-161:3 (J.A. at 442)).

As the court below noted, the FDIC's own representative, Mr. Rich (who submitted an affidavit in support of the FDIC's Stay Relief Motion), agreed that the Debtor was making such efforts to assist the Bank, testifying that the Debtor was working earnestly and

24

acted in good faith to try to assist the Bank.  (J.A. at 21; Rich tr. 130:2-14 (J.A. at 571).)  Mr.

Rich further acknowledged that the Debtor had "contacted dozens and dozens and dozens of

potential acquirers" in an effort to raise the capital necessary for the Bank to meet its Capital

Ratios.  (Rich tr. 170:4-22 (J.A. at 581).)

      The Federal Reserve's Mr. Casebolt expressly testified that he believed the efforts

made by the Debtor satisfied the Debtor's undertakings in the Supervisory Documents.  With

respect to the Debtor MOU, which Mr. Casebolt himself drafted, he testified:

> It says Colonial will utilize its financial and managerial resources
> to assist the bank subsidiary in addressing weaknesses, and goes
> on.  So to me, that's an effort.  They were utilizing their financial
> and managerial resources to try to get there.  The fact that they
> weren't there yet didn't mean that they weren't complying, in my
> view, with this provision.

(Casebolt tr. 230:9-18 (J.A. at 460).)  Moreover, Mr. Casebolt testified that he was not aware of

anyone at the Federal Reserve ever telling the Debtor that it had failed to comply with the Debtor

MOU, the Debtor C&D or the 4(m) Agreement.  (*Id.* at 103:9-104:1 (J.A. at 428); 204:15-205:4

(J.A. at 453).)

      To support its interpretation of the Debtor's undertakings in the Supervisory

Documents as a guarantee that the Bank would achieve the Capital Ratios, the FDIC offered the

testimony of Mr. Rich.  According to Mr. Rich, the Debtor failed to meet its obligations under

the Supervisory Documents because it was ultimately unsuccessful in its efforts.  (Rich tr.

158:10-159:14 (J.A. at 578).)  Not only was Mr. Rich unable to point to language in any of the

Debtor's Supervisory Documents to support his strained interpretation (*id.* at 204:18-24 (J.A. at

589)), but, as the court below found, his testimony was not entitled to weight.

      As the court explained, Mr. Rich's testimony was "weak" because, among other

reasons, the FDIC was not a party to any of the Debtor's Supervisory Documents, and did not

participate in their negotiation or drafting.  (J.A. at 33-34.)  Mr. Rich himself testified that that he did not even attempt to determine whether the Debtor was in compliance with those documents, inasmuch as the Federal Reserve and the SABD were the only entities with oversight responsibility.  (Rich tr. 148:2-18 (J.A. at 575); *see also* Casebolt tr. 162:14-163:3 (J.A. at 443) (FDIC had no role with respect to the Debtor's compliance with the Supervisory Documents).)  As such, Mr. Rich could not possibly offer competent testimony as to the intent of the parties in entering into the Supervisory Documents.

The FDIC also points to the testimony of Mr. Casebolt that his supervisor, Maria Smith, believed that the Debtor was "not in compliance" with the Debtor MOU because the Bank ultimately was unsuccessful in attaining its required Capital Ratios.  (FDIC Br. at 40.)  Although the court admitted this testimony "out of caution" notwithstanding hearsay objections by the Debtor and the Committee, it appropriately concluded that the testimony had "little weight." (J.A. at 48.)  Indeed, the FDIC did not even designate Ms. Smith as a witness.  As discussed above, the Federal Reserve also never made a demand for performance on the Debtor in connection with any of the Supervisory Documents.

The FDIC argues that the Bankruptcy Court's treatment of Mr. Rich's testimony and Mr. Casebolt's testimony about Ms. Smith amounted to improper weighing of the evidence on summary judgment, claiming that the court impermissibly resolved disputed issues of fact against it and failed to resolve inferences in its favor.[12]  (*See, e.g.*, FDIC Br. at 34-35, 40-41.)

---

[12] The FDIC also argues that the court engaged in "improper fact finding" regarding the testimony of the Debtor's chief financial officer, Sarah Moore, because the "court believed [she] had asserted that the Debtor's actions were motivated by its 'obligation to its shareholders to protect the largest asset of the corporation.'"  (FDIC Br. at 41.)  In fact, the court's belief is demonstrably correct:  Ms. Moore used those exact words in her testimony.  (Moore tr. at 32:14-17 (J.A. at 478).)  The FDIC also argues that the court below failed to address an internal memorandum Ms. Moore helped prepare stating that the Debtor C&D "imposes similar requirements and conditions set forth by the bank's C&D [order] to include the holding company," including a requirement to "[i]ncrease capital."  (FDIC Br. at 41-42.)  However, the memorandum made clear that the Debtor C&D required only that the Debtor "take

First, however, it is clear that the court below concluded that none of this testimony was material given that Mr. Rich had no involvement in the documents he was purporting to interpret and Mr. Casebolt—not Ms. Smith—had principal responsibility at the Federal Reserve for the Supervisory Documents.  It is well established that an immaterial factual dispute does not bar summary judgment.  *See, e.g., Church of Scientology of Calif. v. Cazares*, 638 F.2d 1272, 1283 (5th Cir. 1981); *Robbins v. Gould*, 278 F.2d 116, 120 (5th Cir. 1960); *Concrete Co. v. Lambert*, 510 F. Supp. 2d 570, 576 n.13 (M.D. Ala. 2007).  Even more fundamentally, there was no factual dispute regarding the testimony of Mr. Rich and Mr. Casebolt.  The Bankruptcy Court did not resolve any factual dispute with respect to it, but rather only considered the inference to be drawn as to the testimony's significance.  As the court recognized, "when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible,' those inferences will not preclude summary judgment."  (J.A. at 23, citing *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal quotations omitted).)

Assessment of inferences is permissible on summary judgment, particularly where—as here—the hearing is being conducted as a bench trial, rather than a jury trial.  *See, e.g., Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978) ("If [a] decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved."); *Lanting v. Lanting*, 198 B.R. 817, 821 (Bankr. N.D. Ala. 1996) ("Where the trial judge is also the ultimate trier of fact, and where a trial would not enhance the court's ability to draw inferences and conclusions from undisputed facts, then the court is free to

appropriate steps" to ensure the Bank's compliance with its own regulatory documents, which is the exact language of the Debtor C&D.  (Moore tr. at 117:4-119:23 (J.A. at 499-500).)

draw such inferences and conclusions within the context of a motion for summary judgment.") (citations omitted).

