### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF ALABAMA

In re:

**THE COLONIAL BANCGROUP, INC.,**

       Debtor.

---

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,**

       Appellant,

   v.

**THE COLONIAL BANCGROUP, INC., et al.,**

       Appellees.

**Case No. 2:10-cv-0877 (MHT)**

**Bankruptcy Appeal**

### REPLY BRIEF OF APPELLANT FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK [REDACTED VERSION]

Michael A. Fritz, Sr.
michael@fritzandhughes.com
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, AL 36117
(334) 215-4422

John J. Clarke, Jr.
Thomas R. Califano
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500
(212) 335-4501

Dated:  January 19, 2011

Attorneys for the
  Federal Deposit Insurance Corporation,
  as Receiver for Colonial Bank

## Table of Contents

Page

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT

I.       THE DEBTOR MADE A CAPITAL MAINTENANCE COMMITMENT THAT
         IS ENFORCEABLE UNDER SECTION 365(o) ............................................. 1

         A.       The Plain Language of the Debtor's Promises Reflect Commitments to
                  Maintain the Capital of Colonial Bank ................................................. 1

                  1.       The Requirements of Section 365(o) ......................................... 2

                  2.       The Plain Language of the Debtor's Promises to Regulators ................... 6

         B.       The "Source of Strength Doctrine" Requires a Holding Company to
                  Provide Capital Support to Its Bank or Thrift Subsidiary...................... 9

         C.       The Extrinsic Evidence Does Not Support the Bankruptcy Court Rulings ......... 12

                  1.       The Debtor Understood That It Had Made Regulatory
                           Commitments That Carried Adverse Consequences for
                           Non-Compliance .................................................................. 12

                  2.       The Deposition Testimony Does Not Support the
                           Bankruptcy Court Holding ..................................................... 15

         D.       The Capital Maintenance Commitments Are Enforceable ................................. 20

         E.       The Federal Reserve Is a "Federal Depository Institutions
                  Regulatory Agency"........................................................................... 22

II.      THE FDIC-RECEIVER HAS STANDING ................................................... 24

CONCLUSION........................................................................................................ 25

## Table of Authorities

Page

### Cases

*American Fed'n of Gov't Employees, AFL-CIO v. Gates,*
486 F.3d 1316 (D.C. Cir. 2007) ............................................................................8

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................12

*Bakst v. Wetzel (In re Kingsley),*
518 F.3d 874 (11th Cir. 2008) .....................................................................16, 20

*Bankers Ins. Co. v. Florida Res. Prop. & Cas. Jt. Underwriting Ass'n,*
137 F.3d 1293 (11th Cir. 1998) ...........................................................................8

*Board of Governors of the Federal Reserve Sys. v. MCorp Financial, Inc.,*
502 U.S. 32 (1991) ..............................................................................................11

*Board of Governors of the Federal Reserve System v. Lincolnwood Corp.,*
439 U.S. 234 (1978) ..............................................................................................9

*Campbell v. Wainwright,*
726 F.2d 702 (11th Cir. 1984) ...........................................................................20

*Connecticut Nat'l Bank v. Germain,*
503 U.S. 249 (1990) ..............................................................................................2

*Hewitt v. Helms,* 459 U.S. 460 (1983)
*overruled in part on other grounds, Sandin v. Conner*, 515 U.S. 472 (1995) ...........................8

*In the Matter of MCorp, Board of Governors of the Federal Reserve System,*
Docket No. 88-062-B-A2-HC (June 15, 1992) .....................................................11

*In re Cardinal Health, Inc. ERISA Litig.,*
424 F. Supp. 2d 1002 (S.D. Ohio 2006) ..............................................................7

*In re FirstCorp, Inc.,*
126 B.R. 688 (Bankr. E.D.N.Y. 1991), *rev'd*, No. 91-473-CIV-5-BR, 1991 WL
355141 (E.D.N.C. Nov. 7, 1991), *aff'd*, 973 F.2d 243 (4th Cir. 1992) ..................... *passim*

*In re Franklin Savs. Corp.,*
303 B.R. 488 (D. Kan. 2004) .......................................................................13, 21

*In re Overland Park Fin. Corp.,* 217 B.R. 879 (Bankr. D. Kan. 1998),
*rev'd* 232 B.R. 215 (D. Kan. 1999), *aff'd*, 236 F.3d 1246 (10th Cir. 2001) ................... *passim*

*Inglesby, Falligant, Horne, Courington & Nash, P.C. v. Moore (In re American Steel Prod., Inc.)*, 197 F.3d 1354 (11th Cir. 1999) ........................................................2

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
___ U.S. ___, 130 S.Ct. 1605 (2010) ...................................................................13

*MCorp Fin. Corp. v. Board of Governors of the Federal Reserve*,
900 F.2d 852 (5th Cir. 1990), *rev'd*, 502 U.S. 32 (1991) ................................10, 11

*Mize v. Jefferson City Board of Educ.*,
93 F.3d 739 (11th Cir. 1996) ...............................................................................12

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ...............................................................................................8

*Nat'l Treasury Employees Union v. Chertoff*,
452 F.3d 839 (D.C. Cir. 2006) ...............................................................................8

*O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*,
232 B.R. 215 (D. Kan. 1999), *aff'd*, 236 F.3d 1246 (10th Cir. 2001) ............................ *passim*

*R.T.C. v. Tetco*,
758 F. Supp. 1159 (W.D. Tex. 1990), *vacated and appeal dismissed*,
1992 WL 437650 (5th Cir. Apr. 22, 1992) .............................................................25

*United States v. Am. Trucking Ass'n*,
310 U.S. 534 (1940) ..............................................................................................23

*United States v. Lincoln*,
277 F.3d 1112 (9th Cir. 2002) .................................................................................8

*United States v. Monsanto*,
491 U.S. 600 (1989) ................................................................................................8

*United States v. Ron Pair Enters., Inc.*,
89 U.S. 235 (1989) ..................................................................................................2

*Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.)*,
527 F.3d 959 (9th Cir. 2008) ..............................................................................3, 5

Statutes, Rules and Regulations

11 U.S.C. § 101(21B) ..............................................................................................23

11 U.S.C. § 365(o) ........................................................................................... *passim*

12 U.S.C. § 1813(q)(2)(F) .......................................................................................23

12 U.S.C. § 1818(b) ............................................................................................6

12 U.S.C. § 1821(d)(11) ...................................................................................25

12 U.S.C. § 1831*o* ...........................................................................................11

12 U.S.C. § 1831*o*(e)(2)(C)(ii) .......................................................................5

Crime Control Act of 1990, § 2522(c),
    Pub. L. 101-647, 104 Stat. 4789 (Nov. 29, 1990)...................................23

Del. Gen. Corp. L. § 141(a) ..............................................................................7

12 C.F.R. § 225.4(a)(1)......................................................................................9

Other Authorities

Adam B. Ashcraft, *Are Bank Holding Companies a Source of Strength to Their Banking
    Subsidiaries?*, Federal Reserve Bank of N.Y. Staff Report No. 189 (June 2004)...................11

Federal Reserve Board Policy Statement, "Responsibility of Bank Holding Companies to
    Act as Sources of Strength to Their Subsidiary Banks," 52 Fed. Reg. 15707 (Apr. 30,
    1987) ............................................................................................10

H.R. Rep. No. 681(I), 101st Cong., 2d Sess. (1990)......................................................22

Leonard Bierman and Donald R. Fraser, *MCorp and the Future of the
    Source of Strength Doctrine*, 110 Banking L.J. 145 (1993) ...................................11

Merriam-Webster's Collegiate Dictionary (17th ed. 2008)...........................................8

S. Rep. No. 95-323, 95th Cong., 1st Sess. (1977) ...................................................10

Appellant Federal Deposit Insurance Corporation, as receiver for Colonial Bank (the "FDIC-Receiver"), respectfully submits this reply brief in further support of its appeal from several rulings of the United States Bankruptcy Court for the Middle District of Alabama (Williams, J.).