That is especially true in this case given that the FDIC was not precluded from submitting any evidence.  At the May 26, 2010 hearing, the parties specifically agreed to a stipulation that the court would receive testimony from the parties in the form of a stipulated proffer and deposition designations.  (J.A. at 157-61.)  Despite that agreement, the FDIC complains that it informed the court at the hearing that it was prepared to put on testimony, but that the court limited the hearing to argument as to whether it should grant summary judgment. (FDIC Br. at 17-18.)  In fact, however, evidence was submitted pursuant to the stipulation to which the FDIC expressly agreed.  (J.A. at 163-64.)  Trying a different tack, the FDIC suggests elsewhere that the very fact that it submitted evidence somehow establishes that there were disputed issues of material fact.  (FDIC Br. at 5, 17.)  However, the FDIC failed to identify any such issues, despite the Bankruptcy Court's repeated requests at the May 26, 2010 hearing that it do so.  (*See, e.g.*, J.A. at 78, 95-96, 114.)

### C.   None of the Debtor's Public Statements Reflects A Commitment To Maintain The Bank's Capital Levels.

The court below also correctly rejected the FDIC's argument that the Debtor's contemporaneous public filings establish that the Debtor understood that it had agreed to guarantee the Bank's Capital Ratios.  (J.A. at 35.)  Each of the public statements relied upon by the FDIC is consistent with the Debtor's position that it had agreed in its Supervisory Documents only to assist the Bank in reaching the required Capital Ratios, not to infuse the Bank with the capital needed for it to reach those levels.

On appeal, the FDIC focuses on statements in the Debtor's Form 10-K, dated March 2, 2009, and Form 10-Q, dated May 8, 2009, regarding the Debtor MOU, which it argues

28

reflect "public recognition" that the Debtor had made a capital maintenance commitment.  (FDIC Br. at 38-39.)  In the disclosures cited by the FDIC, however, the Debtor simply stated that it had entered into the MOU, which addressed, among other items, "management of asset quality and increased capital for Colonial Bank"; that it "ha[d] agreed to use its resources to support Colonial Bank"; and that its "resources [would] be used to support the Bank."  (*Id.* at 38.)  There is no dispute that the Debtor had undertaken to use its resources to support the Bank, and was in fact doing so.  That is a far cry from guaranteeing that the Bank would attain the Capital Ratios or committing to cover any eventual capital deficiency.

The FDIC also points to a disclosure made by the Debtor in its Form 10-K filing titled "Support to Subsidiary Bank," which provides:  "In the event of a bank holding company's bankruptcy, any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment."  (FDIC Br. at 22-23.)  However, as the Bankruptcy Court expressly found, that disclosure, made by the Debtor in eleven of its twelve prior Form 10-K filings, "does not indicate that such a commitment was made by the Debtor.  The language merely recites the legal effect of such a commitment, if any, in bankruptcy."[13]  (J.A. at 35.)

**D.    The Testimony of the Debtor's Expert Corroborates the Lack of a Capital Maintenance Commitment.**

The FDIC also criticizes the Bankruptcy Court's reliance on the testimony of Herbert Biern, the Debtor's expert.  Mr. Biern testified, based on 25 years of experience as a

---

[13] The other public statements relied upon by the FDIC on appeal are equally unavailing.  (FDIC Br. at 38-39.)  Thus, in a Form 8-K, filed on July 27, 2009, the Debtor explained that its C&D Order "generally provides for the development and implementation of actions to ensure the Debtor's wholly owned subsidiary, Colonial Bank, complies with" the Bank C&D.  As described above, there is no dispute that the Debtor developed and implemented a number of actions to assist the Bank in meeting its regulatory requirements.  Similarly, the Debtor's statement in an August 11, 2009 Form 12b-25 regarding "uncertainties associated with the Debtor's ability to increase its capital levels to meet regulatory requirements" in no way suggests that the Debtor had agreed to guarantee that the Bank would meet its required Capital Ratios.  These statements, like those described above, are merely indicative of the Debtor's responsibility to assist its Bank in meeting its capital requirements.

senior official in the enforcement division of the Federal Reserve, with respect to the Federal

Reserve's regulatory environment, the import of the enforcement actions the Federal Reserve

took, and the language that it used and did not use.  The FDIC—which offered no expert

testimony of its own—argues that (i) the court improperly relied on Mr. Biern's testimony in

holding that the plain language of the Debtor's Supervisory Documents does not create a capital

maintenance commitment; and (ii) the court did so even after allegedly holding that it would not

accept Mr. Biern's opinions as an expert witness.  (FDIC Br. at 37; *see also id.* at 40, 46-47.)

       In fact, as described below, the portion of the court's decision based on the plain

language of the Supervisory Documents did not turn on Mr. Biern's testimony.  What is more, in

the alternative portion of the decision in which the court below considered the extrinsic evidence,

it relied on Mr. Biern's expert testimony after denying the FDIC's motion *in limine* to exclude

that testimony.  (J.A. at 45-46.)  Contrary to the FDIC's claim, at no point did the court agree

that Mr. Biern could not testify as an expert.

       **1.**     **Mr. Biern Testified that the Supervisory Documents Did Not Require the Debtor to Guarantee the Bank's Capital Levels.**

       Mr. Biern joined the Federal Reserve in 1979 and served in the enforcement area

for 25 years, including 20 years as the senior officer in charge of the Enforcement Section of the

Division of Banking Supervision and Regulation.  (J.A. at 272, 274.)  During his tenure at the

Federal Reserve, he drafted or oversaw approximately 3,000 enforcement actions.  (J.A. at 274.)

Mr. Biern made presentations to well over 1,500 boards of directors and individuals to obtain

their consent to the execution or issuance of such enforcement actions. (J.A. at 274.)  He also

"trained and mentored the enforcement and supervisory staffs of the [twelve] Federal Reserve

Banks regarding the drafting, presentation, and execution of enforcement actions" and the

Federal Reserve's policies and practices with regard to such actions and presentations.  (J.A. at

274.)  As the court noted, while Mr. Biern was at the Federal Reserve, he drafted the templates for the three Supervisory Documents.  (J.A. at 32; Biern tr. 231:16-21 (J.A. at 384).)