## PRELIMINARY STATEMENT

Since the enactment of section 365(o) of the Bankruptcy Code in 1990, bankrupt holding companies have advanced a litany of arguments in their attempts to evade in bankruptcy the enforcement of their pre-petition capital maintenance commitments at the expense of the FDIC's Deposit Insurance Fund.  Bankruptcy courts have been receptive to these arguments, but the appellate courts have not agreed.

Just as in these earlier decisions, in this appeal the debtor The Colonial BancGroup, Inc. (the "Debtor") and its Official Committee of Unsecured Creditors (the "Committee") have advanced "hyper technical" and "wholly unpersuasive arguments," *see* Debtor. Br. at 22, n.19, 25, in their efforts to evade at any cost the effects of the Debtor's promises to its federal bank regulators.  Just as in those cases, the bankruptcy court searched for reasons to deny enforcement of the Debtor's capital maintenance commitments and disregarded the plain language of section 365(o) in the process.  And just as in those prior cases, this Court should reverse the bankruptcy court rulings and hold the Debtor accountable in accordance with the terms of the statute.

## ARGUMENT

## I.      THE DEBTOR MADE A CAPITAL MAINTENANCE COMMITMENT THAT IS ENFORCEABLE UNDER SECTION 365(o)

### A.      The Plain Language of the Debtor's Promises Reflect Commitments to Maintain the Capital of Colonial Bank

The appellees advocate for adoption of the bankruptcy court's erroneous holdings that the Debtor's three promises to federal regulators were not capital maintenance commitments within

the meaning of section 365(o) because "[t]he language of the three documents did not require the Debtor to maintain the net worth of the Bank or to infuse additional capital as necessary in order to achieve the target ratios," and "the documents contained no language of guarantee."  A 31. These rulings erroneously read into section 365(o) requirements that are not found in the statute and are based on a misreading of the "plain language" that was actually used in the Debtor's commitments.

### 1.   The Requirements of Section 365(o)

Section 365(o) is clear.  It provides:

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507.   This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365(o) (emphasis added).

Section 365(o) does not include the terms "infuse capital" or "guarantee," and it is not necessary for those words to be included in a bank holding company's pledge to its federal regulators in order for that promise to constitute a commitment to maintain capital under the statute.  "Where [a] statute's language is plain, as here, [a court's] sole function is to enforce it according to its terms."  *Inglesby, Falligant, Horne, Courington & Nash, P.C. v. Moore (In re American Steel Prod., Inc.)*, 197 F.3d 1354, 1357 (11th Cir. 1999) (citing *United States v. Ron Pair Enters., Inc.*, 89 U.S. 235, 240 (1989)); s*ee also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1990) ("When the words of a statute are unambiguous, then, this first canon is also the last:  'judicial inquiry is complete.'").

Since the enactment of section 365(o) in 1990, bankrupt holding companies regularly have argued that their promises to regulators did not constitute "capital maintenance commitments" that were enforceable under section 365(o).  Just as frequently, that argument has been rejected by the courts.  *See, e.g., Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.),* 527 F.3d 959, 966-67 (9th Cir. 2008); *In re Overland Park Fin. Corp.,* 217 B.R. 879 (Bankr. D. Kan. 1998), *rev'd* 232 B.R. 215 (D. Kan. 1999), *aff'd,* 236 F.3d 1246 (10th Cir. 2001); *In re FirstCorp, Inc.,*126 B.R. 688 (Bankr. E.D.N.Y. 1991), *rev'd,* No. 91-473-CIV-5-BR, 1991 WL 355141 (E.D.N.C. Nov. 7, 1991), *aff'd,* 973 F.2d 243 (4th Cir. 1992).

Two common themes are apparent from these decisions:  first, that section 365(o) is to be construed to encompass "*any* commitment by the debtor    to maintain . . . capital" of a bank subsidiary, s*ee Overland Park*, 236 F.3d at 1252 (emphasis added); second, that regardless of the actual language of a given commitment, it is a virtual certainty that a bankrupt holding company will contend that it never agreed to an enforceable capital maintenance commitment within the meaning of section 365(o), just as the Debtor and its bondholders (through the Committee) have argued here.

In *Overland Park*, the "net worth maintenance stipulation" that the debtor holding company provided to the Federal Home Loan Bank Board in 1979 was "informal" and pre-dated the FHLBB's use of "formal net worth maintenance agreements," which began in 1984.  Unlike these earlier "informal stipulations," the FHLBB's later "formal agreements" had a limited duration, "described with specificity the extent of the signer's liability, and stated the effect of failure to comply . . . ."  The "formal agreements" also stated that they were "enforceable by a cease-and-desist order."  *See In re Overland Park Fin. Corp.,* 217 B.R. 879, 884 (Bankr. D. Kan. 1998), *rev'd* 232 B.R. 215 (D. Kan. 1999), *aff'd,* 236 F.3d 1246 (10th Cir. 2001).  Observing

these distinctions, the bankruptcy court agreed that the debtor holding company had not entered into a "capital maintenance commitment" because its pledge to regulators was "an informal net worth maintenance stipulation that is not an enforceable contract under applicable non-bankruptcy law.  Since the stipulation was not such a contract before the petition was filed, subsection 365(o) does not operate upon it."  *Id.* at 890-91.

This conclusion was forcefully rejected by the district court on appeal, which found that the bankruptcy court had disregarded the "plain language of Section 365(o) and its legislative history" in limiting the statute to commitments that were in the form of "enforceable executory contracts"  *O.T.S. v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.),* 232 B.R. 215, 221 (D. Kan. 1999), *aff'd*, 236 F.3d 1246 (10th Cir. 2001).  On further appeal the Tenth Circuit agreed and rejected the debtor's "strained reading of the statute and its attempt to re-characterize the stipulation as a 'mere acknowledgement.'"  236 F.3d at 1252.  In reasoning that most definitively was not *dicta* (as the Debtor mistakenly contends), the appellate court wrote that "nowhere in 11 U.S.C. § 365(o) does Congress mention the commitment must be contractual, executory, formal, or post 1984.  Congress undisputedly knew how to include 'executory' or other limiting language, but Congress did not do so in § 365(o)."  *Id.*  The court "refuse[d] to import Overland Financial's constrictive requirements into the statute's express language," instead holding that section 365(o) only required a "commitment," which was commonly defined as "an '[a]greement or pledge to do something."  *Id.* (quoting *FirstCorp.*, 973 F.3d at 249 n.5). The "informal" stipulation at issue unequivocally met this definition.  *Id.* at 1252-53.

The same arguments were advanced by the debtor in *FirstCorp*, which sought to avoid its liability in bankruptcy under a similar net worth maintenance stipulation on the grounds that it was "not an enforceable contract," that it was not an "executory contract and therefore [cannot

be] subject to the 'deemed assumption' requirement of § 365(o)," and that even if the debtor had made a capital maintenance commitment, that commitment expired by its own terms when its thrift subsidiary was placed into conservatorship.  *In re FirstCorp, Inc.,* 126 B.R. 688, 691 (Bankr. E.D.N.Y. 1991), *rev'd*, No. 91-473-CIV-5-BR, 1991 WL 355141 (E.D.N.C. Nov. 7, 1991), *aff'd*, 973 F.2d 243 (4th Cir. 1992).  The bankruptcy court declined to reach the first two arguments, instead agreeing with the last.  *Id.*  In a short opinion, the district court disagreed that the commitment was no longer enforceable, reversed on this ground and remanded for further proceedings, 1991 WL 355141, at *2, and on further appeal, the Fourth Circuit affirmed the district court's opinion.  In the process, the court of appeals also reached and expressly rejected the debtor holding company's arguments that it had made no "capital maintenance commitment" within the meaning of section 365(o).  *See* 973 F.2d at 249-50 & n. 5, n. 6.