Moreover, Mr. Biern ran the Division's enforcement function when Section 365(o) went into effect in 1990, and he issued the Supervision and Regulation Letter on the topic to the twelve Federal Reserve Banks.  As he testified, he "was aware of the care that needed to be taken to address the provisions of 365(o) in enforcement activities; in other words, what was the intersection between 365(o) and the Federal Reserve's enforcement actions."  (Biern tr. 73:6-11 (J.A. at 344).)  He remained in charge thereafter and reviewed provisions developed to address Section 365(o) from the regulatory perspective of the Federal Reserve.  (J.A. at 282.)

Based on his experience at the Federal Reserve, Mr. Biern offered his opinion that neither the Debtor MOU nor the Debtor C&D committed the Debtor to maintain the Bank's capital.  (J.A. at 279, 280.)  At his deposition, Mr. Biern expressed the opinion that the 4(m) Agreement also did not do so.  (Biern tr. 37:17-38:2 (J.A. at 335-36).)  As the court noted, Mr. Biern explained that the language in the Supervisory Documents is simply a restatement of the Debtor's existing obligation under the Federal Reserve's "Source of Strength" regulation (J.A. at 12), which "does not commit a bank holding company to maintain its subsidiary bank's capital at any time or at any level."  (J.A. at 278-79, 280.)  As the court's Opinion also reflects, Mr. Biern explained that when the Federal Reserve intends to create a capital maintenance commitment, it does so in a manner very different from what was done in the documents at issue here.  (J.A. at 11; J.A. at 342-47.)

### 2.    The Bankruptcy Court Properly Considered Mr. Biern's Testimony.

The FDIC asserts that the court below relied upon Mr. Biern's testimony in reaching its conclusion that the unambiguous language of the Debtor's regulatory documents did not create a capital maintenance commitment.  (FDIC Br. at 37.)  However, the only reference to

Mr. Biern's testimony in the Bankruptcy Court's discussion of the plain language of the documents is in a footnote after its analysis of the language of the Supervisory Documents, and after the court articulated its conclusion with respect thereto.[14]   (J.A. at 28 n.16.)   The Bankruptcy Court did not even rely on Mr. Biern for the proposition in the footnote, *i.e.* that the relevant language in the Debtor C&D merely required the Debtor's directors "to act as a source of strength for the Bank," and that "[t]he Debtor already had that obligation under Federal Reserve Policy."   (*Id.*)   Rather, the court simply referred to the fact that Mr. Biern had offered a similar opinion.

The other portions of the Bankruptcy Court's opinion cited by the FDIC on this issue are in the court's alternative holding based on discussion of the extrinsic evidence.   (FDIC Br. at 37; J.A. at 32-33.)   The Bankruptcy Court considered Mr. Biern's opinions in that context, and it was entirely appropriate for it to do so.   The FDIC takes issue with the Bankruptcy Court's order denying the FDIC's motion *in limine* to exclude Mr. Biern's testimony, but acknowledges that the Court must review that order under an abuse of discretion standard, *see Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103-04 (11th Cir. 2005). Under this standard, the lower court "enjoys considerable leeway," and reversal is appropriate only if the ruling is "manifestly erroneous."   *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc).   The FDIC does not come close to making such a showing.

According to the FDIC, the Bankruptcy Court excluded Mr. Biern as an expert, and then improperly admitted his testimony as a fact witness despite his lack of personal knowledge of the facts at issue.   (FDIC Br. at 37, 40, 46-47.)   That is a complete

---

[14] The footnote at issue provides:  "In addition, the operative paragraph in the Debtor C&D calls on the directors of the Debtor — not the Debtor — to act as a source of strength for the Bank.  The Debtor already had that obligation under Federal Reserve Policy.  As stated above, Herb Biern testified that this paragraph therefore had very little effect."  (J.A. at 28 n.16.)  The court's reference to what was "stated above" was merely to its recitation of the salient points from the deposition testimony of the various witnesses, not to any part of its analysis.

mischaracterization of what the court actually did.  The Bankruptcy Court did *not* exclude Mr. Biern's testimony as an expert, but rather expressly held that Mr. Biern "is qualified as an expert witness."  (J.A. at 45; *see also* J.A. at 11 ("Herb Biern testified as an expert.").)  The court simply excluded any portion of his testimony that purported to render a legal opinion.[15]  (J.A. at 45.)  *See, e.g., United States v. Long*, 300 F. App'x 804, 814 (11th Cir. 2008) ("[a]n expert witness may not testify as to his opinion regarding ultimate legal conclusions").  As the court in *Long* explained, expert testimony is permitted with respect to facts, 300 F. App'x at 814, which is the testimony the Bankruptcy Court held would be allowed in this case.  (J.A. at 45.)  That does not make such testimony fact testimony.  The expert is still testifying as an expert, and is therefore not subject to Federal Rule of Evidence 602—requiring personal knowledge of facts—as the FDIC asserts.

Mr. Biern testified as to the intention of the Supervisory Documents at issue based on his extensive experience preparing and entering into documents of the same type.  The fact that he did not participate in drafting *these* Supervisory Documents is irrelevant.  The FDIC's claim to the contrary would mean that, for example, an expert on arson could not opine as to the origin of a particular fire because he did not witness the fire first hand—a proposition that is absurd on its face.  Mr. Biern is not seeking to testify as to the specific factual circumstances of the documents' preparation or execution, nor need he do so.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.")

---

[15] The FDIC does not assert that the court considered any legal opinion by Mr. Biern, nor could the FDIC do so. Not only is there no reference to any such legal opinion in the court's Opinion, but, in fact, there is none in Mr. Biern's testimony either.  Indeed, the court did not rule that Mr. Biern had attempted to offer legal opinion, only that to the extent there were any legal opinions in Mr. Biern's testimony (as the FDIC claimed), such testimony would not be considered.

Accordingly, the Bankruptcy Court did not abuse its discretion in considering Mr. Biern's testimony, and this Court should affirm the Bankruptcy Court's order.