In *Wolkowitz v. F.D.I.C. (In re Imperial Credit Indus., Inc.),* 527 F.3d 959 (9th Cir. 2008), the commitment at issue was not a "net worth maintenance stipulation" but instead took the form of a "parent guaranty" of a bank's capital restoration plan that was submitted under the "prompt corrective action" statute.  *See* 12 U.S.C. § 1831*o*(e)(2)(C)(ii).  In its brief on this appeal, the Debtor argues that the wording of the guaranty in *Imperial Credit* "vividly demonstrates just how clear a regulatory agency can be when it intends to extract a commitment to maintain a subsidiary's capital that is enforceable under Section 365(o)."  Debtor Br. at 24. That "vivid clarity" did not deter the bankruptcy trustee in *Imperial Credit* from arguing that no enforceable capital maintenance commitment existed there.  The trustee contended that the guaranty only guaranteed compliance with an earlier capital restoration plan that was never accepted by the FDIC.  The district court, and the Ninth Circuit on appeal, rejected the trustee's post hoc attempts to evade the debtor's obligations.  *See id.* at 966-67.

2.      **The Plain Language of the Debtor's Promises to Regulators**

In this case, the "plain language" of the Debtor's promises to regulators reflects three separate pledges by the Debtor to address Colonial Bank's deficient capital levels and ensure that Colonial Bank complied with its own regulatory commitments to increase capital.  Whether or not those promises are a "model of well-crafted prose," *see FirstCorp*,  973 F.3d at 249, they unquestionably constitute "commitments" to "maintain the capital" of Colonial Bank.

In two separate agreements, Colonial Bank made written promises to regulators to raise its capital levels.  In the Bank MOU, Colonial Bank agreed with its regulators that "[b]y February 28, 2009, the Bank <u>shall have</u> a Tier 1 Leverage Capital Ratio of not less than 8 percent and a Total Risk-Based Capital Ratio of not less than 12 percent."  A 139 (emphasis added; original emphasis omitted).  After the Bank failed to meet these requirements, Colonial Bank stipulated to entry of a cease and desist order under 12 U.S.C. § 1818(b) in which it agreed that "[b]y September 30, 2009, the Bank <u>shall have</u> a Tier 1 Leverage Capital Ratio of not less than 8 percent and a Total Risk Based Capital Ratio of not less than 12 percent."  A 154-55 (emphasis added).

In its own regulatory commitments, the Debtor promised that it would do what was required to make sure that Colonial Bank, its wholly owned subsidiary, met these capital requirements.  First, in the 4(m) Agreement, the Debtor agreed that it:

> <u>shall address</u> the factors resulting in the less than satisfactory CAMELS composite and management component ratings assigned to the Bank . . . by <u>taking steps designed to ensure</u> that the Bank complies with the [Bank MOU] and any other supervisory action regarding the Bank taken by the FDIC and SBD during the term of this agreement.

A 143 (emphasis added).  Next, in the Debtor MOU, the Debtor promised that it:

will utilize its financial and managerial resources to assist the subsidiary bank in addressing weaknesses identified by its primary banking supervisors and achieving/maintaining compliance with" the Bank MOU.[1]

A 145 (emphasis added).  Later, when it consented to the Debtor C&D, the Debtor agreed that:

[t]he board of directors of BancGroup shall take appropriate steps to ensure that the Bank complies with" the Bank C&D "and any other supervisory action taken by the Bank's federal or state regulators."

A 171 (emphasis added).[2]

In each of these three commitments, the Debtor's federal and state regulators used the mandatory "shall" or "will" in describing the Debtor's obligations.   In two of the three commitments   the 4(m) Agreement and the Debtor C&D   those regulators also required the Debtor "to ensure" the Bank's compliance with its capital requirements.  *See* A 143 (Debtor "shall address the factors . . . by taking steps designed to ensure that the Bank complies" with regulatory commitments); A 171 ("board of directors of BancGroup shall take appropriate steps to ensure that the Bank complies with" requirements of the Bank C&D or later regulatory commitments).

---

[1] Whether or not signed by its board of directors, the Debtor MOU is an agreement of the Debtor, as the document itself makes clear.  A 145 (preamble) (Debtor MOU an agreement "By and Among The Colonial BancGroup, Inc., Federal Reserve Bank of Atlanta and [the Alabama State Banking Department]" in which "the holding company, through its board, agrees that it will move in good faith to comply with [its] requirements"); *id.* (paragraph 1) ("Colonial will utilize its financial and managerial resources . . . .") (emphasis added).  As a corporation, the Debtor acts through and can be bound to agreements by its board of directors.  *See infra* n. 2.

[2] As with the Debtor MOU, the fact that the Debtor C&D requires the board of directors "to take appropriate steps to ensure" Colonial Bank's compliance with its capital commitments is both unsurprising and irrelevant.  The Debtor C&D was entered into by the board of directors "on behalf of BancGroup" and the directors "consent[ed] to compliance with each and every provision of this Order by BancGroup and its institution-affiliated parties . . . "  A 170 (emphasis added).  Under the laws of Delaware, "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors . . . ."  Del. Gen. Corp. L. § 141(a).  A commitment made by the Debtor's board, acting in that capacity, is legally indistinguishable from a commitment made by the Debtor.  *See, e.g., In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002, 1050 (S.D. Ohio 2006) (rejecting "the proposition that a meaningful distinction can be drawn between a corporation and the directors through whom it must act").

The word "shall" is "used in laws, regulations, or directives to express what is mandatory." Merriam-Webster's Collegiate Dictionary 1143 (17th ed. 2008). Courts repeatedly have held that "shall," "will" or "must" are used to express a mandate. *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) (by using the word "shall" in a forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory"); *Hewitt v. Helms*, 459 U.S. 460, 471 (1983) ("[the Commonwealth] has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed"), *overruled in part on other grounds*, *Sandin v. Conner*, 515 U.S. 472 (1995); *Bankers Ins. Co. v. Florida Res. Prop. & Cas. Jt. Underwriting Ass'n*, 137 F.3d 1293, 1298 (11th Cir. 1998) (use of "shall," "will," or "must" indicates mandatory statutory requirement). The word "ensure" means "to make sure, certain, or safe: GUARANTEE." Merriam Webster's Collegiate Dictionary, at 416 (emphasis in original); *see, e.g., American Fed'n of Gov't Employees, AFL-CIO v. Gates*, 486 F.3d 1316, 1336 (D.C. Cir. 2007) (Tatel, J., dissenting) (noting that language used in the National Defense Authorization Act, "ensure that employees may . . . bargain collectively," without any relevant qualification, would create a mandatory obligation).

Used together, as they were in the Debtor's 4(m) Agreement and the Debtor C&D, the words cannot be construed as anything but mandatory. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 590-91 (1998) (statute's requirement that chairperson of National Endowment for the Arts "shall ensure that . . . artistic excellence and artistic merit are the criteria by which applications are judged" was mandatory, not advisory); *Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 858 (D.C. Cir. 2006) (finding phrase "shall ensure" in Homeland Security Act of 2002 created a mandatory obligation); *United States v. Lincoln*, 277

F.3d 1112, 1113-14 (9th Cir. 2002) (finding phrase "shall ensure" in Mandatory Victim Restitution Act created a mandatory obligation).

The Debtor MOU includes similarly compulsory language.  It states that "Colonial will utilize its financial and managerial resources" to assist Colonial Bank in "achieving/maintaining compliance with" the requirements of the Bank MOU, including its capital requirements.  A 145 (emphasis added).  The fact that in the Debtor MOU the Debtor agreed to "move in good faith" to comply does not eliminate the mandatory nature of those requirements.  In any event, no similar "move in good faith" provision is included in either the Debtor's 4(m) Agreement or the Debtor C&D, both of which were in effect as of the Debtor's petition date.

### B. The "Source of Strength Doctrine" Requires a Holding Company to Provide Capital Support to Its Bank or Thrift Subsidiary

The bankruptcy court further erred in concluding that the Debtor's commitments incorporated the Federal Reserve Board's source of strength doctrine which it mistakenly found "does not require a bank holding company to make capital contributions to its subsidiaries." A 27 n.15.  This amounted to fact-finding with respect to extrinsic evidence in a portion of the opinion in which the bankruptcy court purported to construe the plain language used in the commitments themselves.  Moreover, contrary to the bankruptcy court's conclusion, the Federal Reserve's expressed views show that it believes the source of strength doctrine requires bank holding companies to infuse capital into their troubled or failing bank subsidiaries.