## III.   THE BANKRUPTCY COURT CORRECTLY HELD THAT SECTION 365(O) DOES NOT APPLY BECAUSE THE SUPERVISORY DOCUMENTS WERE UNENFORCEABLE, TERMINATED OR OF NO EFFECT.

Even if the Court were to conclude that, under the Supervisory Documents, the Debtor had agreed to infuse sufficient additional capital for Colonial Bank to achieve specified capital levels, or had otherwise guaranteed Colonial Bank's attainment of those levels, Section 365(o) still would not be applicable.  That is because, as the Bankruptcy Court correctly held in the alternative, the documents at issue were unenforceable, terminated or of no effect.  (J.A. at 37-41.)

### A.   The Debtor MOU Was Unenforceable And, In Any Event, Was Terminated.

#### 1.   The Debtor MOU Was Unenforceable and Therefore Cannot Be The Basis Of A Capital Maintenance Commitment Under Section 365(o).

The FDIC does not dispute the Bankruptcy Court's conclusion that the Debtor MOU was not enforceable.  (J.A. at 39.)  As the FDIC acknowledges (FDIC Br. at 28), the Debtor MOU explicitly states that it "is not a 'written agreement' for the purposes of Section 8 of the Federal Deposit Insurance Act, as amended" (J.A. at 231).  According to the Federal Reserve's own manual for examiners, a "written agreement" is a type of formal, enforceable enforcement action, while a memorandum of understanding is a type of "informal supervisory tool."  *See* BD. OF GOVERNORS OF THE FED. RESERVE SYS., DIV. OF BANKING SUPERVISION AND REGULATION, COMMERCIAL BANK EXAMINATION MANUAL, FORMAL AND INFORMAL CORRECTIVE ACTIONS § 5040.1 (Eff. Nov. 2003) (J.A. at 665, 668).  Informal supervisory tools

"*are not enforceable*, and their violation cannot serve as a basis for assessing a civil money penalty or initiating a removal and prohibition action."  (J.A. at 668 (emphasis added).)[16]

However, the FDIC takes the position that an agreement need not be enforceable to be a capital maintenance commitment under Section 365(o).  The Bankruptcy Court expressly held to the contrary (J.A. at 37-38), and its conclusion is clearly supported by the statute, its legislative history and case law.

As the FDIC recognizes, Congress enacted Section 365(o) "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. REP. NO. 101-681(I), at 185 (1990) *as reprinted in* 1990 U.S.C.C.A.N. 6472, 6585.  (FDIC Br. at 21.)  A holding company that has an *unenforceable* agreement with respect to its subsidiary would not need Chapter 11 to avoid performing it.  The parent simply would fail to perform, and the agency to which the commitment was made would have no recourse against it as a matter of law.  Nor would it make sense to assume a commitment under Section 365(o) if that commitment were unenforceable.  Accordingly, the purpose and language of Section 365(o) make clear that a "commitment" must be enforceable.

That Section 365(o) cannot apply to unenforceable obligations is also reflected in Section 507(a)(9), which parallels Section 365(o) and contains the same "commitment" language.  In particular, Section 507(a)(9) provides that "allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency . . . to

---

[16] *See also* Fed. Reserve Bank of Atlanta*, Financial Update, *Enforcement Actions Help Keep Banks Safe and Sound*, Vol. 14, No. 3 (July-Sept. 2001) (J.A. at 671-72) (*available at* http://www.frbatlanta.org/pubs/financialupdate/financial_update-vol_14_no_3-did_you_know.cfm?redirected=true) (recognizing that memoranda of understanding are informal actions, which are not enforceable).

maintain the capital of an insured depository institution" are to be given ninth priority.  11 U.S.C. § 507(a)(9) (2010).  As described below, Section 507(a)(9) and the relevant definitions of its terms make clear that a "commitment" must be enforceable.

Section 507(a)(9) applies to "allowed unsecured claims."  The Bankruptcy Code defines a "claim" as a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment."  11 U.S.C. § 101(5)(A-B) (2010).  As the Supreme Court has held, "a 'right to payment . . . is nothing more nor less than an enforceable obligation.'"  *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998) (citation omitted).  Thus, only enforceable agreements can be the basis for a claim under Section 507(a)(9).  That is also evident from the fact that Section 507(a)(9) applies only to claims that are "allowed."  Pursuant to Section 502 of the Bankruptcy Code, a claim is not allowable to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1) (2010).[17]

Accordingly, the term "commitment" in Sections 365(o) and 507(a)(9) clearly refers to an enforceable obligation.  That is consistent with the court's recognition in *FDIC v. Butler (In re Connor Corp.)*, 127 B.R. 775 (E.D. N.C. 1991), that the Crime Control Act of 1990, which enacted Sections 365(o) and 507(a)(9) (originally 507(a)(8)), did not create claims that would not otherwise exist.  *Id.* at 780-81.

---

[17] Given that a "commitment" under Section 507(a)(9) must be an enforceable obligation, it necessarily must be an enforceable obligation for purposes of Section 365(o) as well.  Not only do the two provisions use the same language, but they work together.  The consequence under Section 365(o) of failing to cure a capital maintenance commitment is to require a Debtor to proceed under Chapter 7 rather than Chapter 11.  In Chapter 7, the FDIC's claim would be governed by Section 507(a)(9).  *See Wolkowitz*, 527 F.3d at 976 ("[A] debtor's failure to cure a pre-petition capital maintenance obligation is … subject to the § 507 priority scheme post-conversion to Chapter 7.").  Given that an unenforceable undertaking cannot serve as the basis for a claim under Section 507(a)(9), it would make no sense to read Section 365(o) as requiring conversion to a Chapter 7 proceeding on account of such an undertaking.