The source of strength doctrine requires that a "bank holding company shall serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe and unsound manner."  12 C.F.R. § 225.4(a)(1); *see Board of Governors of the Federal Reserve System v. Lincolnwood Corp.*, 439 U.S. 234, 251-52 (1978) (quoting

S. Rep. No. 95-323, 95th Cong., 1st Sess. 11 (1977) ("Holding companies are supposed to be a source of strength to subsidiary financial institutions")).

The Federal Reserve Board explained the meaning of the doctrine in a 1987 policy statement, which observed that bank holding companies "derive[] certain benefits" from owning an "institution that can issue federally insured deposits and has access to Federal Reserve credit," and as a result they have a corresponding obligation "to serve as sources of strength and support to their subsidiary banks." *See* Federal Reserve Board Policy Statement, "Responsibility of Bank Holding Companies to Act as Sources of Strength to Their Subsidiary Banks," 52 Fed. Reg. 15707 (Apr. 30, 1987). "Accordingly," the Federal Reserve Board stated,

> it is the Board's policy that a bank holding company should not withhold financial support from a subsidiary bank in a weakened or failing condition when the holding company is in a position to provide the support. <u>A bank holding company's failure to assist a troubled or failing subsidiary bank under these circumstances would generally be viewed as an unsafe and unsound banking practice or a violation of Regulation Y or both.</u>

*Id.* at 15707-08 (emphasis added).

The agency demonstrated precisely what it meant when it brought enforcement proceedings under the source of strength regulation against MCorp Financial, Inc. ("MCorp"), a bankrupt multi-bank holding company. MCorp owned 25 banks, 20 of which had been closed by bank regulators before its bankruptcy. Soon after the MCorp bankruptcy petition, the Federal Reserve Board issued an amended notice of charges alleging that MCorp had failed to act as a source of strength to its subsidiary banks and seeking an order directing MCorp to use "all of [its] available assets . . . to recapitalize" the subsidiary banks. *See MCorp Fin. Corp. v. Board of Governors of the Federal Reserve,* 900 F.2d 852, 853-54 (5th Cir. 1990), *rev'd,* 502 U.S. 32 (1991).

As MCorp illustrates, the Federal Reserve Board understands the source of strength doctrine to *require* bank holding companies to downstream assets into their failing or troubled subsidiary banks.  Further, the Fifth Circuit decision invalidating the Federal Reserve's administrative action (upon which the bankruptcy court placed mistaken reliance, *see* A 27 n.15) was reversed by the United States Supreme Court for lack of jurisdiction and has no precedential value.  *See Board of Governors of the Federal Reserve Sys. v. MCorp Financial, Inc.*, 502 U.S. 32, 44 (1991) ("The Court of Appeals therefore erred when it held that it had jurisdiction to consider the merits of MCorp's challenge to the source of strength regulation.").[3]

Commentators have observed that the source of strength regulation "impose[s] a general open-ended liability on parent holding companies *to infuse necessary capital to subsidiary banks*" even after *MCorp* and notwithstanding the subsequent enactment of the "prompt corrective action" regime set forth in 12 U.S.C. § 1831*o* in 1991.  Leonard Bierman and Donald R. Fraser, *MCorp and the Future of the Source of Strength Doctrine*, 110 Banking L.J. 145, 151 (1993) (emphasis added); *see also* Adam B. Ashcraft, "Are Bank Holding Companies a Source of Strength to Their Banking Subsidiaries," Federal Reserve Bank of N.Y. Staff Report No. 189, at 3 (June 2004) (source of strength doctrine "involves the *transfer of capital* to a distressed subsidiary to prevent failure") (emphasis added).[4]

Consequently, any reference to the source of strength doctrine, or similarity between the wording of the Debtor's capital maintenance commitments and the Federal Reserve Board's

---

[3] After remand, the Federal Reserve Board discontinued its enforcement action because MCorp already had downstreamed $17 million to its bank subsidiaries and because, by then, MCorp's only remaining operating bank subsidiary was adequately capitalized due to a "capital injecton" by MCorp.  As a result, the debtor holding company had complied with the source of strength policy and enforcement was no longer required.  *See In the Matter of MCorp, Board of Governors of the Federal Reserve System*, Docket No. 88-062-B-A2-HC, at 5 (June 15, 1992) A copy of the Federal Reserve Board decision is attached hereto as Exhibit A.

[4] Available at http://www.ny.frb.org/research/staff_reports/sr189.html.

regulation (*see* Debtor Br. at 27, 29, 30), supports the conclusion that the Debtor's promises reflect commitments to maintain the capital of Colonial Bank and to infuse capital where required.  The bankruptcy court finding to the contrary reflected further error.

### C.       The Extrinsic Evidence Does Not Support the Bankruptcy Court Rulings

The appellees devote considerable attention to alleged "extrinsic evidence" of the parties' intent in their efforts to salvage the bankruptcy court's rulings.  The only question on summary judgment, however, is whether there exists a genuine issue of material fact.  As a result, the bankruptcy court was required to draw every reasonable inference in the FDIC-Receiver's favor and was not permitted to weigh the evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Mize v. Jefferson City Board of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).  The record shows that the bankruptcy court failed to adhere to these requirements.[5]

### 1.       The Debtor Understood That It Had Made Regulatory Commitments That Carried Adverse Consequences for Non-Compliance

The appellees' "extrinsic evidence" arguments boil down to the assertion that no one ever told the Debtor that it could be held liable under section 365(o) of the Bankruptcy Code for its three capital maintenance commitments.  This contention is meritless.

---

[5] The appellees raise several unfounded procedural arguments.  The transcript makes clear that the FDIC-Receiver preserved its objection to the bankruptcy court's insistence on proceeding with summary judgment rather than holding an evidentiary hearing.  *See* May 26, 2010 Tr. at 7, 29-77 (A 231, 253-301).  Further, the FDIC-Receiver amply met its burden under Rule 56 to submit evidentiary materials establishing disputed issues of fact.  *See, e.g., id.*; *see also* A 105-35 (FDIC-Receiver's Statement of Facts); A 94-104 (Declaration of John J. Clarke, Jr., dated May 17, 2010) (submitting supporting materials cited in Statement of Facts).  Finally, the FDIC-Receiver was prepared to present live testimony at the hearing from at least three witnesses, including both the Debtor's chairman Simuel Sippial, Jr. and the Debtor's chief financial officer Sarah Moore, who were present under trial subpoenas, and was prepared to demonstrate on cross-examination that Mr. Biern and the other witnesses for the Debtor did not support the Debtor's case, but the procedure followed by the bankruptcy court denied the FDIC-Receiver that opportunity.

First, the Debtor is not excused from enforcement of its capital maintenance commitments because of any alleged lack of understanding that enforcement under section 365(o) was one of their potential legal consequences.  *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, ___ U.S. ___, 130 S.Ct. 1605, 1611 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'") (citation omitted).  If evidence of such an express warning were a requirement for granting relief under section 365(o), none of the capital maintenance commitments that were enforced in *Overland Park*, *FirstCorp* or *Franklin Savings* Corp. *v. O.T.S. (In re Franklin Savs. Corp.),* 303 B.R. 488 (D. Kan. 2004), would have been enforceable under the statute since all of those commitments pre-dated its enactment.[6]

Second, and in any event, the Debtor understood that it had entered into agreements with its federal and state banking regulators regarding the maintenance of Colonial Bank's capital ratios and further understood that any failure to abide by those agreements would have serious adverse consequences.