Consistent with this, the cases finding capital maintenance commitments all have involved enforceable obligations.  Three of them involved commitments by a debtor to a federal agency that the debtor agreed to as a condition for that agency's approval of the acquisition of a savings and loan or thrift institution.  *See Firstcorp*, 973 F.2d 243; *Franklin*, 303 B.R. 488; *Overland*, 236 F.3d 1246.  Commitments made as a condition for the acquisition of a bank have been found to be "clearly enforceable."  *Firstcorp*, 973 F.2d at 250 n.6 (citing *Kaneb Servs., Inc. v. Fed. Sav. & Loan Ins. Corp.*, 650 F.2d 78 (5th Cir. 1981)); *see also MCorp Fin., Inc.,* 900 F.2d at 861-62 (Federal Reserve could require the bank holding company to agree to maintain its subsidiary's capital as a condition to approving an application).[18]  There also was an enforceable commitment in the fourth case.  *See Wolkowitz*, 527 F.3d at 966-67 (guarantee of performance of capital restoration plan submitted to FDIC by undercapitalized bank subsidiary required for plan to be acceptable under prompt corrective action provisions of the FDIA, 12 U.S.C. § 1831o(e)(2)).

Citing the Tenth Circuit's decision in *Overland*, the FDIC argues that the term "commitment" should be interpreted broadly to include "informal" net worth stipulations, even though they are not "enforceable."  (FDIC Br. at 24-26.)  In *Overland*, however, the district court and Tenth Circuit overturned a bankruptcy court's holding that a Section 365(o) commitment must be an *executory contract* (and that, accordingly, Section 365(o) did not apply to the commitment in question, which was a stipulation).  *Overland*, 236 F.3d at 1252-53.  That is in no way inconsistent with the Bankruptcy Court's decision here, which held that a Section 365(o) commitment must be enforceable, not that it must be a contract.  (J.A. at 37-38.)

---

[18] *See also* 12 U.S.C. § 1818(b)(1), (i)(2)(A)(iv), (e)(1)(A)(i)(IV) (2010) (FDIA §§ 8(b)(1), (i)(2)(A)(iv), (e)(1)(A)(i)(IV)) (a "condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request" can form the basis for a cease and desist order, a civil money penalty or the exercise of the regulatory agency's removal and prohibition authority).

Indeed, contrary to the FDIC's argument, in *Overland*, both the Tenth Circuit and the district court acknowledged the enforceability of the stipulation at issue. *See Overland*, 236 F.3d at 1252-53 (concluding that net worth stipulation was in fact a "binding commitment" based on the stipulation's "mandatory" language that "evince[d] Overland Financial's understanding it is obligated to maintain, and if necessary infuse, capital" to ensure compliance with the regulations, as well as on the fact that the stipulation was an "integral condition precedent" to agency approval of the acquisition); *see also Office of Thrift Supervision v. Overland Park Financial Corp. (In re Overland Park Fin. Corp.)*, 232 B.R. 215, 224 (D. Kan. 1999) (referring to Office of Thrift Supervision's power to enforce the stipulation by cease and desist order pursuant to administrative authority under 12 U.S.C. § 1818).

The FDIC points out (FDIC Br. at 25) that the district court in *Overland* referred to the dictionary definition of the term "commitment" as "an agreement or pledge to do something." *OTS v. Overland*, 232 B.R. at 222. But the conclusion the district court drew from that definition was that a capital maintenance commitment under Section 365(o) does not require an "enforceable *contract*" (FDIC Br. at 25 (emphasis added)), not that it can be unenforceable *per se*. *See also Firstcorp*, 973 F.2d at 250 n.6 (finding that alleged commitment was "clearly enforceable"). Moreover, the FDIC cannot read the word "commitment" in isolation from the statutory purpose and legislative history described above. *See Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010) ( "We do not look at one word or term in isolation, but instead we look to the entire statutory context."); *United States v. Silva*, 443 F.3d 795, 798 (11th Cir. 2006) (same). In light of the statutory purpose of Section 365(o), as discussed above, it would make no sense to apply Section 365(o) to commitments that are not enforceable.

2.     **The Debtor MOU Was Terminated Before The Debtor Filed Its Bankruptcy Petition.**

Even if the Court were to hold that unenforceable commitments are subject to Section 365(o), the FDIC still could not rely on the Debtor MOU because the Debtor MOU was no longer in place at the time the Debtor filed its bankruptcy petition under Chapter 11.

As noted above, pursuant to the Debtor MOU, the Debtor agreed to assist the Bank in achieving compliance with the Bank MOU, which provided that the Bank would achieve certain Capital Ratios by February 28, 2009.  (J.A. at 223.)  The Bank did not achieve those Capital Ratios and, on June 5, 2009, the Bank's regulators informed its board of directors "that the Bank MOU was 'being discontinued and replaced by a new action in the form of a Cease and Desist Order.'"  (FDIC Br. at 13; *see also* J.A. at 264.)  The FDIC and the SABD issued that Cease and Desist Order on June 15, 2009, thereby superseding the Bank MOU.

The Bankruptcy Court correctly found that the Debtor MOU, which was based on the Bank MOU, effectively was terminated when the underlying Bank MOU was discontinued and replaced by the Bank C&D.  (J.A. at 39 n.21.)  As the Bankruptcy Court also noted, the parties do not dispute that the Debtor MOU was followed and superseded by the July 22, 2009 Debtor C&D, which referenced the Bank C&D.  (J.A. at 39; J.A. at 256.)   The FDIC does not contest either of these conclusions.  In fact, in its Stay Relief Motion, the FDIC expressly conceded that the Debtor C&D replaced the Debtor MOU:

> [T]he Debtor's consent and agreement to the cease and desist order supplanted its earlier Memorandum of Understanding, thereby subjecting the Debtor to more exacting scrutiny and stricter enforcement for future violations.

[Doc. No. 499, ¶ 31.]  Because the Debtor MOU was no longer in effect at the time the Debtor filed its bankruptcy petition, it cannot serve as the basis for a Section 365(o) claim.

**B.    The Debtor C&D And 4(m) Agreement Were Of No Effect At The Time The Debtor Filed Its Bankruptcy Petition.**

The Committee does not dispute that, unlike the Debtor MOU, the Debtor C&D and the 4(m) Agreement were enforceable supervisory documents when they were entered into.[19] However, even if those documents contained a capital maintenance commitment, which they did not (*see* Sections I and II, above), any such commitment was of no force and effect by August 25, 2009, when the Debtor filed its bankruptcy petition.  Accordingly, for this reason alone, neither of those documents can be a basis for invoking Section 365(o).