In its Form 10-K filed on March 2, 2009, the Debtor told investors that it and Colonial Bank were "operating under heightened federal scrutiny" due to their financial condition, that in agreements with regulators the Debtor had "agreed to use its resources to support Colonial Bank," that a failure to raise Colonial Bank's capital ratios to required levels could result in more serious enforcement measures and that "our failure to adequately comply could eventually allow the banking regulators to appoint a receiver or conservator of Colonial Bank's net assets." Colonial BancGroup, Inc. Form 10-K at 13-14.  Since Colonial Bank accounted for substantially

---

[6] In *Franklin*, the court found an enforceable commitment but concluded that there was no deficit under that commitment that required an "immediate[] cure."  *See Franklin Savings Corp.*, 303 B.R. 495.

all of the Debtor's assets and revenues, it is difficult to conceive of more serious potential consequences that could arise for the Debtor than those that were actually disclosed.[7]

The Debtor repeated these disclosures in its Form 10-Q filed on May 8, 2009 (A 190), but when the deadline arrived for filing the next quarterly report the Debtor could not do so because of its deteriorating condition.  In a Form 12b-25 filed with the SEC on August 11, 2009, the Debtor explained that "as a result of uncertainties associated with *BancGroup's ability to increase its capital levels to meet regulatory requirements*, management has concluded that there is substantial doubt about its ability to continue as a going concern."  A 224 (emphasis added).[8]

Deposition testimony of the Debtor's chairman confirms the Debtor's awareness that a failure to raise the capital levels of Colonial Bank would have serious adverse consequences. *See* Sippial Dep. at 33-37.  Consistent with this understanding, during the first six months of 2009 the Debtor contributed $142 million in capital to Colonial Bank.  Moore Dep. at 100-01. The Debtor also engaged in extensive efforts to arrange a $300 million private equity investment by the regulatory deadline ███████████████████████████████ ██████████████████████████  *See* Sippial Dep. at 77, 84.  At minimum, the Debtor's argument on appeal that these capital contributions and fundraising efforts are not an implicit recognition of its capital maintenance commitments raises a question of fact that is not appropriate for resolution on summary judgment.[9]

---

[7] The Form 10-K also included a warning to investors that in a bankruptcy "any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a subsidiary bank will be assumed by the bankruptcy trustee and entitled to priority of payment."  A 107.

[8] This admission clearly concerned the Debtor's capital maintenance commitments since the only "regulatory requirements" in place at the time were those concerning the capital levels of Colonial Bank that are at issue on this appeal.

[9] The Debtor asserts in its brief that Jack Miller, a deceased director who was a bank regulatory lawyer, "never expressed the view" that the commitments were capital maintenance

### 2.   The Deposition Testimony Does Not Support the Bankruptcy Court Holding

Contrary to the appellees' assertions, to the extent it is relevant, the deposition testimony clearly establishes that the parties intended to create a capital maintenance commitment within the meaning of section 365(o).

<u>Kurt Casebolt.</u>   The appellees heavily rely upon the deposition testimony of Kurt Casebolt, an employee with the Federal Reserve Bank of Atlanta.   Mr. Casebolt undeniably had some oversight responsibility for the Debtor during the period in question, but his testimony does not, as appellees suggest, demonstrate their entitlement to summary judgment.

a.   <u>The 4(m) Agreement.</u>   The Debtor asserts that Mr. Casebolt drafted the 4(m) Agreement.   *See* Debtor Br. at 33.   In fact, Mr. Casebolt testified that  Casebolt Dep. at 142, which he testified was *id.*   Mr. Casebolt *Id.* at 225.

b.   <u>The Debtor C&D.</u>   As with the 4(m) Agreement, the Debtor C&D was prepared *Id.* at 119-20.   *Id.* at 124.   Although he was generally familiar with other cease and desist orders, Mr. Casebolt

commitments.   Debtor Br. at 37.   The only "evidence" of this assertion was a proffer made by the Debtor's counsel.   The FDIC-Receiver was never provided the opportunity to cross-examine *any* witness with respect to this unsupported "offer of proof."

██████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at 123.

      c.      <u>The Debtor MOU.</u>  Unlike the 4(m) Agreement and the Debtor C&D, Mr.

Casebolt was the principal draftsman of the Debtor MOU, ████████████████████████

████████████████████████████ *Id.* at 43-45.  He included in that document a

provision ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████ *Id.* at 62 (emphasis added).  He understood at the time he prepared the Debtor MOU

██████████████████████████████████████████████████████

████████████ *Id.* at 214-15.  Mr. Casebolt testified that a ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ *id.* at 218, and ████████████████████

██████████████████████████████████████████████████████

████████████ *id.* at 219-20.  Mr. Casebolt and his supervisor, Maria Smith, had a disagreement about

what the Debtor MOU required with respect to Colonial Bank's capital levels.  Ms. Smith told

Mr. Casebolt that the Debtor was not in compliance with the Debtor MOU because Colonial

Bank had failed to raise its capital ratios to the required levels by the required deadline.  *Id.* at

101, 229-31.[10]

      d.      <u>No View on the Issue in Dispute.</u>  Mr. Casebolt testified that ████████████

██████████████████████████████████████████████████████

---

      [10]  In a separate order that no party appealed, the bankruptcy court overruled the appellees' objections to this testimony which was admitted into evidence.  A 47.  Appellees are barred from taking issue with that ruling due to their failure to cross-appeal from it.  *See Bakst v. Wetzel (In re Kingsley)*, 518 F.3d 874, 876 n.1 (11th Cir. 2008) (*per curiam*).



*Id.* at 207, 209.

*Id.* at 210.

see *id.* at 233-37,

*Id.* at 244-45.

<u>Herbert Biern.</u>  Mr. Biern was offered by the Debtor as a putative expert witness, but the bankruptcy court excluded from evidence "any opinion offered by him on the legal issue of whether the debtor made a 'commitment' within the meaning of 11 U.S.C. § 365(o) . . .  A 45.  This was the *only* opinion that was expressed by Mr. Biern in his "expert" report.  *See* DA-273 (Scope of Assignment), DA 285 (Conclusion).[11]  Although the bankruptcy court overruled the FDIC-Receiver's objection to Mr. Biern's "testimony regarding issues of fact," A 45, Mr. Biern had no personal knowledge of any relevant factual issue.[12]

Mr. Biern contended that he had developed "templates" or "form books" of enforcement documents for the Federal Reserve Board, but as will be shown, there was no evidence that any of the Debtor's three commitments were based in any way on such templates.  Moreover, in refusing to proceed with an evidentiary hearing, the bankruptcy court erroneously credited the unsupported views of a paid "fact" witness without requiring live testimony to assess his credibility.

---

[11] Citations to "DA ___" refer to pages within the "joint" appendix filed by the Debtor and the Committee.

[12] The Debtor incorrectly contends that the FDIC-Receiver did not challenge Mr. Biern's qualifications as an expert or his findings and conclusions.  The FDIC-Receiver expressly challenged Mr. Biern's qualifications in its motion *in limine*, which was granted in relevant part in a ruling from which no appellee has taken a cross-appeal.  Further, the FDIC-Receiver challenged Mr. Biern's unfounded conclusions at length in his deposition and was prepared to do so at the evidentiary hearing, but it was denied that opportunity by the bankruptcy court.

a.    4(m) Agreement.  During his deposition, Mr. Biern professed a lack of memory regarding any involvement with 4(m) agreements while he was with the Federal Reserve Board.  Biern Dep. at 232, 236, 238.  There is no other evidence in the record suggesting that anyone at the Federal Reserve referred to a template developed by Mr. Biern in drafting the 4(m) Agreement here.  *See* Casebolt Dep. at 142.

b.    Debtor MOU.  Mr. Biern asserted in his deposition that the Debtor MOU appeared to have been based on a "template" he had developed.  Contradicting this testimony, however, Mr. Biern admitted that the Debtor MOU included provisions that he was not familiar with or that he would not have used, including portions of the paragraph at issue on this appeal. Biern Dep. at 158-62.  He acknowledged that he did not know what was in the minds of Federal Reserve officials in preparing or using the document.  *Id.* at 127, 128-29, 162-63, 171-72.  In contrast to Mr. Biern's assertions, Mr. Casebolt testified that ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Casebolt Dep. at 44-45.

c.    Debtor C&D.  Mr. Biern claimed that the "Source of Strength" provision in the Debtor C&D was based on a "template" he had developed while he was with the agency. Biern Dep. at 221-22.  Mr. Casebolt, however, testified that ████████████████████████ ███████████████████████████████████████████ Casebolt Dep. at 122-23.  Other than Mr. Biern's unsupported assertion, there was no evidence in the record that any template developed by Mr. Biern was used in preparing that provision.