As explained above, the 4(m) Agreement required the Debtor to "tak[e] steps designed to ensure" the Bank's compliance with the Bank MOU and "any other supervisory action regarding the Bank" taken by its regulators.  (J.A. at 227.)  On June 15, 2009, the Bank MOU ceased to exist and the Bank C&D took its place.  The Committee does not take issue for these purposes with the FDIC's assertion that the Bank C&D would constitute an "other supervisory action regarding the Bank" within the meaning of the 4(m) Agreement.  The Bank C&D also was referenced, expressly, in the Debtor C&D, which provided that the Debtor would "take appropriate steps to ensure" the Bank's compliance with it. (J.A. at 256.)

However, the Bank C&D did not call for the Bank to achieve the specified capital ratios until September 30, 2009.  (J.A. at 239-40, ¶ 3(a).)  Before that deadline, on August 14, 2009, the SABD closed the Bank and appointed the FDIC as its receiver, and the FDIC immediately sold the Bank's deposits to BB&T.  When a receiver is appointed for a bank, the holding company loses control of the subsidiary and is no longer able to fulfill any capital maintenance commitment.  *See Firstcorp*, 973 F.2d at 251 (assuming that receivership ended

---

[19] The FDIC complains that the Bankruptcy Court recited an offer of proof made by the Debtor at the May 26, 2010 hearing that the 4(m) Agreement was not "duly authorized," and argues that to the extent the court considered the proffer, it was improper to do so.  (FDIC Br. at 36.)  The FDIC does not claim that the court did in fact consider the proffer (asserting that whether the court did so is "unclear"), and the court plainly never relied on it.

holding company control over subsidiary "and therefore terminated its capital maintenance commitment"); *Franklin*, 303 B.R. at 499-500 (appointment of receiver or conservator terminates holding company's control over subsidiary bank for purposes of capital maintenance commitment).  The Bankruptcy Court recognized that, once a receiver is appointed over a bank, the bank is no longer an operating entity, and thus performance under any capital maintenance commitment that previously may have existed is impossible.  (J.A. at 40.)

As the court held, because Section 365(o) applies only to assuming and curing ongoing commitments, it cannot apply to a situation in which a bank has been closed and sold. (J.A. at 40-41.)[20]  In so holding, the court correctly noted that section 365(o) expressly "does not extend any commitment 'that would otherwise be terminated by any act of such agency.'"  (J.A. at 40.)  The court also noted that Section 365(o) contemplates a continuing commitment, in that it makes provision for a subsequent breach.  (J.A. at 40.)  On appeal, the FDIC asserts that the Bankruptcy Court committed legal error in concluding that Section 365(o) was inapplicable because the commitment, could no longer be assumed and cured, claiming that the same reasoning was considered and rejected by the court in *Firstcorp*.  (FDIC Br. at 31.)  In fact, the court in *Firstcorp* did not deal with this issue at all.

In *Firstcorp*, the bank was placed into receivership two days *after* the holding company had filed for bankruptcy, and after there already was a deficit in the holding company's capital maintenance commitment because it was ongoing and not calibrated to any particular due date.  The holding company had a capital maintenance commitment to which it had agreed as a condition to acquiring the bank several years earlier, and by the time of the bankruptcy and later

---

[20] The FDIC argues that the Debtor's and Committee's position as to the effectiveness of the 4(m) Agreement and the Debtor C&D renders the undertakings "tentative," "hollow promise[s] that could not be enforced," or "aspirational." (FDIC Brief at 27, 30.)  However, as described above, the Debtor and Committee do not claim that they were unenforceable.  Rather, they ceased to be of any force and effect prior to the filing of the Debtor's bankruptcy petition by virtue of intervening events.

receivership, the commitment already had become due.  *Firstcorp*, 973 F.2d at 244-45.  Thus, the question before the court was whether the holding company was relieved of the cure obligation under Section 365(o)—which clearly existed at the time it filed for bankruptcy— by virtue of the *subsequent* appointment of a receiver.  *Id.* at 248-50.  The court held that Section 365(o) applied to the holding company's "existing, matured liability," which had attached by the date of its bankruptcy filing and was not terminated by the appointment of a receiver.  *Id.* at 251.  In the present case, by contrast, the Bank was placed into receivership both before the Debtor's bankruptcy filing and before the due date for the purported capital maintenance commitment.

        The FDIC also claims that most of the cases addressing 365(o) involved capital maintenance commitments with respect to banks or thrifts that were in receivership.  (FDIC Br. at 33.)  However, as noted above, in *Firstcorp*, the receiver was appointed after the deficiency already existed and the holding company had filed for bankruptcy.  In *Wolkowitz*, the receivership preceded the bankruptcy, but the court did not reach the question of whether Section 365(o) was applicable notwithstanding that.  The debtor already had converted to Chapter 7, and the sole question before the court was the degree of priority to which the FDIC's claim was entitled.  *Wolkowitz*, 527 F.3d at 973.  The receivership in *Overland* also preceded the bankruptcy, but the decisions in that case focused on whether there had ever been a commitment in the first place, and did not consider the effect of the receivership on the applicability of Section 365(o).  236 F.3d at 1249-50, 1252-53.  (Having found that there was such a commitment, the Tenth Circuit then remanded the case to the bankruptcy court to consider the other issues that had been raised by the debtor.  *Overland*, 236 F.3d at 1254-55.)  Nor was this issue considered in *Franklin*, where the bank's receiver had filed a proof of claim for an asserted capital deficiency rather than seeking relief under Section 365(o).  303 B.R. at 502-503.

The FDIC argues that it will lose billions of dollars in revenue if Section 365(o) is inapplicable when a bank is placed into receivership and its assets are sold prior to the date of the holding company's bankruptcy.  (FDIC Br. at 32-33.)  However, the court below simply held that, in that situation, any claim by the FDIC would have to be raised under Section 507(a)(9) rather than Section 365(o).  (J.A. at 41, n.23, n.24.)  Because that holding was sufficient to dispose of the FDIC's Section 365(o) motion, the court did not have to reach the question of whether a claim would lie under Section 507(a)(9).[21]

Although it is not necessary for the disposition of the FDIC's motion, it is clear that the timing of the receivership also would preclude a claim for breach of any purported commitment under Section 507(a)(9).  That is because the receivership not only preceded the bankruptcy (which precludes a claim under Section 365(o)), but also preceded by over a month the date that any purported commitment would have been due, given that the Bank was not obligated to reach the Capital Ratios until September 30, 2009.  (J.A. at 239-40, ¶ 3(a).)  In all of the cases in which banks were placed into receivership and a claim was found to exist under a capital maintenance commitment, the holding company's obligation became due prior to the receivership, and therefore the holding company had no justification for failing to comply with it.[22]  Here, even if there had been a capital maintenance commitment under the 4(m) Agreement or Debtor C&D, that liability had not matured at the time the FDIC was appointed receiver because the receivership pre-dated the Bank's September 30, 2009 deadline for achieving the

---

[21] The court's earlier conclusion that there was no capital maintenance commitment at all (*see* Sections I and II above) *would* preclude a claim under both Section 365(o) and Section 507(a)(9), inasmuch as both of those provisions require that there have been such a commitment.