Simuel Sippial, Jr.  Mr. Sippial is the chairman of the Debtor's board of directors and was a director of both the Debtor and Colonial Bank during the events in question.  In his deposition

testimony, he explained that in the Debtor MOU, ████████████████████

████████████████████████████████████████████████

██████ Sippial Dep. at 108-09 (emphasis added).  Later, Mr. Sippial ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ *Id.* at 109-10 (emphasis added).

    Mr. Sippial testified to ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ *Id.* at 43.  ████████████████████████

████████████████████████████████████████████████

*Id.* at 44.  ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.*



    <u>Timothy D. Rich.</u> Mr. Rich was the FDIC examiner in charge of Colonial Bank throughout the events in question and had primary day-to-day responsibility for supervising the Bank and assuring that its condition improved rather than worsened.  Rich Dep. at 20-22.  He was among the FDIC officials who presented the Bank MOU and Bank C&D to the Colonial Bank board of directors, Rich Dep. at 72-75, 100-01, he interacted regularly with Mr. Casebolt and other Federal Reserve officials in their oversight of the holding company, *id.* at 28-29, he was present during the Federal Reserve's presentations to the Debtor's board of directors regarding the Debtor C&D, *id.* at 130-35, and he understood that the Debtor's three promises to its federal and state banking regulators included a commitment to ensure that Colonial Bank's

capital levels would be raised to the levels required in Colonial Bank's supervisory documents, *id.* at 39-41. Based on his involvement in the events, Mr. Rich plainly had a basis for a view as to the meaning of the relevant provisions, and the bankruptcy court erroneously disregarded his views in granting summary judgment and denying the FDIC-Receiver the opportunity to present his testimony during an evidentiary hearing.

### D.      The Capital Maintenance Commitments Are Enforceable

The appellees raise a number of meritless arguments that the Debtor's three capital maintenance commitments were not enforceable as of the petition date. None of them offers a basis for affirmance.

First, both the Debtor and the Committee assert that there is no enforceable capital maintenance commitment because the underlying Bank C&D was terminated by the FDIC before the September 30, 2009 deadline for raising capital. Debtor Br. at 46 n.39; Committee Br. at 40. The appellees advanced this argument in the proceedings below, and the bankruptcy court rejected it. A 39. Neither of the appellees filed a timely cross appeal from that holding, and they are precluded from revisiting the issue now. *See Bakst v. Wetzel (In re Kingsley)*, 518 F.3d 874, 876 n.1 (11th Cir. 2008) (*per curiam*) (citing *Campbell v. Wainwright*, 726 F.2d 702, 704 (11th Cir. 1984) ("a party who has not appealed may not enlarge his rights under the judgment or diminish those of the opposing party")).

Second, the Committee erroneously asserts that the closing of Colonial Bank somehow resulted in the abrogation of the Debtor's capital maintenance commitments because the holding company "loses control of the subsidiary and is no longer able to fulfill any capital maintenance commitment." Committee Br. at 40.[13] This is a variation on the bankruptcy court's erroneous

---

[13] In *FirstCorp* and *Franklin Savings*, the language of the commitments at issue expressly provided that the holding companies in those cases would maintain their bank subsidiaries' net

holding that section 365(o) does not apply to a commitment to maintain the capital of a depository institution that is no longer operating.  A 41; *see also* Debtor Br. at 46.  The appellate courts have rejected this argument, finding that if it were so:

> a holding company obligated to maintain the capital of a depository institution could avoid that obligation entirely simply by ignoring it; once the institution's financial position deteriorated to such an extent that federal regulators were forced to step in and take control, the holding company could argue that its liability under the capital maintenance obligation was thereby extinguished.  Congress could not have intended such a result.

*FirstCorp*, 973 F.2d at 251.  The bankruptcy court's holding and the appellees' arguments misunderstand both the purpose of capital and the function of section 365(o).  "[C]apital functions to maintain the viability of the federal deposit insurance system by reducing the potential cost to that system of resolving failed depository institutions."  *FirstCorp*, 973 F.2d at 249.  Section 365(o) was added to the Bankruptcy Code to permit enforcement of a holding company's capital maintenance commitments and, in cases where they exist, shift the loss arising from a bank failure to the holding company and its creditors and away from the Deposit Insurance Fund.  *See generally FirstCorp* at 248-51.  Neither the Committee nor the Debtor attempts to explain the rationale behind their alternative, contorted readings of section 365(o).

Third, the Debtor and the Committee argue that the Debtor MOU was not "enforceable" within the meaning of the enforcement provisions of federal banking law and therefore cannot be

---

worth for as long as they controlled them.  *See FirstCorp*, 973 F.2d at 244 (promise to maintain net worth "for as long as FirstCorp controls [FF-Raleigh]"); *Franklin Sav.*, 303 B.R. at 491 ("[FSC] shall stipulate to [FSLIC] that so long as [FSC] controls [FSA], [FSC] will cause the net worth of [FSA] to be maintained . . .").  While skeptical that the receivership ended the holding company's control, the court in *FirstCorp* assumed for the sake of argument that it did but still held the holding company responsible for the deficit that had accrued through that date.  *See FirstCorp*, 973 F.2d at 251.  The district court in *Franklin* followed *FirstCorp* in construing a virtually identical promise.  *Franklin Sav.*, 303 B.R. at 498.  Neither the Debtor nor the Committee have ever identified similar language in the Debtor's three commitments in this case because there is none.

a capital maintenance commitment.  *See* Debtor Br. at 43-45; Committee Br. at 34-38.  The appellees make no such argument with respect to either the 4(m) Agreement or the Debtor C&D, both of which expressly state that they are "enforceable."  *See* A 144; A 177.  There is no question that the Debtor MOU also embodied a "pledge" or "agreement" by the Debtor to comply with its provisions.  The document itself expressly states that it "represents an agreement . . ." under which "the holding company, through its board, agrees that it will move in good faith to comply with its requirements . . ."  A 145.  Under the case law, this type of promise is all that is required.  *See Overland Park*, 236 F.3d at 1252; *FirstCorp*, 973 F.2d 249-50 n.5 & n.6.  The appellees' attempt to relitigate *Overland Park* should be denied.

Finally, the fact that the Bank C&D provided the Debtor and Colonial Bank until September 30, 2009 to achieve the required capital levels does not support the Committee's argument that no obligation had "matured" as of the Debtor's petition date.  The Debtor's obligations "matured" the instant the Debtor entered into each of the three regulatory agreements.  There is no dispute that a substantial deficit existed on the petition date under the Debtor's commitments, and it was required to "immediately cure" that deficit as a condition to obtaining relief under chapter 11 of the Bankruptcy Code.  *See FirstCorp*, 973 F.2d at 248. Section 365(o) was enacted to prevent holding companies "from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990).  The Committee's argument seeks precisely that result.

### E.  The Federal Reserve Is a "Federal Depository Institutions Regulatory Agency"

Under the bankruptcy court's reading of the definition of "Federal depository institutions regulatory agency," a commitment made to the Federal Reserve Board   the only federal

regulator with direct responsibility for regulating bank holding companies   could never be a "capital maintenance commitment" under section 365(o).  The actual language of the relevant Bankruptcy Code provisions does not support this absurd result.  *See United States v. Am. Trucking Ass'n*, 310 U.S. 534, 543 (1940) (courts will not construe language of statute to produce absurd results).  To the contrary, because Colonial Bank was open at the time of the commitments at issue the Bankruptcy Code definition expressly incorporates the definition of "appropriate Federal banking agency" from the Federal Deposit Insurance Act, *see* 11 U.S.C. § 101(21B), which provides that the Federal Reserve Board is the "appropriate Federal banking agency" for bank holding companies such as the Debtor, *see* 12 U.S.C. § 1813(q)(2)(F).

Neither the Debtor nor the Committee has even attempted to reconcile the bankruptcy court's erroneous construction of the definition with the original language of section 365(o), in which the Federal Reserve Board was expressly mentioned.  *See* Crime Control Act of 1990, § 2522(c), Pub. L. 101-647, 104 Stat. 4789 (Nov. 29, 1990).  Nor has either appellee identified any evidence that Congress intended to remove the Federal Reserve Board from the scope of the statute when it amended section 365(o) in 1994.  In fact, Congress did not do so as the plain language of the statute reflects.