[22] *See Firstcorp*, 973 F.2d at 251 (Section 365(o) applied to deficiency in capital maintenance commitment existing before the bank was placed into receivership); *Wolkowitz*, 527 F.3d at 964, 968 (bank placed into receivership on February 7, 2003, while deficit under performance guaranty calculated as of June 30, 2002, seven months earlier); *Overland*, 236 F.3d at 1249-50 (asserting rights under Section 365(o) with respect to deficiency in subsidiary's capital as of the date of receivership).

2:10-cv-00877-MHT   Document 31   Filed 01/05/11   Page 50 of 56

capital ratios under the Bank C&D.  Thus, there can be no capital maintenance claim at all, whether under Section 365(o) or Section 507(a)(9).[23]

## IV.  THE BANKRUPTCY COURT PROPERLY CONCLUDED THAT SECTION 365(O) DOES NOT APPLY BECAUSE THE FEDERAL RESERVE WAS NOT THE "FEDERAL DEPOSITORY INSTITUTIONS REGULATORY AGENCY" IN THIS CASE.

Section 365(o) is inapplicable here for another reason as well.  Under Section 365(o), a capital maintenance commitment must be made to a "Federal depository institutions regulatory agency."  The Bankruptcy Court correctly held that, under the definition of that term, the Federal depository institutions regulatory agency in this case was the FDIC, which was the Federal agency responsible for regulating Colonial Bank.  (J.A. at 36.)  However, the Supervisory Documents on which the FDIC bases its claim were not entered into with the FDIC, but rather with the Federal Reserve.  Accordingly, even if a commitment had been made in those documents, it would not be commitment to a Federal depository institutions regulatory agency, and would not fall within Section 365(o).  (J.A. at 36.)   The FDIC provides no basis for its challenge to this determination.  (FDIC Br. at 42-46.)

There is no dispute that "Federal depository institutions regulatory agency" is defined by Section 101(21B)(A) of the Bankruptcy Code, to mean:

> with respect to an insured depository institution (as defined in Section 3(c)(2) of the Federal Deposit Insurance Act) for which no conservator or receiver has been appointed, the appropriate Federal banking agency (as defined in Section 3(q) of such Act).

---

[23] What is more, the Bank C&D was expressly terminated on September 29, 2010, one day before the deadline for the Bank to achieve the Capital Ratios.  (J.A. at 265-66.)  The Bankruptcy Court found this argument "weak," stating that there was "no evidence that one day would have made any difference in the [Bank's] ability to perform under the [Bank] C&D."  (J.A. at 39.)  However, whether the Bank could have done so is not the issue.  Once the Bank C&D was terminated prior to the due date, there could be no liability on Debtor's part with respect to it.  As the court in *Firstcorp* concluded, a holding company will be liable for any "existing, matured liability."  973 F.2d at 251.  There could be no such liability based on the Bank C&D in this case.

11 U.S.C. § 101(21B)(A) (at the time of alleged commitment in this case, no receiver had been appointed).  Nor is there any dispute that the insured depository institution in this case is the Bank.[24]  Finally, there also is no dispute that Section 3(q) of the FDIA defines the "appropriate Federal banking agency" for the Bank as the FDIC.  (*See* FDIC Br. at 43-44.)  Accordingly, a commitment under Section 365(o) must be made to the *Bank's* regulator, not the regulator for the holding company.  Notwithstanding that, the FDIC claims "[t]here is nothing in the language of [Section 365(o)] that excludes from its scope pledges made to the federal regulator that is responsible for regulating a bank or thrift's holding company," in this case the Federal Reserve.  (*Id.* at 43.)  However, that ignores the above definition of the term "Federal depository institutions regulatory agency," which is used in Section 365(o).[25]

In an effort to avoid the language of that definition, the FDIC argues that the phrase, "with respect to an insured depository institution," modifies the phrase "for which no conservator or receiver has been appointed."  (*Id.* at 44.)  In fact, however, it is the other way around.  The phrase "for which no conservator or receiver has been appointed" clearly modifies the term "insured depository institution."  Read as a whole, Section 101(21B)(A) simply provides that, in the case of an insured depository institution for which no conservator or receiver has been appointed, the "Federal depository institutions regulatory agency" is the appropriate Federal banking agency for that insured depository institution.

---

[24] Section 3(c)(2) of the FDIA defines "insured depository institution" to mean "any bank or savings association the deposits of which are insured by the [FDIC] pursuant to this Act."

[25] The FDIC also argues that construing the phrase "appropriate Federal banking agency" as applying to the Bank's regulator, rather than the holding company's regulator, would "conflict with federal banking law" because the Federal Reserve is responsible for regulating holding companies such as the Debtor.  (FDIC Br. at 43.)  As the Bankruptcy Court noted, however, there is no reason that the FDIC could not have sought a commitment from the Debtor as part of its regulation of the Bank.  (J.A. at 36.)  Indeed, guarantees always are provided to the obligee to which the underlying obligation is owed.

The FDIC also points to a prior version of Section 365(o), before it was amended in 1994.  Instead of referring to a "Federal depository institutions regulatory agency," the earlier version of Section 365(o) referenced enumerated federal agencies, including the FDIC and the Federal Reserve.  (*Id.* at 45.)  The FDIC notes that the change was denominated a technical amendment, and argues that nothing in the legislative history of the amendment suggests that Congress intended to alter the meaning of section 365(o).  According to the FDIC, the Bankruptcy Court failed to consider this purportedly "clear and compelling legislative history" in interpreting Section 365(o).  (*Id.* at 46.)