Finally, both appellees urge the Court to consider testimony from Herbert Biern, the Debtor's proposed expert, because of his alleged experience at the Federal Reserve Board supposedly crafting regulatory documents that were intended to serve as capital maintenance commitments under section 365(o).  *See* Debtor Br. at 35*;* Biern Report, ¶ 72 (DA 283) ("A clear distinction must be made between (i) types of enforcement actions undertaken by the Federal Reserve when it seeks to bind a bank holding company pursuant to Section 365(o) of the U.S. Bankruptcy Code and (ii) the enforcement actions in this case . . ."); *id.*, ¶ 69 (DA 282) (referring

23

to examples of Federal Reserve Bank agreements "developed" by Biern to be capital maintenance commitments under section 365(o)).  The FDIC-Receiver disputes that Mr. Biern can offer any relevant testimony, but the appellees do not explain why Mr. Biern allegedly engaged in such activity given their view that section 365(o) does not apply to commitments made to that agency.

## II.     THE FDIC-RECEIVER HAS STANDING

The Committee, but not the Debtor, argues that the FDIC-Receiver does not have standing to enforce a capital maintenance commitment under section 365(o).  The Committee advanced this argument below, and the bankruptcy court implicitly rejected it.  In any event, the standing argument is as meritless as the (many) others that have been advanced by the appellees on this appeal.

First, Colonial Bank was an intended beneficiary of the Debtor's commitments, and the FDIC-Receiver is the successor to the failed bank by operation of law.   12 U.S.C. § 1821(d)(2)(A).  In the only decision to address the issue, the district court in *Overland Park* held (in *dicta*) that the receiver or conservator for a failed bank was the logical entity to enforce a capital maintenance commitment as the legal successor in interest to the failed institution.  *See Overland Park*, 232 B.R. at 228 n.22.  In addition, the Resolution Trust Corporation, as receiver, was one of the two movants in *FirstCorp*, and the courts in that case addressed the merits of the motions without questioning its standing.

Second, there can be no dispute that section 365(o) was enacted to protect the FDIC's Deposit Insurance Fund.  *See FirstCorp*, 973 F.2d at 248.  This was also ███████████████████ ██████████████████████████████████████  *See* Casebolt Dep. at 244-45.   The FDIC-Receiver is the entity best situated to enforce the Debtor's commitments for the benefit of that Fund.  The Deposit Insurance Fund is granted a priority in recovery from the Colonial Bank

receivership, as subrogee to the failed bank's protected depositors, for the estimated $3.8 billion loss it has sustained in the resolution of that failed institution.  *See* 12 U.S.C. § 1821(d)(11).  As a result, the Fund would be the principal recipient (after administrative claimants) of any recovery obtained by the FDIC-Receiver here.

Finally, the sole decision cited by the Committee, *R.T.C. v. Tetco*, 758 F. Supp. 1159 (W.D. Tex. 1990), *vacated and appeal dismissed*, 1992 WL 437650 (5th Cir. Apr. 22, 1992), is entirely inapposite.  The decision did not involve a motion under section 365(o) but instead concerned whether the RTC as conservator was granted an express or implied right of action under the Savings and Loan Holding Company Act or Change in Control Act to enforce a holding company's net worth maintenance stipulation.  The court never considered the RTC's standing under section 365(o).

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in the FDIC-Receiver's opening brief, the rulings of the bankruptcy court should be reversed and these matters should be remanded to the bankruptcy court for further proceedings.

Dated:  Montgomery, Alabama
      January 19, 2011

Of Counsel:

John J. Clarke, Jr.
Thomas R. Califano
Michael D. Hynes
Spencer Stiefel
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
212-335-4500
212-335-4501

Respectfully submitted,

  /s/ Michael A. Fritz, Sr.
Michael A. Fritz, Sr.
Fritz & Hughes LLC
7020 Fain Park Drive Suite 1
Montgomery, Alabama  36117
(334) 215-4422

Attorneys for the
Federal Deposit Insurance Corporation
as Receiver for Colonial Bank

## Exhibit A

UNITED STATES OF AMERICA

BEFORE THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

WASHINGTON, D.C.

In the Matter of

MCORP
Dallas, Texas

DOCKET NO.   88-062-B-A2-HC
88-062-C1-HC
88-062-C2-HC
88-062-C3-HC

DECISION

On October 19, 1988, the Board of Governors of the
Federal Reserve System (the "Board") issued, pursuant to
section 8(b) of the Federal Deposit Insurance Act, as amended
(the "FDI Act") (12 U.S.C. § 1818(b)) and section 5(b) of the
Bank Holding Company Act of 1956, as amended (the "BHC Act") (12
U.S.C. § 1844(b)), a Notice of Charges and of Hearing (Docket No.
88-062-B-HC) (the "Notice") against MCorp, Dallas, Texas
("MCorp"), a registered bank holding company.  The Board also
issued on October 19, 1988 two Temporary Orders to Cease and
Desist (Docket No. 88-062-C1-HC and 88-062-C2-HC), pursuant to
section 8(c) of the FDI Act (12 U.S.C. § 1818(c)) and
section 5(b) of the BHC Act.  On October 26, 1988, the Board
issued, pursuant to section 8(b) of the FDI Act and section 5(b)
of the BHC Act, an Amended Notice of Charges and of Hearing
(Docket No. 88-062-B-A1-HC) (the "Amended Notice") against MCorp,
which amended and superseded the Notice issued against MCorp on

Exhibit 1

- 2 -

October 19, 1988, and, pursuant to section 8(c) of the FDI Act
and section 5(b) of the BHC Act, a third Temporary Order to Cease
and Desist (Docket No. 88-62-C2-HC) (collectively referred to
herein with the two Temporary Orders to Cease and Desist issued
on October 19, 1988 as the "Temporary Orders").

The October 1988 actions alleged, inter alia, that
MCorp had engaged and would continue to engage, unless
restrained, in certain unsafe and unsound practices.
Specifically, it was alleged that MCorp had engaged in unsafe and
unsound practices and violations of section 225.4(a)(1) of
Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)(1))
by failing to take all necessary actions to serve as a source of
managerial and financial strength to its subsidiary banks.  In
initiating this action, the Board sought the issuance of a cease
and desist order requiring that MCorp preserve its corporate
assets for the benefit of its subsidiary banks and to use those
assets to recapitalize those subsidiary banks that did meet the
minimum capital standards imposed by their primary regulator, the
Office of the Comptroller of the Currency (the "OCC"), in
accordance with the Board's source of strength regulation and
policy statement (12 C.F.R. § 225.4(a)(1); 52 Fed. Reg. 15707-08
(1987)) and the Memorandum of Understanding between MCorp and the
Federal Reserve Bank of Dallas (the "Reserve Bank"), dated
November 4, 1986.

To prevent the dissipation of corporate assets and to ensure that all of MCorp's subsidiary banks met the OCC's minimum capital standards during the pendency of the source of strength proceeding, the Board issued the three Temporary Orders.  These orders:  (1) prohibited MCorp from paying any dividends without the prior written approval of the Reserve Bank; (2) prohibited MCorp from dissipating corporate assets without the prior written approval of the Reserve Bank; and (3) required MCorp to submit to the Board a list of all of its subsidiary banks that did not meet the OCC's minimum capital standards and a written plan outlining the steps that MCorp proposed to take to recapitalize those banks and to take all necessary actions to provide required capital support to its subsidiary banks.

In order to permit MCorp to seek financial assistance from the Federal Deposit Insurance Corporation in November 1988, MCorp's compliance with the third Temporary Order and the cease and desist proceedings on the two October 1988 notices were deferred until further notice from the Board.  On March 21, 1989, several creditors of MCorp instituted involuntary bankruptcy proceedings against the company, with such proceedings subsequently converted to voluntary proceedings under Chapter 11 of the Federal Bankruptcy Code.  On March 28 and 29, 1989, the OCC declared 20 of the 25 banks then owned by MCorp to be insolvent, thereby resulting in MCorp's ownership of the five remaining subsidiary banks.