In fact, there is no legislative history describing the change made by the 1994 amendment, so there is nothing "clear and compelling" about it.  That the change was denominated a "technical amendment" means nothing.  If anything, the change is consistent with the idea that Congress was clarifying that Section 365(o) applies to a commitment made to any of the agencies previously enumerated in the statute, *if* the agency is the one that regulates the depository institution at issue.  In any event, it is improper to attempt to resort to "legislative history" where, as here, the statutory language is clear.  *See, e.g., Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1332-33 (11th Cir. 2005); *Harris v. Garner,* 216 F.3d 970, 976-77 (11th Cir. 2000).

## V.    THE FDIC WOULD NOT HAVE STANDING TO ENFORCE ANY CAPITAL MAINTENANCE COMMITMENT OF THE DEBTOR.

Even if the Supervisory Documents created a capital maintenance commitment that was subject to Section 365(o), the Court should affirm the Bankruptcy Court's dismissal of

46

the FDIC's Section 365(o) Motion because the FDIC does not have standing to enforce the Supervisory Documents.[26]

As receiver, the FDIC's rights are limited to those held by the Bank, which do not include the right to enforce the terms of the Supervisory Documents—to which the Bank was not a party.  In *Resolution Trust Corp. v. Tetco, Inc.*, the Resolution Trust Corporation ("RTC"), as conservator for a Texas savings and loan association, filed an action against the association's holding company, seeking damages for its breach of a net worth maintenance stipulation provided to the FHLBB.  758 F. Supp. 1159, 1161-62 (W.D. Tex. 1990), *vacated as moot* No. 91-5612, 1992 WL 437650 (5th Cir. Apr. 22, 1992).  The RTC argued that even if it had no statutory private right of action against the holding company, it could assert a claim as third party beneficiary of the net worth stipulation.  *Id*. at 1165.  The court dismissed the RTC's action, stating:

> If Congress did not intend to give the appropriate agencies the right to enforce administrative regulatory provisions in a private suit denominated as an action under the statutes and regulations in question, surely it could not have intended for those agencies, or other interested private parties, to effect substantially the same remedies in a private lawsuit denominated as a contract claim.  In other words, the remedies available in contract would be so nearly comparable to the administrative remedies as to compel the conclusion that the reasons for denying a private claim on the statute should apply with equal force to that claim in contract.

758 F. Supp. at 1165.

The FDIC does not and could not claim any right to enforce the Supervisory Documents based on a statutory private right of action.  Accordingly, for reasons articulated in

---

[26] The Bankruptcy Court did not reach the issue of standing under Section 365(o) because its other holdings disposed of the case.  (J.A. at 42.)  However, the Court may affirm summary judgment on any legal ground, whether or not relied on by the lower court.  *See, e.g., Neumont v. Florida*, 610 F.3d 1249, 1250 n.1 (11th Cir. 2010).

*Tetco*, the FDIC cannot seek to achieve the same result as a purported successor third party beneficiary under those documents.[27]

## VI.     THE BANKRUPTCY COURT PROPERLY DENIED THE FDIC'S MOTION FOR STAY RELIEF UNDER SECTION 362(D).

The FDIC argues that the Bankruptcy Court's denial of its Section 362(d) Stay Relief Motion should be reversed because it was based on the court's conclusion that the FDIC did not have a claim arising under Section 365(o), which the FDIC asserts was erroneous.  (J.A. at 47.)  The FDIC does not dispute that, if the Bankruptcy Court's holding under Section 365(o) was correct, the Stay Relief Motion should be denied.  Because the court's ruling on Section 365(o) is in fact correct, its ruling on the Stay Relief Motion should be affirmed.[28]

---

[27] Although the district court in *Overland* stated that it "would appear" that the right to enforce a claim based on a capital maintenance commitment belongs to the bank's conservator, not to its regulator, that statement was pure *dicta* inasmuch as the conservator was not seeking standing.  *OTS v. Overland*, 232 B.R. at 228 n.23.

[28] The Debtor and the Committee opposed the FDIC's Stay Relief Motion on other grounds as well.  These include the FDIC's inability to set off claims against the bank accounts at issue under Section 362(d) of the Bankruptcy Code.  The Bankruptcy Court did not address those grounds because it dismissed the FDIC's claim under Section 365(o).  These issues are presently being considered by the Bankruptcy Court as a result of a subsequent motion filed by the FDIC for stay relief under Section 362(d) based on its other claims.  The motion was taken under submission after argument on December 14, 2010.

## CONCLUSION

For all of the foregoing reasons, the Committee respectfully requests that the

Bankruptcy Court's decision be affirmed.

DATED:  January 5, 2011

Respectfully submitted,


/s/ Marc P. Solomon
Robert B. Rubin
brubin@burr.com
Marc P. Solomon
msolomon@burr.com
BURR FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone:  205-251-3000
Facsimile:  205-244-5733


- and -

Alan R. Glickman
(admitted *pro hac vice*)
alan.glickman@srz.com
Brian D. Pfeiffer
(admitted *pro hac vice*)
brian.pfeiffer@srz.com
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York  10022
Telephone:  212-756-2000
Facsimile:  212-593-5955

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS**

49

## CERTIFICATE OF SERVICE

       I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the 5th day of January, 2011:

John J. Clarke, Jr.
Michael D. Hynes
Spencer D. Stiefel
Thomas R. Califano
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
john.clarke@dlapiper.com
michael.hynes@dlapiper.com
spencer.stiefel@dlapiper.com
thomas.califano@dlapiper.com

Michael Aaron Fritz, Sr.
Fritz & Hughes, LLC
7020 Fain Park Drive, Suite 1
Montgomery, AL 36117
bankruptcy@fritzandhughes.com

C. Edward Dobbs
J. David Freedman
Rufus T. Dorsey, IV
Parker, Hudson, Rainer & Dobbs, LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, NE
Atlanta, GA 30303
ced@phrd.com
jdf@phrd.com
rtd@phrd.com

Clark Watson
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
cwatson@balch.com

Nicholas Christian Glenos
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
cglenos@ba-boult.com

                       /s/ Marc P. Solomon
                       OF COUNSEL