- 4 -

On May 24, 1989, the Board issued, pursuant to section 8(b) of the FDI Act and section 5(b) of the BHC Act a Second Amended Notice of Charges and of Hearing (Docket No. 88-062-B-A2-HC) (the "Second Amended Notice"), which amended and superseded the Notice and the Amended Notice issued against MCorp in October 1988.  The Second Amended Notice alleged that MCorp engaged in unsafe and unsound practices and violated the Board's Regulation Y when it failed to take all necessary actions to serve as a source of managerial and financial strength to its five remaining subsidiary banks and sought the issuance of a cease and desist order that would require MCorp to make additional investments in three of its remaining subsidiary banks that were then undercapitalized.[1]

In June 1989, the federal district court in Houston, sitting in bankruptcy, issued a preliminary injunction that prohibited the Board from, among other things, prosecuting the source of strength charges and from enforcing the Temporary Orders.  The preliminary injunction against the source of strength proceedings and the Temporary Orders was upheld by the Fifth Circuit Court of Appeals.  In a decision issued in December

---

[1] On March 30, 1989, the Board issued another Notice of Charges and of Hearing (Docket No. 88-062-B2-HC) against MCorp and one of its nonbank subsidiaries, MCorp Management, Inc., Dallas, Texas (the "Section 23A Action") alleging that the holding company and its nonbank subsidiary caused two of the MCorp subsidiary banks to violate section 23A of the Federal Reserve Act (12 U.S.C. § 371c).  This Decision and the resulting order do not effect this proceeding in any manner.

- 5 -

1991, the Supreme Court ruled that the courts lacked jurisdiction
to enjoin the Board's source of strength proceedings.   <u>Board of</u>
<u>Governors of the Federal Reserve System v. MCorp Financial, Inc.</u>,
112 S.Ct. 459 (1991).

As noted above, 20 of MCorp's 25 subsidiary banks were
declared insolvent and closed by the OCC on March 28 and 29,
1989.  Between March 29, 1989 and the date of this Decision,
MCorp sold four of its five remaining subsidiary banks as part of
its efforts to reorganize under the bankruptcy laws.  During this
time, MCorp downstreamed at least $17 million to its subsidiary
banks.  Moreover, as a result of a capital injection by MCorp,
the capital of the one remaining MCorp bank, the Plaza Bank,
N.A., New Braunfels, Texas (the "Plaza Bank"), which the company
plans to sell or otherwise divest ownership of in the near
future, currently meets all applicable minimum capital
requirements imposed by the OCC.

As a result of the bankruptcy proceedings and MCorp's
downstreaming of capital, as called for the Board of Governors'
source of strength policy, to its subsidiary banks since
March 29, 1989, the Board has determined that, for the present,
the purposes of all of the source of strength notices and the
Temporary Orders have been achieved.  Consequently, the actions
at present are not necessary to effectuate their required
remedial goals.  Moreover, the proposed sale of the Plaza Bank

- 6 -

brings into question the need to continue to prosecute the cease and desist action initiated by the Second Amended Notice.

Nothing in this decision or resulting order, however, effects or limits, in any manner, the ability of the Board of Governors to reinstitute source of strength proceedings against MCorp should the capital levels of the Plaza Bank fall below acceptable regulatory minimums or the company fail to sell the bank within a reasonable period of time. Moreover, this decision and resulting order do not effect or limit, in any manner, the ability of the Board of Governors to initiate or continue to prosecute any other action against MCorp, including the Section 23A Action brought against MCorp by the Board on March 30, 1989.

## CONCLUSION

For the reasons stated above, the Board issues the attached Order Terminating Temporary Orders and Conditionally Dismissing Notices of Charges and of Hearing.

UNITED STATES OF AMERICA

BEFORE THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | |
| MCORP | DOCKET NO.   88-062-B-A2-HC |
| Dallas, Texas | 88-062-C1-HC |
| | 88-062-C2-HC |
| | 88-062-C3-HC |

ORDER TERMINATING TEMPORARY ORDERS TO CEASE AND DESIST AND
CONDITIONALLY DISMISSING NOTICES OF CHARGES AND OF HEARING

**WHEREAS**, for the reasons set forth in the accompanying
Decision, the Board of Governors of the Federal Reserve System
(the "Board of Governors") is of the opinion that an order
terminating temporary orders to cease and desist and
conditionally dismissing notices of charges and of hearing should
be entered in this matter.

**NOW, THEREFORE, IT IS HEREBY ORDERED**, pursuant to
sections 8(b) and 8(c) of the Federal Deposit Insurance Act, as
amended (12 U.S.C. §§ 1818(b) and (c)) and section 5(b) of the
Bank Holding Company Act of 1956, as amended (12 U.S.C.
§ 1844(b)), that:

1.    The Temporary Orders to Cease and Desist issued in
this matter against MCorp, Dallas, Texas ("MCorp"), a registered

*Exhibit 2*

- 2 -

bank holding company, on October 19, 1988 and October 26, 1988 are terminated.

2.    To the extent they have not already been superseded or suspended, the Notice of Charges and of Hearing issued on October 19, 1988 and the Amended Notice of Charges and of Hearing issued on October 26, 1988 by the Board of Governors against MCorp are dismissed.

3.    (a)   The Second Amended Notice of Charges and of Hearing (the "Second Amended Notice") issued in this matter against MCorp on May 24, 1989 is dismissed on the condition and for that period of time that MCorp takes all necessary actions:

(i)   To ensure that the capital of MCorp's subsidiary bank, the Plaza Bank, N.A., New Braunfels, Texas (the "Plaza Bank") meets all capital requirements imposed by the Office of the Comptroller of the Currency (the "OCC") through regulation or otherwise; and

(ii) to complete the sale of the Plaza Bank within one year of the date of this Order.

(b)   The provisions of paragraph 3(a) hereof may become void, and the Second Amended Notice or another notice of

- 3 -

charges may be reinstituted by the Board of Governors, at the earlier of:

(i) The Plaza Bank's failure, as long as it remains a subsidiary bank of MCorp, to meet or otherwise comply with any capital requirement imposed by the OCC through regulation of otherwise; or

(ii) one year from the date of this Order.

4. Notwithstanding any provision of this Order to the contrary, the Director of the Division of Banking Supervision and Regulation of the Board of Governors, with the concurrence of the General Counsel of the Board of Governors, may, in his or her sole discretion, grant a written extension of the time period imposed by paragraphs 3(a)(ii) and 3(b)(ii) hereof.

5. The provisions of this Order shall not bar, estop or otherwise prevent the Board of Governors, or any federal or state agency or department, from taking any other action affecting MCorp, any of its current or former subsidiaries or any of its current or former institution-affiliated parties, including the cease and desist proceeding instituted against

- 4 -

MCorp and one of its nonbank subsidiaries, MCorp Management,

Dallas, Texas (Docket No. 88-062-B2-HC) by the Board of Governors

on March 30, 1989.


By order of the Board of Governors of the Federal

Reserve System effective this /5ᵗᵉᵗ day of June, 1992.




By: _____

William W. Wiles
Secretary of the Board

## CERTIFICATE OF SERVICE

The undersigned hereby certifies he is one of the attorneys for defendant FDIC-Receiver and that on January 19. 2011, a true and correct copy of the foregoing document was filed with this Court's ECF system in this action, which will cause the electronic service of this document upon all persons registered in this action to receive CM/ECF notifications as of its filing to include the following:

N. Christian Glenos
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203

C. Edward Dobbs
Rufus T Dorsey, IV
Parker, Hudson, Rainer & Dobbs, LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, NE
Atlanta, GA 30303

William Clark Watson
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203

Alan R. Glickman
Brian D. Pfeiffer
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Robert B. Rubin
Marc P. Solomon
Derek F. Meek
Burr & Forman
420 North 20th Street, Suite 3400
Birmingham, AL 35203

_____/s/ Michael A. Fritz, Sr._____
Michael A. Fritz, Sr.